Tom Slutes, Esq.
**SLUTES, SAKRISON & ROGERS, P.C.**
4801 E. Broadway, Suite 301
Tucson, Arizona 85711
Telephone: (520) 624-6691
Facsimile: (520) 791-9632
TSlutes@sluteslaw.com
State Bar No. 001212
*Attorneys for Defendants Fatima Lah,*
*Dayne Heath, Tyler Tate & AB Staffing Solutions, LLC*

## UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RENALDA BENALLY, as Administrator of the Estate of GIBSON BENALLY and on her own behalf,<br><br>                Plaintiff,<br><br>v.<br><br>COCONINO COUNTY; COCONINO COUNTY JAIL DISTRICT; JAMES DRISCOLL, Sheriff of Coconino County; BRET AXLUND, Chief Deputy Sheriff of Coconino County; AB STAFFING SOLUTIONS, LLC; MEDICAL DIRECTOR LINDSEY ROBBINS; NURSE SUPERVISOR LISA HIRSCH; NURSE LEANN JAMES; NURSE SHEILA LAWVER; NURSE SHELLY CERSOSIMO; NURSE SUMNNER WOLFE; NURSE FATIMA LAH; NURSE DAYNE HEATH; NURSE JANEEN FRASER; NURSE TATE; DETENTION SERGEANT OBRIEN; NAVAJO COUNTY JAIL DISTRICT; NAVAJO COUNTY; DAVID CLOUSE, Sheriff of Navajo County; ERNIE GARCIA, Chief Deputy Sheriff of Navajo County; ADVANCED CORRECTIONAL HEALTHCARE, INC.; USA MEDICAL & PSYCHOLOGICAL STAFFING, S.C.; WEXFORD HEALTH SOURCES, INC.; NURSE DEBORAH WILLIAMS; NURSE DESIREE SHIELDS and NURSE APRIL PERKINS<br><br>                Defendants. | No. **3:24-cv-08049-PCT-MTL**<br><br><br>**DEFENDANTS AB STAFFING, DAYNE HEATH, FATIMA LAH, AND TYLER TATE'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br><br>(Assigned to Hon. Michael T. Morrisey) |

Defendants AB Staffing, Dayne Heath, Fatima Lah, and Tyler Tate, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56 hereby submit the following Statement of Facts in support of their Motion for Partial Summary Judgment being filed simultaneously herewith.

1. AB Staffing is a temporary staffing company in the business of recruiting qualified medical personnel to government healthcare clients. (*See* Ex. A; Supplemental Staffing Agreement attached.)

2. AB Staffing entered into a contract with Coconino County Jail where it would provide medical personnel including Defendants Fatima Lah, NP; Tyler Tate, LPN; and Dayne Heath, RN to work at Coconino County Jail. (*See Id.*)

3. Decedent Gibson Benally was admitted into Coconino County Jail on March 24, 2022, and underwent initial medical screening on March 25, 2022. (*See* Ex. B; Coconino County Jail Medical Records at 000100 attached.)

4. The decedent had a history of hypertension and a standing directive was documented indicating "check BP daily x 3 days; if any BP readings are elevated per our standing directives (> 140/90), generate a task to continue BP checks 2 x per week x 2 weeks and enter a task for medical provider to review BP at the end of that 2 week period." (*See Id.* at 000104.)

5. On March 26, 2022, medical received a verbal order to administer Lisinopril 30 mg which was given at 0840 hours. (*See Id.* at 000097.)

6. The medical record and investigative report indicates that Defendant Fatima Lah, NP, was not present and working at Coconino County Jail on the night of April 17, 2022 and on April 18, 2022. (*See generally,* Ex. B and Ex. C attached.)

7. On April 17, 2022 at approximately 1900 hours Defendant Dayne Heath, RN, saw the decedent in F-pod for medical complaints. (*See* Ex. C; Coconino Investigation Report at 000005 attached.)

8. On April 18, 2022 at 00:25, Defendant Heath documented "Called to 1/M bunk, reports feeling very weak and dizzy. Blood glucose 166, BP 142/106 HR 100. No sis of distress, no diaphoresis, no vomiting, or blurred vision. Encouraged 1/M to rest on L side and to notify medical staff for any status change. 1/M verbalized understanding." (*See* Ex. B at 000106.)

9. Nurse Heath stated that the decedent had not requested to be seen again until April 18, 2022 at approximately 1700 hours. (*See* Ex. C at 000005.)

2

10. On April 18, 2022, the decedent was seen on surveillance standing up and then going back to lay on his bunk at 1655 hours. (*See* Ex. C at 000012.)

11. At approximately 1657, an inmate pushed the pod emergency call button upon observing the decedent lying in his bunk. (*See Id.*)

12. At approximately 1658 hours, the inmate advised that he had an emergency with one of the inmates, referring to the decedent. (*See Id.*)

13. At approximately 1659 hours, Sergeant O'Brien was informed by the inmate that the decedent was having the same problems he had last night and that he was blacking out. (*See Id.*)

14. Based on this information, Sergeant O'Brien notified nursing staff and exited the housing dorm. (*See Id.*)

*15.* At approximately 1703 hours, Co-Defendant Janeen Fraser, RN, arrived at the housing dorm with detention officers and proceeded to examine the decedent. (*See Id.*)

16. Co-Defendant Fraser documented that at this time, the decedent reported that he started feeling poorly on Thursday (April 14) and stated that he felt dizzy. (*See* Ex. B at 000105.)

17. Co-Defendant Fraser documented the following: "BP was 119/77, P 116, 02 sats 98%. 1/M was instructed to sit up on the edge of the bed. BP 115/77, P 100. He was then instructed to stand with a BP of 114/70, P 121 […] He was reassured that his vitals signs were normal. (*See Id.*)

18. At approximately 1709 hours, the decedent was escorted to the dorm table area and was provided a dinner tray. (*See* Ex. C at 000012.)

19. At approximately 1710 hours, Co-Defendant Fraser and the detention officers left the dorm. (*See Id.*)

20. At approximately 1711 hours, an inmate ran to the door, pushed the emergency button and less than 30 seconds later, Sergeant O'Brien ran into the dorm to examine the decedent. (*See Id.*)

21. Sergeant O'Brien then reported to Co-Defendant Fraser that the decedent was feeling dizzy. (*See Id.*)

22. At approximately 1713 hours, Sergeant O'Brien and Co-Defendant Fraser re-entered the dorm and an inmate then advised that the decedent could not stand up. (*See Id.*)

3

23. Co-Defendant Fraser then re-evaluated the decedent at the dorm table he was sitting at where he was found to be hyperventilating. (*See* Ex. B at 000105.)

24. Co-Defendant Fraser found that the decedent's BP was 148/65, P 62, 02 sats 92%. (*See Id.*)

25. The decedent was repeatedly encouraged to slow down his breathing. (*See Id.*)

26. Once the decedent was more calm, Co-Defendant Fraser found that his BP was 107/79, P 51. (*See Id.*)

27. At approximately 1720 hours, the detention officers assisted the decedent back to his bunk. (*See* Ex. C at 000012.)

28. At approximately 1721 hours, the detention officers and Co-Defendant Fraser exited the dorm. (*See Id.*)

29. At approximately 1725 hours, the decedent could be heard breathing loudly at his bunk. (*See Id.*)

30. At approximately 1732 hours, an inmate pushed the emergency button and advised that the decedent was saying that his chest pains are getting worse. (*See Id.*)

31. Sergeant O'Brien informed the medical department that the decedent was having chest pains. (*See* Ex. B at 000105.)

32. At approximately 1736 hours, Defendant Dayne Heath, RN, who was not yet on shift, entered the dorm with a wheelchair and removed the decedent from the dorm for closer observation. (*See* Ex. C at 000012); (Ex. D; Heath Testimony at 9:25-10:2 attached.)

33. On the way to medical cell number E190, Defendant Heath testified that the decedent was having some shortness of breath, but was able to talk, and she did not notice the decedent being diaphoretic. (*See* Ex. D at 14:14-15:16.)

34. At approximately 1739 hours, Defendant Heath and the decedent arrived at the medical cell number E190. (*See* Ex. C at 000011.)

35. Once at the pod, Defendant Heath testified that the decedent was able to stand but observed him to be having some pain and shortness of breath. (*See* Ex. D at 14:14-15:16.)

36. Defendant Heath believed that because the decedent's vital signs were normal that he was having an anxiety attack. (*See Id.* at 22:3-8.)

4

37. Surveillance footage indicated that at this time the decedent could be heard with labored breathing and was making incoherent noises. (*See* Ex. C at 000011.)

38. At approximately 1741 hours, Sergeant O'Brien and Defendant Heath left the medical cell. (*See Id.*)

39. Defendant Heath testified that she returned back to the medical office and let Co-Defendant Fraser know that the decedent was in the medical cell. (*See* Ex. D at 16:7-12.)

40. At approximately 1806 hours, a detention officer arrived in the medical unit to conduct a security check and visually observed the decedent. (*See* Ex. C at 000011.)

41. At approximately 1808 hours, the detention officer exited the cell and notified the nursing staff of a "Code 3." (*See Id.* at 000011-12.)

42. At approximately 1808 hours, Defendants Tate and Heath, as well as Co-Defendant Fraser arrived at the cell with lifesaving medical equipment. (*See Id.* at 000012.)

43. At approximately 1809 hours, the nurses advised officers to call 911. (*See Id.*)

44. Detention officers and the nursing staff performed lifesaving measures until EMTs from the Flagstaff Fire Department arrived at approximately 1821 hours and subsequently took over care of the decedent. (*See Id.*)

45. At approximately 1846 hours, an EMT indicated to stop lifesaving measures. (*See Id.*)

46. The time of death was called at 1839 hours. (*See Id.*)

47. Plaintiff Renalda Benally was notified via telephone at 2116 hours of the decedent's death. (*See* Ex. C at 000009.)

48. Plaintiff filed a first amended complaint pleading the following claims against Defendants: medical negligence, wrongful death, survival, intentional infliction of emotional distress, and a section 1983 claim. (*See* Doc. 65.)

49. Plaintiff's standard of care expert Bruce Charash, MD is an internist with a cardiology specialty. (*See* Ex. E; Charash CV attached.)

50. Dr. Charash has disclosed an expert declaration and rebuttal report where he is not critical of the care and treatment of Defendants Lah, Tate, or AB Staffing but only addresses Defendant Heath's care and treatment of decedent on April 17, 2022 and

April 18, 2022. (*See* Ex. F; Charash Report attached); (Ex. G; Charash Rebuttal attached); (*See* Ex. H; Charash Testimony at 53:12-13; 56:25-57:5 attached.)

51. Dr. Charash testified that he has never worked as a nurse in a correctional setting nor he has taught nurses at an accredited institution. (*See* Ex. H at 13:12-13; 64:15-65:21.)

52. Dr. Charash is critical of Defendant Heath's care and treatment of decedent on April 17, 2022 in that Defendant Heath should have rechecked his blood pressure again but he fails to connect this criticism to the decedent's death. (*See Id.* at 58:1-19.)

53. A.R.S. § 12-2604 requires parties to retain a standard of care expert in the same specialty as the Defendant practitioner. *See Rasor v. Northwest Hosp., LLC*, 239 Ariz. 546, 567, ¶ 11, 373 P.3d 563 (App. 2016).

54. Plaintiff has not retained a Nurse Expert Witness who is critical of Defendant Lah, Tate, and Heath. (*See generally*, Ex. F and G.)

55. Plaintiff has not retained an expert witness who is critical of Defendant AB Staffing. (*See Id.*)

56. Defendants have retained Michael Munn, NP, as a standard of care expert who is supportive of the defendant's care and treatment. (*See* Ex. I; Munn Report attached.)

Dated this 8th day of December, 2025

SLUTES, SAKRISON & ROGERS, P.C.

By:  /s/ Tom Slutes
     Tom Slutes
     Attorneys for Defendants Lah,
     Heath, Tate & AB Staffing Solutions,
     LLC

# CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2025, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF system for filing and the attached document was served by first class mail to the Plaintiff on the same date to the following person who is not a registered participant of the CM/ECF system:

Arthur Loevy admitted pro hac vice
Maria Makar admitted pro hac vice
Mikayla Sue Young admitted pro hac vice
Loevy & Loevy
311 N. Aberdeen Stret
Chicago, IL 60607
arthur@loevy.com
makar@loevy.com
young@loevy.com
        *Attorneys for Plaintiffs*

Lee Phillips
Law Offices of Lee Phillips, P.C.
209 N. Elden Street
Flagstaff, AZ 86001
leephillips@leephillipslaw.com
        *Attorneys for Plaintiff*

David L. Stoll
N. Patrick Hall
BEAUGUREAU, HANCOCK, STOLL & SCHWARTZ, P.C.
302 East Coronado Road
Phoenix, AZ 85004
dtoll@bhsslaw.com
phall@bhsslaw.com
        *Attorneys for Defendants Leann Janes and Janeen Fraser*

EXHIBIT A



**Coconino County**
# SHERIFF'S OFFICE
*Jim Driscoll, Sheriff*

April 28, 2022

AB Staffing Solutions, LLC
Attn: Evan Burks
3451 S Mercy Rd
Gilbert, AZ 85297

Re:    Supplemental Staffing Agreement

Dear Mr. Burks,

Enclosed, please find three original agreements.  Please sign and mail two executed originals to me at:

Coconino County Sheriff's Office
Attn: Kathleen Levinson
911 E Sawmill Road
Flagstaff, AZ 86001

We look forward to our partnership.  If you have any questions, I may be reached at 928-226-5074.

Sincerely,

*Kathleen Levinson*

Kathleen Levinson
Administrative Manager

Enc



*"SERVICE TO COMMUNITY"*

## SUPPLEMENTAL STAFFING AGREEMENT

**THIS SUPPLEMENTAL STAFFING AGREEMENT** (the "**Agreement**") is entered into this 1st day of July, 2022, between Coconino County Jail District, with its physical location at 911 E Sawmill Rd., Flagstaff, AZ 86001 ("**Client**") and AB Staffing Solutions, LLC an Arizona limited liability company, with its principal office located at 3451 S. Mercy Road, Suite 102, Gilbert, Arizona 85297 ("**ABSS**") (each a "**Party**" and collectively the "**Parties**").

## RECITALS

A.      Client operates a county jail.

B.      ABSS is a temporary staffing company in the business of recruiting qualified personnel and providing supplemental clinical and non-clinical healthcare staffing services to commercial and governmental healthcare clients.

C.      Client desires ABSS to provide, when requested and on a non-exclusive basis, competent and qualified supplemental staffing.

**THEREFORE**, the Parties agree as follows:

## AGREEMENT

**1      Requests for Staff; Qualifications**.  Upon request by Client, ABSS will use its best efforts to recruit, interview, screen and assign competent and qualified temporary supplemental personnel, whether employees or independent contractors of ABSS (individually and collectively "**Staff**") to Client to meet Client's supplemental staffing needs.  All Staff supplied by ABSS shall be appropriately screened by ABSS in accordance with policies and procedures consistent with the then current published standards of The Joint Commission.  Such screening will include, without limitation, obtaining pertinent information concerning the past employment, licensure, certification, education and professional skills of Staff.  ABSS shall make available all screening information of Staff to Client upon request.  Each Staff is subject to approval by Client.  The average time required for Staff to report to a facility is 7 days from hire and completion of the appropriate background and credentialing activities.

**2      Training; Policies and Procedures; Discipline of Staff.**

   **2.1**      At the outset of any assignment, Client shall orient each Staff to its facility and rules and regulations and shall provide Staff with information about the facility's policies and procedures, including dress code, physical layout, emergency procedures and equipment.  Client shall also confirm Staff's competency and ability in the proper use of any equipment to be used by such Staff in connection with the assignment.

   **2.2**      Staff shall perform the Services described herein for the benefit of the Client and under the direction of a Client Clinical Manager or other written designee.  Staff initially requested for a particular area may be reassigned to other areas by Client after arriving at Client's facility or at any time while working for Client, subject to Staff's demonstrated competency, appropriate certifications, credentials and professional qualifications.  Staff should be reassigned only to areas of comparable clinical diagnoses and acuities.

   **2.3**      Client agrees to notify ABSS in writing within 24 hours of any event, competency issue, unexpected incident, including errors, unanticipated deaths and other events related to the care and services provided by any Staff. Client agrees to notify ABSS in writing whenever an incident/injury report related to Staff is completed.   ABSS will document and track all incidents, injuries and unexpected events.  Staff assigned by ABSS to Client under this Agreement are employees of ABSS or, in some cases, independent contractors, and are not employees, contractors or agents of Client.

   **2.4**      If Client concludes that any Staff assigned to Client by ABSS is not performing such Staff's duties in a satisfactory manner or that such Staff is otherwise failing to satisfy the criteria for qualified Staff, such Staff shall not be permitted to continue working for Client.  Under such circumstances, Client may immediately terminate Staff's assignment and ask such Staff to immediately leave Client's property.  Client shall immediately inform ABSS in

writing of any such action. ABSS will be paid for the actual hours worked by such Staff prior to dismissal. Client shall cooperate in an evaluation of Staff relative to such Staff's ability to perform specific job functions and responsibilities upon completion of any assignment.

**3    Fees; Invoicing; Payment Terms.**

**3.1**    All-inclusive hourly rates, representing the entire rate to be charged to Client for Staff provided by ABSS, are set forth on the attached **Schedule A – Rate Schedule**. Notwithstanding the foregoing, any sales tax, gross receipt tax, business and organization tax, excise tax, or other similar tax imposed by any governmental jurisdiction will be charged to the Client in addition to the hourly rate set forth on Schedule A. The Rate Schedule is not subject to adjustment unless agreed upon by both Parties in writing. Pricing is subject to renegotiation when either Party initiates negotiations; however, during such negotiations, the most recent Rate Schedule shall remain in effect until a new structure is agreed upon in writing.

**3.2**    ABSS will invoice Client on a weekly basis for the Services provided under this Agreement. Invoices shall be remitted to Client by email to arodriguez@coconino.az.gov which mode of transmission and/or address may be changed by Client upon written notice pursuant to Section 9.

**3.3**    Invoices will be supported by the pertinent time sheets documenting time worked by the assigned Staff. Client's signature or other agreed method of approval of the time sheets submitted for assigned Staff certifies that the documented hours are correct and authorizes ABSS to bill Client for those hours.

**3.4**    All invoices shall be serially numbered and shall contain the following information: (i) Staff's name, (ii) Date worked, (iii) Total hours worked, (iv) Hourly rate, (v) Total charge, (vi) Overtime identified, (vii) Additional charges identified, and (viii) any applicable sales tax, gross receipt tax, business and organization tax, excise tax, or other similar tax imposed by any governmental jurisdiction on the services provided under this Agreement.

**3.5**    Payment is due upon receipt of the invoice. All payments shall be in U.S. Dollars. Invoices that are not paid within thirty (30) days of the date of such invoice will be considered Past Due and will be subject to interest from the date of such invoice at a rate equal to the lesser of 10% per annum or the maximum amount allowed by law. Client agrees that it is responsible to ABSS for all costs of collection, including, but not limited to, attorney's fees and taxable and non-taxable costs and expenses. Client also agrees that ABSS may discontinue an assignment at any time, in its sole discretion, should Client not timely remit payment based on the terms of payment set forth in this Agreement.

**3.6**    Client agrees that in the event any Staff assigned by ABSS to Client becomes employed, in the broadest sense, directly or indirectly, by Client or any affiliate or related party of Client, or provides services of any kind through any third party at the facility such Staff was assigned to by ABSS, other than pursuant to the terms of this Agreement, (collectively "**Direct Client Employment**"), then Client will pay ABSS a conversion fee ("**Conversion Fee**") based on the Conversion Fee tables set forth on the attached **Schedule A – Rate Schedule**. Should Staff that Client must pay a Conversion Fee to ABSS pursuant to this Section 3.6 leave voluntarily or be terminated for just cause within the first 90 days of Direct Client Employment, the Conversion Fee(s) shall be refunded on a pro-rata basis. Otherwise, there will be no adjustment in any Conversion Fee.

**4    ABSS Insurance.**   ABSS shall purchase and maintain during the duration of this Agreement the following insurance coverages:

**4.1**    Workers' compensation and employer's liability insurance covering ABSS's legal and statutory obligations for damages due to bodily injury either by accident or disease, occurring to any ABSS employee in connection with their employment. The insurer shall waive all rights of subrogation against Client, its officers, agents, employees and volunteers for losses arising from work performed by ABSS for the Client.

**4.2**    Unemployment insurance as required by law for all employees.

**4.3**    Commercial general liability insurance, occurrence based, covering ABSS Staff, employees, contractors and agents for bodily injury, personal injury or property damage claims arising out of or relating to the activities of

ABSS. Minimum limits of liability for the above coverage shall be $1,000,000 per occurrence and $3,000,000 annual aggregate. General Liability coverage shall include the following:

- General Aggregate                                      $2,000,000
- Products/Completed Operations Aggregate                $2,000,000
- Personal and Advertising Injury                        $1,000,000
- Fire Legal Liability                                   $    50,000
- Each Occurrence                                        $1,000,000

**4.4**    Professional liability insurance covering ABSS Staff, employees, contractors and agents and endorsed as Coconino County additional insured for medical professional liability. Minimum limits of liability shall be $1,000,000 per incident and $3,000,000 annual aggregate. Includes a retroactive liability date which precedes the date of this Agreement. In the event that professional liability insurance is terminated for any reason, during the term of this Agreement or within two (2) years following contract termination, ABSS shall obtain, at its cost, Extended Claim Reporting insurance of not less than two years following the termination of the policy.

**4.5**    Automobile liability insurance in an amount not less than $1,000,000 combined single limit per occurrence for all ABSS owned, hired or non-owned vehicles. Such coverage shall include loading and unloading hazards.

**4.6**    ABSS will name the Client, its agents, officials and employees, and volunteers as additional insureds for general liability including premises/operations, personal and advertising injury, products/completed operations, and as additional insured for automobile liability, and will specify that the insurance afforded by ABSS is primary insurance and that any insurance coverage carried or self-insurance by the Client, any department or any employee will be excess coverage and not contributory insurance to that provided by ABSS. Said policies must contain a severability of interest provision.

**4.7**    If a policy expires during the life of this Agreement, a renewal certificate must be sent to Client fifteen (15) days prior to the expiration date. Upon execution of this Agreement, ABSS will furnish Client with copies of Certificates of Insurance prepared in conformity with the above requirements. Failure to maintain required insurance will constitute a material breach of this Agreement upon which the Client may immediately terminate the Agreement.

**5**    **Cooperation**.    The Parties agree to cooperate fully and to provide assistance to the other Party in the investigation and resolution of any complaints, claims, actions or proceedings that may be brought by or that may involve any ABSS Staff.

**6**    **Representations**.

**6.1**    ABSS represent that it does not unlawfully discriminate against its Staff, employees, contractors, or agents and that it fully complies with all applicable local, state and federal anti-discrimination and employment related regulations and laws.

**6.2**    ABSS represents and warrants that ABSS has not been excluded from any Federal healthcare program. ABSS verifies that is has not been nor is it presently excluded or subject to sanctions by any regulatory or governmental agencies. ABSS also represents and warrants that all Staff (a) are not Excluded Individuals or Entities, and (b) have been screened for exclusion status under the OIG List and the GSA List.

**7**    **Termination.**

**7.1**    This Agreement shall end on June 30, 2022. Client shall, at its sole option, have the right to extend the contract for an additional four (4) option years, which shall be exercised by the Client no later than thirty (30) days prior to the end of the then current year. In the event Client fails to notify ABSS of its intent to terminate the Agreement or exercise the option year, then the Agreement will automatically be extended for an additional one (1) year period. However, Client agrees to pay ABSS for all services rendered regardless of the termination date of this Agreement and the terms and conditions of this Agreement shall continue to govern the provision of those services until all Staff assignments have been completed.

**7.2** Notwithstanding the above, this Agreement may be terminated by either Party, for any reason, upon providing written notice to the other Party as set forth in Section 9, with such termination to be deemed effective the earlier of (a) thirty (30) days following such written notice or (b) the end of the last assignment of Staff placed with Client by ABSS. In the event Client terminates this Agreement upon less than thirty (30) days prior written notice to ABSS, Client shall pay to ABSS, as agreed upon liquidated damages, an amount equal to $20/hour for nursing and allied health positions, and $40/hour for physician positions, for each hour that such Staff would have otherwise worked under the assignment with Client through the thirty (30) day required notice period, together with any out of pocket expenses incurred, but not yet recovered, by ABSS in the placement of such Staff with Client.

**8     Survival of Certain Obligations.** Termination of this Agreement shall not affect any obligation of either Party which has occurred prior to such termination. Provisions of this Agreement, which by their terms extend beyond the termination or non-renewal of this Agreement will remain effective after termination or non-renewal of this Agreement.

**9     Notices.** All notices required or permitted to be given under this Agreement must be (a) in writing and (b) sent to the Parties at their addresses set forth below, and will be effective (i) on delivery, if delivered personally (including by messenger, telephone facsimile or overnight courier), or (ii) three (3) calendar days after mailing, by registered or certified mail, return receipt requested, postage prepaid, if given by mail:

| | |
|---|---|
| If to ABSS: | AB Staffing Solutions, LLC<br>Attn: Evan Burks, President<br>3451 S. Mercy Rd, Suite 102<br>Gilbert, AZ 85297 |
| With copies to: | Adam Boxberger<br>aboxberger@abstaffing.com<br>(888) 515-3900  Ext 215 |
| If to Client: | Coconino County Jail District<br>Attn: Matthew Figueroa<br>911 E. Sawmill Rd.<br>Flagstaff, AZ 86001<br>mfigueroa@coconino.az.gov<br>928-226-5075 |

Any Party may change its address by notice given under this Section 9.

**10     Indemnification.** It is understood and agreed that ABSS shall not become a Business Associate of Client for purposes of HIPAA compliance in recognition of the fact that ABSS has no control over or direct access to any Protected Health Information. ABSS is performing the Services hereunder per the terms of this Agreement and is not a partner or joint venturer of the Client. Nothing contained in this Agreement is intended, nor shall it be construed, to create any responsibility on the part of ABSS for any liability for claims for damages, losses, costs, expenses or damages arising from or relating to: (a) any negligent or intentional acts or omissions of Client, its employees, contractors or agents, or (b) any negligent or intentional acts or omissions of Staff, employees, contractors or agents of ABSS in circumstances where the act or omission giving rise to a potential claim occurred at the explicit or implicit direction of Client or its employees, contractors, or agents. Client agrees to indemnify, defend and hold ABSS and its Staff, employees, contractors, agents and/or other representatives harmless from and against any and all claims, demands, causes of action, losses, damages, costs, and expenses, including reasonable attorney's fees, arising from or relating in any manner, directly or indirectly, to any of the foregoing circumstances. With the exception of the foregoing, ABSS agrees to indemnify, defend and hold harmless the Client, its employees, contractors, or agents for, from, and against any claims, losses, liability, costs or expenses, including reasonable attorney fees, (hereinafter collectively referred to as "Claims") arising out of this Contract, but only to the extent that such Claims which result in vicarious or derivative liability to the Client, its employees, contractors, or agents are caused by the act, omission, negligence, misconduct, or other fault of the ABBS, its officers, officials, agents, employees or volunteers that was not at the explicit or implicit direction of Client or its employees, other contractors, or agents.

**11     Miscellaneous.**

**11.1    Binding Effect.** Except as otherwise agreed, this Agreement is personal to the Parties. No Party will have the right or power to assign any of its rights or obligations, and any attempted assignment, at the option of the non-assigning Party, will be void. Subject to the foregoing, this Agreement and all of its terms will be binding upon and inure to the benefit of the Parties, their respective heirs, personal representatives, successors and assigns.

**11.2    Entire Agreement.** This Agreement sets forth the entire agreement between the Parties as to its subject matter, and is subject to no promise, warranty or representation not expressly set forth.

**11.3    No Third-Party Beneficiaries.** Except as specifically set forth in this Agreement, no person or entity other than the Parties is an intended beneficiary of this Agreement.

**11.4    No Oral Modifications.** This Agreement may not be modified except by a writing signed by both Parties.

**11.5    Governing Law; Venue; Waiver of Jury.** This Agreement shall be construed, interpreted, governed and enforced in accordance with the laws of the State of Arizona. Any suit to enforce this Agreement or to assert any right or remedy under this Agreement shall be brought only in the Superior Court of the State of Arizona, for Maricopa County, which shall be the exclusive venue for, and which Courts shall have exclusive jurisdiction with respect to, any such suit. The Parties hereto intentionally and knowingly waive their right to have any dispute or cause of action arising from or in any manner relating to this Agreement tried before a jury.

**11.6    Attorneys' Fees.** If any Party commences an action or other proceeding against the other Party arising out of or in any manner relating to this Agreement, the substantially prevailing Party shall be entitled to recover from the non-substantially prevailing Party all of its reasonable attorneys' fees and taxable and non-taxable costs and expenses incurred with respect to such action or proceeding, including, without limitation, any such fees and costs incurred on appeal. In the event a judgment is entered in such action or proceeding, the judgment creditor shall be entitled to recover from the judgment debtor all of its reasonable attorneys' fees and taxable and non-taxable costs and expenses incurred in the enforcement and/or collection of the judgment upon application to the Court, which Court shall expressly reserve jurisdiction in the judgment to award such fees, costs and expenses and amend, modify and supplement the judgment accordingly.

**11.7    Captions.** Captions and paragraph headings used in this Agreement are for convenience only, are not a part of this Agreement, and do not limit or alter any of its provisions.

**11.8    Execution; Counterparts.** This Agreement will not be binding on any Party until it is executed by all Parties. This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party may execute this Agreement by signing any such counterpart. The signature of a Party on a faxed or electronically transmitted document shall be considered, for all purposes, an original signature.

Client: **Coconino County Jail District**

By: _____

Patrice Horstman, Chairwoman

Date: **4/26/22**


ATTEST:

_____

Clerk of the Board

**AB Staffing Solutions, LLC,** an Arizona limited liability company

By: _____

Evan Burks, President

Date: **5/2/22**


Approved as to form:

_____

Deputy County Attorney

# Schedule A – Rate Schedule

### Effective as of May 2021

| Specialty | Hourly Rate |
|---|---|
| NP/PA | $120.00 |
| RN | $90.00 |
| LPN | $65.00 |

\*Overtime shall be charged at a rate of one and one-half times (1.5x) the base hourly rate for all hours worked in excess of 40 per week or in accordance with state law.

\*Holiday shall be charged at a rate of one and one-half times (1.5x) the base hourly rate for all hours worked on approved holidays.

**The following Conversion Fees apply to Direct Client Employment, as defined in Section 3.6 of the Agreement:**

#### Nursing and Allied Health

| Conversion Rate - % of First Year Earnings pursuant to Direct Client Employment | Straight Time Hours Worked and Billed to Client by ABSS Prior to Direct Client Employment |
|---|---|
| 25% | Introduction – 520 hours |
| 15% | 521 hours – 1040 hours |
| 7.5% | 1041 hours + |

#### Physician and Advanced Practice

| Conversion Rate - % of First Year Earnings pursuant to Direct Client Employment | Straight Time Hours Worked and Billed to Client by ABSS Prior to Direct Client Employment |
|---|---|
| 30% | Introduction – 520 hours |
| 20% | 521 hours – 1040 hours |
| 15% | 1041 hours + |

EXHIBIT B

4/18/22, 7:33 PM                          CorEMR - BENALLY, GIBSON :: Summary | v5.5.0

## GIBSON BENALLY

### #J202201153

AHCCCS consent forms signed 2022/2023, Medical Exception-Lower Bunk, Medical Exception-Lower tier

Sex: Male
DOB: ███████ ██ ████
Height: 5ft 7in
Weight: 155 lbs
BMI: 24.3
SSN: 528193430
Agency: CCDF
Location: MED E190 1
JMS ID: 9331
Allergies:
NKMA

Summary

### Highlighted Chart Notes

Covid-19 test result from 04/01/22 was NEGATIVE. 04/02/2022

### Current Problems

|   | Problem      | Onset Date | Open Date  |
|---|--------------|------------|------------|
| 1 | Hypertension | N/A        | 08/02/2017 |

### Current Medications

| Medication | End Date |
|------------|----------|
| lisinopril30mg<br>1 tab By Mouth QD | 05/24/2022 MAR |
| Gabapentin100 mg.<br>Float medication in water and administer | 05/15/2022 MAR |
| lisinopril30mg<br>Received VO per SW,DNP, #395; give pt one tab qd for HTN | 04/24/2022 MAR |

### Tasks

Overdue Tasks:  0 View
Today's Tasks:  0 View
Upcoming Task: 1 View

### Intake Forms

| Form | Date Saved |
|------|-----------|
| CCDF Medical Screening Form-Initial | 03/25/2022 1452 View |
| TB Form (Initial) | 04/03/2022 0903 View |
| TB Form (Yearly) | - Begin |

| Date | Patient Medical History |
|------|------------------------|
| 04/18/2022 | Note: During his walk, Srgt. Waggoner noted that the I/M was face down on his bed in M |
| 04/18/2022 | Note: Called to F-Pod by Srgt. O'Brein at 1650 since I/M c/o SOB. I/M was found lying |
| 04/18/2022 | Note: Called to I/M bunk, reports feeling very weak and dizzy. Blood glucose 166, BP |
| 04/17/2022 | Prescription: lisinopril 30mg QD NP Lah, Fatima |
| 04/16/2022 | Document Stored: General Patient Chart Inmate Request |
| 04/16/2022 | Prescription: Gabapentin 100 mg. QHS NP Lah, Fatima |
| 04/16/2022 | Task: I/M has history of taking gabapentin 100mg po Q HS for back pain. He turned in (Completed) |
| 04/04/2022 | Document Stored: General Patient Chart Housing Units Medical Clearance Form |

Viewing 1-20 of 123 History Items
1
2
3
4
5
6
7
Next >

coremr/Modules/Chart/summary.php?pid=37367                                                          1/2

BENALLY 000096

4/18/22, 7:33 PM                          CorEMR - BENALLY, GIBSON :: Summary | v5.5.0

| Date | Patient Medical History |
|------|------------------------|
| 04/04/2022 | Task: Lisinopril restarted - SW #395 Pt reports hx of htn; lisinopril 30mg Request (Completed) |
| 04/03/2022 | Task: Record PPD (Completed) |
| 04/02/2022 | Note: Covid-19 test result from 04/01/22 was NEGATIVE. |
| 04/02/2022 | Task: Covid test done 4/1/22. QED 4/3/22 (Completed) |
| 04/01/2022 | Completed Form: TB Form (Initial) by Shelley Cersosimo |
| 04/01/2022 | Task: Place PPD (Completed) |
| 03/28/2022 | Pulse: 78 BP: 135/89 |
| 03/28/2022 | Task: *check BP daily x 3 days; if any BP readings are elevated per our standing direc (Completed) |
| 03/27/2022 | Pulse: 72 BP: 129/93 |
| 03/27/2022 | Task: *check BP daily x 3 days; If any BP readings are elevated per our standing direc (Completed) |
| 03/26/2022 | Note: late entry: first dose of lisinopril given at 0840. |
| 03/26/2022 | Note: Received VO per SW,DNP, #395; order lisinopril 30mg 1 tab PO QD |

Viewing 1-20 of 123 History Items
1
2
3
4
5
6
7
Next >

**BENALLY 000097**

Meds
BP/BS
Tasks
PPD
Records

Name: _Benally Gibson_          DOB: _11/21/65_

## __Consent to Treat__

I, the undersigned, herby authorize the responsible jail physicians, nurses, nurse practitioners, counselors and psychiatrists to administer medical examinations and/or treatments necessary for my health. This may include sending medical records to other agencies or individuals. I hereby certify that I have read and fully understand the above authorization for medical care. I understand that I may elect to refuse medical care if so desired. I also understand that all medical records are confidential to my personal needs and are in no way part of my confinement record. I understand that if I am granted a medical exception, including an exception for medical property or equipment, I will be issued a green band. I acknowledge that if I tamper with the band in any way, it will result in a replacement fee or possible removal of the medical exception.

X _____
Signature

_____          _7/25/22_
Witness                                    Date

This Consent to Treat is to remain in the Inmate File as a permanent scanned record for this period of incarceration in the Coconino County Detention Facility.

**BENALLY 000098**

# Consent for an Assistor

## Option to Refuse Consent:

When you do not give consent for an Assistor Organization to help you or you cancel consent, it will not affect eligibility for assistance.

You may apply, renew or report changes for Medical Assistance, Nutrition Assistance and Cash Assistance, without the help of an Assistor Organization.

- You may create your own HEAplus account at https://www.healthearizonaplus.gov to create applications yourself.
- You may complete a paper application and submit it to any DES/FAA office.

## Please select one of the following options:

☑ I, (Print name) _Benally Anderson_____, **GIVE** consent for the State of Arizona to show my household's personal information to the assistor organization named on Page 1, so they can help me with my application for assistance.

☐ I, (Print name) _____, **DO NOT GIVE** the State of Arizona consent to show my household's personal information to the assistor organization named on Page 1. I prefer to apply without help from an Assistor.

Customer's Signature: _____

Date Signed: _____

Revised 09/29/16

2 of 2

**BENALLY 000099**

# ⌂CCDF Medical
# Screening Form-Initial

## GIBSON BENALLY
## #J202201153

| | |
|---|---|
| JMS ID: | 9331 |
| SSN: | 526193430 |
| DOB: | ▮▮▮▮▮ |
| Age: | 53 |
| Agency: | CCDF |

| | |
|---|---|
| Location: | MED E190 1 |
| Ethnicity: | NON-HISPANIC |
| Interviewer: | RN James, Leann (03/25/2022 1452) |

| # | Question | Answer | |
|---|---|---|---|
| 1. | Have you been in custody at this jail before? If yes, are there any other names you have used? | ◉ Yes | |
| 2. | Are you a VETERAN of the United States Military? A yes response will automatically alert the Inmate Relations Officer (IRO) of veteran status... | ☑ No | |
| 3. | Do you have private health insurance? (If yes, please indicate name of insurance if known) | ◉ No | |
| 4. | Do you have any medical problems that we should know about? If YES, DESCRIBE BRIEFLY...(supplement with a detailed nursing noet if indicated) | ◉ Yes | htn lisinopril 30mg unk acid reflux med reports hx of back pain with surgery last year at FMC, reports hardware placement. occasional sharp pain or numbness. Reports taking gabapentin qd; pt reports he was transfer from Holbrook and is also seen at Show Low Summit. slow uneven steady gait, slow to sit and stand from chair. |
| 5. | Do you have any allergies to food or medication? Do you have any special diet needs? If yes, please specify and generate special diet. | ◉ No | NKMA |
| 6. | Do you have any current rashes, open sores, or injuries such as cuts or sprains that we should know about? If YES, DESCRIBE BRIEFLY... (supplement with a detailed nursing note if indicated) | ◉ No | |
| 7. | Are you sick today? If YES, DESCRIBE BRIEFLY...(supplement with a detailed nursing note including temperature if indicated) | ◉ No | |
| 8. | Have you received the Covid vaccination? (If YES ask which type, when it was administered and if the full course has been completed) | ◉ No | |
| 9. | Do you have any special needs/requirements such as crutches, braces, wheelchair, hearing device, etc...If YES, DESCRIBE BRIEFLY..(supplement with a detailed nursing note if indicated and add medical exception and alert as necessary) | ◉ No | |
| 10. | Do you have any dental problems? If YES and inmate wants to be seen by the dentist, please generate a dental task. | ◉ No | |
| 11. | Vitals: | Blood Pressure [166] sys [117] dia  Pulse [77] beats per min | actual weight |

BENALLY 000100

4/18/22, 7:31 PM          CorEMR - GIBSON BENALLY #J202201153 :: CCDF Medical Screening Form-Initial, Location: MED E190 1, Agency: CCDF, Inter...

| | Respirations | | breaths per min | |
|---|---|---|---|---|
| | Temperature | 98.4 | °F | |
| | Weight | 155 | lbs | |
| | Height | 5ft 7in ⌄ | | |
| | SPO2 | 24.3 | % | |

| | | | |
|---|---|---|---|
| 12. | Do you take any medications on a regular basis? If yes, document NAME/LOCATION of pharmacy. | ⦿ Yes | see above |
| 13. | Do you have a regular doctor or clinic you go to when you are sick or hurt? If YES, document name and location if known. | ⦿ Yes | Show Low Summit, FMC |
| 14. | Have you tested POSITIVE for Covid-19 in the last 3 months? If yes, please document approximate date and place. | ⦿ No | |
| 15. | Have you ever had a positive tuberculosis skin test or PPD? If YES, please document where we can find those medical records...If no, and no record of PPD placement in last 12 months, generate task for PPD placement. | ⦿ No | |
| 17. | How many days were you drinking or using drugs? | denies | |
| 18. | On average, how many drinks or what amount of recreational street drug(s) have you used each day? If heroin, opiates or benzodiazepines, list amount, dosage, frequency of use and time of last dose...Indicate if patient is using benzodiazepines and/or ETOH with opiates... | denies | |
| 19. | If the inmate is female, ask if pregnant or possibly pregnant...if the answer is "Yes" and currently using opiates, do a urine HcG immediately and follow standing directives for Opiate Detox (opiate withdrawl can be fatal to fetuses, see standing directives) | ⦿ N/A | |
| 20. | Does the inmate appear to have any fine hand or tongue tremors? Piloerection? Sweating? Vomiting? If yes, please follow standing directives for ETOH/opiate withdrawal. | ⦿ N/A | |
| 21. | Are you experiencing any withdrawal symptoms now? If yes, DESCRIBE BRIEFLY | ⦿ N/A | |
| 22. | Do you have any mental health issues that we should know about? | ⦿ No | |
| 23. | Do you have a psychiatrist or counselor that you use for mental health issues? If Yes, document name and location/address | ⦿ No | |
| 24. | Are you currently involved in a substance abuse treatment program and if so, do you have an active prescription for medication assisted treatment such as Methadone, Buprenorphine or Naltrexone? If "Yes", please document name of medication, when they last took the medication, who prescribes it for the patient and which pharmacy they use. | ⦿ No | |
| 25. | Do you want to hurt yourself or anyone else at this time? Do you want to take your life/kill yourself? If Yes, document a complete assessment note and initiate Suicide Watch and notify MHC. | ⦿ No | |
| 26. | Have you ever attempted suicide in the past? If so, when? | ⦿ No | |
| 27. | Does the individual appear to understand the questions being asked of him/her? If an interpreter has been used to help with this assessment, please document. | ⦿ Yes | |
| 28. | Is the individual engaging in any atypical behavior or emotional displays? If Yes, assess and refer to MHC as necessary... | ⦿ No | |
| 29. | Race | ⦿ Native American | |

BENALLY 000101

4/18/22, 7:31 PM         CorEMR - GIBSON BENALLY #J202201153 :: TB Form (Initial), Location: MED E190 1, Agency: CCDF, Interviewer: Temp RN Ce...

# 🖶TB Form (Initial)

## GIBSON BENALLY #J202201153

| | |
|---|---|
| JMS ID: | 9331 |
| SSN: | 526193430 |
| DOB: | ▬▬▬▬ |
| Age: | 53 |
| Agency: | CCDF |

| | |
|---|---|
| Location: | MED E190 1 |
| Ethnicity: | NON-HISPANIC |
| Interviewer: | Temp RN Cerscosimo, Shelley (04/03/2022 0903) |

| | | | |
|---|---|---|---|
| 1. | Have you tested positive for Tuberculosis in the past? | ○ Yes<br>◉ **No** | |
| 2. | Race | ○ Caucasian<br>○ Asian<br>○ Hispanic<br>○ Native American<br>○ African American<br>○ Pacific Islander<br>◉ **Other** | |

**PLACEMENT**

| | | | |
|---|---|---|---|
| 3. | Date and Time PPD Test was given:<br>(Entering this information will create a nurse task to read the test results in 48-72 hours). | 04-01-22 0800 | |
| 4. | Placement location | ◉ **Right forearm**<br>○ Other (please specify) | |

**READING**

| | | | |
|---|---|---|---|
| 5. | Date & Time Read (should be 48-72 hours after placement) | | 04-03-22 0800 |
| 6. | MM INDURATION<br><br>Be sure that you are measuring INDURATION only and not redness. | 0 MM | |
| 7. | Schedule a Chest X-Ray? | ○ Yes<br>◉ **No** | |
| 8. | X-ray results: | NA | |

**GUIDELINES FOR DEFINING POSITIVE RESULTS:**

| | | |
|---|---|---|
| 1) An Induration of 5 or more MM is considered positive for:<br>a) People who are HIV+; b) Close contacts of known infectious individuals; c) People whose chest x-ray results indicate previous TB disease; and d) IV drug users with unknown HIV status.<br>2) An Induration of 10 or more MM is considered positive for the remainder of the population that we screen at the jail.<br><br>**Isolate only if individual has fever, cough, night sweats, recent weight loss or other signs of active TB.** | | |
| Results | ○ +<br>◉ **-** | |

**BENALLY 000102**

# GIBSON BENALLY

## #J202201153

AHCCCS consent forms signed 2022/2023, Medical Exception-Lower Bunk, Medical Exception-Lower tier

Sex: Male
DOB: ▮▮▮▮▮▮▮
Height: 5ft 7in
Weight: 155 lbs
BMI: 24.3
SSN: 526193430
Agency: CCDF
Location: MED E190 1
JMS ID: 9331
Allergies:
NKMA

Tasks
Historic (36)

# Tasks

Viewing 1-10 of 36 Items
1
2
3
4
Next >

| | | Update Notes |
|---|---|---|
| 1<br><br>04-16-2022 | Doctor/NP<br>At staff request<br>I/M has history of taking gabapentin 100mg po Q HS for back pain. He turned in an IRF requesting to restart. See records from Show Low Summit.<br><br>[Created by: Temp RN Cersosimo, Shelley at 04-16-2022 14:08:41]<br>[Completed by: Wolfe PNP, Summer at 04-16-2022 16:06:28] | • **Completed Appointment** - Gabapentin ordered to be floated in water. [PNP Wolfe, Summer on 04-16-2022] |
| 1<br><br>04-04-2022 | Doctor/NP<br>At staff request<br>Lisinopril restarted - SW #395<br><br>Pt reports hx of htn; lisinopril 30mg<br>Requesting records to verify. Pt with elevated BP, will continue to monitor per SD.#407<br><br>3/26 per Show Low Summit records scanned, pt rx'd the following meds as of 1/4/22:<br>levofloxacin 750mg 1 tab PO qd expired 1/10/22<br>percocet 1 tab PO PRN expired 1/29/22<br>gabapentin 100mg qhs expired 1/29/22 (back pain w/ hardware in place)<br>Lisinopril 30mg 1 tab qd expires 10/12/22<br>Pt has hx of GERD, HTN back pain, hx of h. pylori, GI bleed in Jan<br><br>[Created by: RN James, Leann at 03-25-2022 15:00:01]<br>[Completed by: Wolfe PNP, Summer at 03-29-2022 14:02:36] | • **Completed Appointment** - Completed Appointment [PNP Wolfe, Summer on 03-29-2022] |
| 1<br><br>04-03-2022 | Nurse - TB<br>At staff request<br>Record PPD<br><br>[Created by: Temp RN Cersosimo, Shelley at 04-01-2022 09:10:35]<br>[Completed by: Cersosimo Temp RN, Shelley at 04-03-2022 09:02:29] | • **Completed Appointment** - Completed Appointment [Temp RN Cersosimo, Shelley on 04-03-2022] |
| 1<br><br>04-02-2022 | Covid Test Pending<br>At staff request<br>Covid test done 4/1/22. QED 4/3/22<br><br>[Created by: RN LAWVER, Sheila at 03-25-2022 07:39:02]<br>[Completed by: Fraser, Janeen at 04-02-2022 15:37:32] | • **Completed Appointment** - Completed Appointment [Fraser, Janeen on 04-02-2022] |
| 1<br><br>04-01-2022 | Nurse - TB<br>At staff request<br>Place PPD<br><br>[Created by: RN LAWVER, Sheila at 03-25-2022 07:38:30]<br>[Completed by: Cersosimo Temp RN, Shelley at 04-01-2022 09:10:00] | • **Completed Appointment** - Completed Appointment [Temp RN Cersosimo, Shelley on 04-01-2022] |
| 1<br><br>03-28-2022 | Nurse - Vital Signs<br>At staff request<br>*check BP daily x 3 days; if any BP readings are elevated per our standing directives (>140/90), generate a task to continue BP checks 2 x per week x 2 weeks and enter a task for medical provider to review BP at the end of that 2 week period<br><br>[Created by: RN James, Leann at 03-25-2022 14:52:33]<br>[Completed by: Young, Damon at 03-28-2022 09:42:25] | • **Completed Appointment** - Completed Appointment [Young, Damon on 03-28-2022] |
| 1<br><br> | Nurse - Vital Signs<br>At staff request<br>*check BP daily x 3 days; if any BP readings are elevated per our standing directives | • **Completed Appointment** - Completed |

**BENALLY 000103**

4/18/22, 7:31 PM                          CorEMR - BENALLY, GIBSON :: Tasks | v5.5.0

| | | |
|---|---|---|
| 03-27-2022 | (>140/90), generate a task to continue BP checks 2 x per week x 2 weeks and enter a task for medical provider to review BP at the end of that 2 week period<br><br>[Created by: RN James, Leann at 03-25-2022 14:52:33]<br>[Completed by: LAWVER RN, Sheila at 03-27-2022 09:17:12] | Appointment [RN LAWVER, Sheila on 03-27-2022] |
| 1<br><br>03-26-2022 | Nurse - Vital Signs<br>At staff request<br>*check BP daily x 3 days; if any BP readings are elevated per our standing directives (>140/90), generate a task to continue BP checks 2 x per week x 2 weeks and enter a task for medical provider to review BP at the end of that 2 week period<br><br>[Created by: RN James, Leann at 03-25-2022 14:52:33]<br>[Completed by: LAWVER RN, Sheila at 03-26-2022 08:34:18] | **Update Notes**<br><br>• **Completed Appointment** - Completed Appointment [RN LAWVER, Sheila on 03-26-2022] |
| 1<br><br>03-26-2022 | Doctor/NP<br>At staff request<br>Pt reports hx of htn; lisinpril 30mg<br>Requesting records to verify. Pt with elevated BP, will continue to monitor per SD.#407<br><br>3/26 per Show Low Summit records scanned, pt rx'd the following meds as of 1/4/22:<br>levofloxacin 750mg 1 tab PO qd expired 1/10/22<br>percocet 1 tab PO PRN expired 1/29/22<br>gabapentin 100mg qhs expired 1/29/22 (back pain w/ hardware in place)<br>Lisinopril 30mg 1 tab qd expires 10/12/22<br>Pt has hx of GERD, HTN back pain, hx of h. pylori, GI bleed in Jan<br><br>[Created by: RN James, Leann at 03-25-2022 15:00:01]<br>[Last modified: James RN, Leann at 03-26-2022 08:45:15] | **Update Notes**<br><br>• **Rescheduled Appointment** - received VO for lisinopril; r/s task to office hours. [RN James, Leann on 03-26-2022] |
| 1<br><br>03-25-2022 | Needs Assessment<br>At staff request<br>needs assessment<br><br>[Created by: RN LAWVER, Sheila at 03-25-2022 07:37:20]<br>[Completed by: James RN, Leann at 03-25-2022 14:52:45] | **Update Notes**<br><br>• **Completed Appointment** - Completed Appointment [RN James, Leann on 03-25-2022] |

Viewing 1-10 of 36 Items
1
2
3
4
Next >

BENALLY 000104

4/18/22, 7:31 PM                              CorEMR - BENALLY, GIBSON :: Chart Notes | v5.5.0

## GIBSON BENALLY

**#J202201153**

AHCCCS consent forms signed 2022/2023, Medical Exception-Lower Bunk, Medical Exception-Lower tier

Sex: Male
DOB:
Height: 5ft 7in
Weight: 155 lbs
BMI: 24.3
SSN: 526193430
Agency: CCDF
Location: MED E190 1
JMS ID: 9331
Allergies:
NKMA

Chart Notes
# Chart Notes

Type: Medical Note
Access: Medical Staff

| Date: 04/18/2022 19:14                                        Author: Fraser, Janeen | Related Problems |
|---|---|
| During his walk, Srgt. Waggoner noted that the I/M was face down on his bed in Medical 190. He did not respond to attempts to gain his attention. I/M was found nonresponsive, was moved to the floor of his cell and chest compressions were initiated at 1803. Srgt. Waggoner called out for help and Code 3. Nurses Heath #954 and Tate #956 were first to arrive on the scene. Oxygen was initiated at 15 LPM via ambu bag and the AED pads were applied to his chest. Nurse #954 took over compressions, Nurse #956 maintained the oxygen via ambu bag and provided breaths per CPR guidelines. Central Control was called and requested that paramedics be summoned to the Medical Department for an active code. At 1806, the AED was activated and compressions were recommended to be resumed. Compressions were resumed at 1807. At 1808, Srgt. O'Brein took over compressions. The AED had compressions be stopped, no shock was recommended and compressions were resumed. At 1809, the airway was repositioned and maintained by Nurse James #407. The ambu bag and oxygen continued to be maintained by Nurse #958 with breaths given per CPR guidelines. Nurse #954 took over compressions at this time. At 1810, I/M was noted to be diaphoretic and his skin was cool to the touch. The AED requested that compressions cease, no shock was recommended and compressions were resumed. At 1812, Lt. Hover stepped in to provide compressions. Nurse #407 reported that the I/M pupils were fixed at that time. At 1813, the AED requested that compressions cease, no shock was recommended and compressions were resumed. At 1813, Nurse #407 noted that the I/M had frothing around his mouth. She continued to assist with positioning of his head while Nurse #956 maintained the oxygen via ambu bag and provided breaths. Nurse #954 took over chest compressions. At 1815, the AED was analyzing, no shock was recommended and CPR was resumed. At 1816, paramedics from Guardian arrived on scene. At 1817, paramedic staff stepped in to provide chest compressions. At 1818, compressions were stopped for AED analyzing, no shock was recommended and chest compressions were taken over by Nurse #954 at 1819. At 1820, Nurse #954 completed chest compressions and the paramedic staff resumed compressions at 1821. Complete care was then transferred to the paramedic staff at this time. | |

Type: Medical Note
Access: Medical Staff

| Date: 04/18/2022 17:53                                        Author: Fraser, Janeen | Related Problems |
|---|---|
| Called to F-Pod by Srgt. O'Brein at 1650 since I/M c/o SOB. I/M was found lying on his bed upon my arrival. He reported that he started feeling poorly on Thursday (April 14). He stated that he felt dizzy. Other I/M were gathered around him and had placed cool, wet washcloths on his head and chest. BP was 119/77, P 116, O2 sats 98%. I/M was instructed to sit up on the edge of the bed. BP 115/77, P 100. He was then instructed to stand with a BP of 114/70, P 121. I/M stated that he had Covid-19 in early 2020. He denied any lingering symptoms since then. I/M reported only drinking four glasses of water/day. He was reassured that his vital signs were normal. He walked to the table to eat his dinner. As I was walking back to the Medical Department, Srgt. O'Brein was calling for me again. He stated that the I/M was reporting being dizzy. I/M was found sitting at the table. The other inmates had placed a dripping, wet washcloth on his head. I/M was found to be hyperventilating. His BP was 148/65, P 62, O2 sats 92%. He had to be repeatedly encouraged to slow down his breathing. Once he was more calm, his BP was 107/79, P 51. Within minutes of leaving the pod, Srgt. O'Brein called the Medical Department to report that I/M was c/o chest pain. He was transported to the | |

BENALLY 000105

CorEMR - BENALLY, GIBSON :: Chart Notes | v5.5.0

Medical Department via w/c. After leaving the pod, his breathing slowed and he appeared to relax. Report verbally given to night nurse.

| | |
|---|---|
| Type: Medical Note ⌄ <br> Access: Medical Staff | **Date:** 04/18/2022 00:25          **Author:** RN Heath, Dayna <br> Called to I/M bunk, reports feeling very weak and dizzy. Blood glucose 166, BP 142/106 HR 100. No s/s of distress, no diaphoresis, no vomiting, or blurred vision. Encouraged I/M to rest on L side and to notify medical staff for any status change. I/M verbalized understanding. | **Related Problems** |
| Type: Medical Note ⌄ <br> Access: Medical Staff | **Date:** 04/02/2022 15:37          **Author:** Fraser, Janeen <br> Covid-19 test result from 04/01/22 was NEGATIVE. | **Related Problems** |
| Type: Medical Note ⌄ <br> Access: Medical Staff | **Date:** 03/26/2022 12:43          **Author:** RN James, Leann <br> late entry: first dose of lisinopril given at 0840. | **Related Problems** |
| Type: Medical Note ⌄ <br> Access: Medical Staff | **Date:** 03/26/2022 08:46          **Author:** RN James, Leann <br> Received VO per SW,DNP, #395; order lisinopril 30mg 1 tab PO QD | **Related Problems** |
| Type: Medical Note ⌄ <br> Access: Medical Staff | **Date:** 03/25/2022 14:48          **Author:** RN James, Leann <br> LLLB given d/t fragility; hx of back surgery with hardware placement. | **Related Problems** |
| Type: Misc. Note ⌄ <br> Access: Medical Staff | **Date:** 09/09/2017 10:02          **Author:** Guthrie, Andrea <br> LLLB - started ETOH protocol | **Related Problems** |

BENALLY 000106

4/18/22, 7:31 PM                           CorEMR - Flow Sheets :: Vital Signs | v5.5.0

## GIBSON BENALLY

Sex: Male
DOB: ▓▓▓▓▓▓
Height: 5ft 7in
Weight: 155 lbs
BMI: 24.3
SSN: 526193430

#### #J202201153

Agency: CCDF
Location: MED E190 1
JMS ID: 9331
Allergies:
NKMA

AHCCCS consent forms signed 2022/2023, Medical Exception-Lower Bunk, Medical Exception-Lower tier

Flow Sheets
Vital Signs

# Vital Signs

Viewing 1-23 of 23 Flow Records

| User | Record Date | Pos | BP Sys | BP Dia | Pulse | Resp. | Temp. | Weight | Height | BMI | S$_p$O$_2$ | Notes |
|------|-------------|-----|--------|--------|-------|-------|-------|--------|--------|-----|------|-------|
| Young, Damon | 03/28/2022 0941 | Sitting | 135 | 89 | 78 | | | | | | | |
| RN LAWVER, Sheila | 03/27/2022 0916 | Sitting | 129 | 93 | 72 | | | | | | | |
| RN LAWVER, Sheila | 03/26/2022 0834 | Sitting | 150 | 98 | 79 | | | | | | | |
| RN James, Leann | 03/25/2022 1452 | Sitting | 166 | 117 | 77 | | 98.4 °F | 155 lbs | 5ft 7in | 24.30 | | actual weight |
| Hirsch, Lisa | 09/12/2017 0921 | Sitting | 154 | 113 | 78 | | | | | | | alert, no FTT/hand tremors, denies N/V |
| Worfolk-Elam, Laura | 09/11/2017 0911 | Sitting | 149 | 104 | 92 | | | | | | | no FHT/FTT, no pilo, no hallucinations |
| Worfolk-Elam, Laura | 09/10/2017 0800 | Sitting | 153 | 105 | 89 | | | | | | | alert - no ftt no fht no diaphoresis denies n/v |
| Guthrie, Andrea | 09/09/2017 1006 | Sitting | 169 | 102 | 108 | | | 194 lbs | 5ft 7in | 30.40 | | self reports ht |
| Guthrie, Andrea | 09/09/2017 0847 | - - - | | | | | | | 5ft 7in | .00 | | |
| RN Fulmer, Katrina | 08/30/2017 0719 | Sitting | 157 | 104 | 86 | | | | | | | |
| Hirsch, Lisa | 08/29/2017 0816 | Sitting | 139 | 102 | 89 | | | | | | | |
| RN Fulmer, Katrina | 08/28/2017 0856 | Sitting | 145 | 104 | 96 | | | 191 lbs | 5ft 7in | 29.90 | | |
| Guthrie, Andrea | 08/15/2017 0922 | Sitting | 134 | 99 | 84 | | | | | | | alert - no ftt no fht no diaphoresis denies n/v |
| RN Fulmer, Katrina | 08/14/2017 0753 | Sitting | 152 | 108 | 86 | | | | | | | alert, no fht/ftt, denies n/v |
| RN Fulmer, Katrina | 08/13/2017 0750 | Sitting | 152 | 109 | 90 | | | | | | | alert, no fht/ftt, c/o nausea |
| Worfolk-Elam, Laura | 08/13/2017 0651 | Sitting | 175 | 109 | 82 | | | | | | | No FHT/ FTT, alert and oriented |
| RN Fulmer, Katrina | 08/12/2017 1535 | Sitting | 166 | 114 | 128 | | | | | | | +FHT/FTT, c/o nausea, started on protocol, given green band |
| Worfolk-Elam, Laura | 08/12/2017 1015 | Sitting | 164 | 114 | 113 | | | 198 lbs | 5ft 7in | 31.00 | | |
| RN Fulmer, Katrina | 08/02/2017 0730 | Sitting | 137 | 100 | 71 | | | | | | | |
| Guthrie, Andrea | 08/01/2017 0810 | Sitting | 149 | 101 | 78 | | | | | | | |
| Hirsch, Lisa | 07/31/2017 0803 | Sitting | 147 | 100 | 79 | | | | | | | |
| Hirsch, Lisa | 07/30/2017 0755 | Sitting | 147 | 103 | 88 | | | | | | | |
| Worfolk-Elam, Laura | 07/27/2017 1043 | Sitting | 131 | 94 | 82 | | | 200 lbs | 5ft 7in | 31.30 | | ht/wt per inmate |

Viewing 1-23 of 23 Flow Records

coremr/Modules/Flows/flow_vitals.php?pid=37367                                                                    1/1

BENALLY 000107

4/18/22, 7:31 PM                          CorEMR - BENALLY, GIBSON :: Medication | v5.5.0

## GIBSON BENALLY

### #J202201153

AHCCCS consent forms signed 2022/2023, Medical Exception-Lower Bunk, Medical Exception-Lower tier

Sex: Male
DOB:
Height: 5ft 7in
Weight: 155 lbs
BMI: 24.3
SSN: 526193430
Agency: CCDF
Location: MED E190 1
JMS ID: 9331
Allergies:
NKMA

Medication
Medications

# Medication

| Medication | Start Date | End Date | Clinician | Status | Dist |
|---|---|---|---|---|---|
| Gabapentin100 mg.<br>Float medication in water and administer | 04/16/2022 | 05/15/2022 | NP Fatima Lah | ○ Pending<br>Blister Pack | Sched |
| lisinopril30mg<br>1 tab By Mouth QD | 04/25/2022 | 05/24/2022 | NP Fatima Lah | ○ Pending<br>Blister Pack | Sched |
| lisinopril30mg<br>Received VO per SW,DNP, #395; give pt one tab qd for HTN | 03/26/2022 | 04/24/2022<br>(EXPIRING<br>SOON) | PNP Summer Wolfe | ○ Pending<br>Blister Pack | Sched |

coremr/Modules/Chart/medication.php?pid=37367                                              1/1

**BENALLY 000108**

No ENEMIES

## SHERIFF'S OFFICE
*Jim Driscoll, Sheriff*

# COCONINO COUNTY DETENTION FACILITY
# HOUSING UNITS MEDICAL CLEARANCE FORM

**PURPOSE:** Form is to be completed ONLY by MEDICAL STAFF when clearing an inmate from MEDICAL/ISOLATION/BEHAVIORAL hold from any cell designated for Medical/Behavioral Isolation or Quarantine, to be moved to another housing assignment.

**INMATE NAME:** Gibson Benally

**INMATE DATE OF BIRTH:** 11/21/68

**IS THE INMATE:**

Alert and Oriented (x3)          YES ☒ NO ☐

Able to ambulate on own          YES ☒ NO ☐

Without S/S of COVID-19          YES ☒ NO ☐

A309
04/03/22

*IF ANY OF THE ABOVE IS NO, DO NOT TRANSFER.*

**DOES THE PATIENT HAVE ANY CURRENT MEDICAL EXCEPTIONS?**     YES ☒ NO ☐
**IF YES, SPECIFY (USE SPACE BELOW):**

LLLB

**INMATE IS BEING TRANSFERRED FROM THE FOLLOWING LOCATION:**

GENERAL POPULATION ☐

QUARANTINE ☒

ISOLATION ☐

MEDICAL/BEHAVIOR ☐

**INMATE IS TO BE TRANSFERRED TO THE FOLLOWING LOCATION:**

GENERAL POPULATION ☒     LOCATION: F3 (18)

QUARANTINE ☐     LOCATION: _____     END DATE: __/__/__

ISOLATION ☐     LOCATION: _____     END DATE: __/__/__

**ADDITIONAL NOTES (PENDING TEST, ETC.):**

CLEARED BY: _James Kazu, RN_ 04/03/22 @ 1535
                RN/NP/MD              DATE/TIME

**DETENTION STAFF:** Please be aware that an inmate on any MEDICAL/ISOLATION/BEHAVIORAL hold cannot be moved from their current housing assignment UNLESS cleared by Medical Staff and a Medical Clearance Form is signed by an RN/NP/MD. If any time prior to or during the movement, you feel the inmate's condition changes and warrants another evaluation by an RN/NP/MD, notify medical staff immediately. Otherwise, please sign and return this form to Medical Staff.

TRANSFERRED BY: _____ 4467 4/3/22 @ 1051
                    SIGNATURE/BADGE          DATE/TIME

*"SERVICE TO COMMUNITY"*

911 E. Sawmill Rd. • Flagstaff, AZ 86001 • phone (928) 774-4523 or (1-800) 338-7888 • www.coconino.az.gov/sheriff.aspx

BENALLY 000109

## COCONINO COUNTY SHERIFF'S OFFICE
## INMATE REQUEST FOR HEALTH SERVICES

Print Name: Gibson Benally                DOB: 11-21-68

Date: 4-14-22                Dorm: F-300

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action. Use this form to describe one issue only and return to nursing staff.

Nature of problem or request:

I was told My records well be check Before I get My pain pills. nothing yet I came here March 24, 2022. I was getting gabpentin and hydro codine for my back outside

Service Requested: __X__ medical _____ mental health _____ dentist

I understand that, per ARS 31-161, I will be charged a $10.00 Health Service fee (excluding exemptions granted by statute) for each visit/treatment that I am herein requesting. I understand I do not have the right to dictate treatment or who provides treatment.

Gibson Benally

Inmate's Signature (signature needed for consent to treatment)

## HEALTH CARE DOCUMENTATION

Received by Nursing Staff: (DATE/TIME/BADGE NUMBER) 485 0880 4/6/22

Subjective: C/O Back Pain

Objective: BP: _____ P: _____ SaO2%: _____ R: _____ T: _____
(If indicated)

Assessment: Would like to restart gabapentin.

Plan: Refer to NP for her consideration.

Refer to: ___ Physician/NP ___ Mental Health ___ Dental ___ Charge RN

Badge #: 485 Title: RN Date: 4-16-22 Time: 1400

BENALLY 000110

| TIME RECEIVED<br>March 25, 2022 at 4:17:35 PM MST | REMOTE CSID<br>72093_SUMMIT_HELTHCA | DURATION<br>1022 | PAGES<br>38 | STATUS<br>Received |

03/25/22   19:00:47   72093_SUMMIT_HELTHCA -> CCSO                    72093_SUMMIT_HELTHCA Page: 001

---

This message was sent securely using Zix⁺

This message is for the designated recipient(s) only. It may contain privileged, confidential, proprietary, or otherwise private information that is legally protected. If you have received it in error, please notify the sender immediately and delete the original. You are prohibited from using or distributing this email without permission. Thank you.

This message was secured by Zix®.

BENALLY 000111

# EXHIBIT C



## CCSO

911 EAST SAWMILL ROAD FLAGSTAFF AZ 86001
9287745253

**JIM DRISCOLL**
**SHERIFF**

### Incident / Investigation Report

**Incident Number # : S2201164**

| Incident Information | | | |
|---|---|---|---|
| **Reported Date :** 04/18/2022 19:05 | **Occured From :** 04/18/2022 19:05  MON | **Occured To :** | **Reporting Officer :** FELDMAN, MINDY ELYSE (1040237) |
| **Incident Location :** 951 E SAWMILL RD  FLAGSTAFF, 86001 | | | **Lead Investigator :** MEYER, TRISTAN G (1044882) |
| **Case Status :** INFORMATION OR NON-CRIME | **Status Date :** 04/19/2022 21:17 | **Disposition :** NOT APPLICABLE | **Disposition Date :** 04/20/2022 13:01 |

| Associated Name Summary | | | |
|---|---|---|---|
| **FULL NAME** | **TYPE** | **INVOLVEMENT** | **DOB** |
| BENALLY, GABRIELLE | INDIVIDUAL | INVOLVED, OTHER | |
| BENALLY, GIBSON | INDIVIDUAL | VICTIM | |
| BENALLY, RENALDA | INDIVIDUAL | INVOLVED, OTHER | |
| GARCIA, JOSEPH ALBERT | INDIVIDUAL | WITNESS | |

| Offense Information | | | |
|---|---|---|---|
| **Offense Code :** DEATH - NATURAL | **Offense Description :** DEATH - NATURAL | **Severity :** MISDEMEANOR | **DV :** NO    **Attempt :** COMPLETED |

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW; CS

**Incident Number : S2201164**

BENALLY 000002

| Narrative | | | |
|---|---|---|---|
| **Supplement # :**<br>S2201164-0000 | **Title :**<br>MEF S22-01164 | **Author :**<br>FELDMAN, MINDY ELYSE (1040237) | **Entered On :**<br>04/20/2022 01:17 |

PATROL DR # S22-01164

DEPUTY MINDY FELDMAN #106

C208:  04/20/2022

ASSIGNMENT:

On 04/18/2022 at approximately 1905 hours I was assigned to investigate a death that occurred at the Coconino County Detention Facility (CCDF), 951 E Sawmill Rd.

INVESTIGATION:

I arrived at the Coconino County Sheriff's Office, 911 E Sawmill Rd, at approximately 1815 hours to begin my patrol shift. Upon my arrival I noticed Flagstaff Fire Department was outside of CCDF. Shortly after I noticed Guardian Medical had also arrived at CCDF.

FIRE:

Flagstaff Fire Department responded to the above incident. Please refer to their report, F22004382, for further information.

MEDICAL:

Guardian Medical responded to the above incident. Please refer to their report, 2205656, for further information.

INVESTIGATION CONTINUED:

At approximately 1905 hours I was informed an inmate, later identified as Gibson BENALLY, was deceased. Dispatch advised the detention staff had already notified the on-call Detective and the Medical Examiner.

CRIMINAL INVESTIGATION NOTIFICATION:

On 04/18/2022 at approximately 1905 hours I contacted the on-call Detective, Detective MEYER. Upon contact, Detective MEYER advised the detention staff notified him and the Medical Examiner. Please refer to Detective MEYER'S report for further.

FLAGSTAFF PD: LOEVY & LOEVY: ATTORNEYS AT LAW: CS

Incident Number : S2201164

BENALLY 000003

MEDICAL EXAMINER NOTIFICATION:

The Medical Examiner was advised of the above incident by the detention staff. Please refer to the detention staff's reports, S22001163, for further.

INVESTIGATION CONTINUED:

Upon my arrival at CCDF a member of the detention staff brought me to the medical unit where GIBSON was located. After arriving in the medical unit I met with Detention Sergeant OBRIEN. Detention Sergeant OBRIEN showed me where GIBSON was located.

I observed crime scene tape marking off the area where GIBSON'S body was. GIBSON'S body was in front of cell E190. I noted GIBSON on his back with medical equipment hooked up to his body. I did not see anything else of note on GIBSON'S body.

After showing me where GIBSON was, I spoke with Detention Sergeant OBRIEN. The following is a synopsis of my interview with Detention Sergeant OBRIEN.

INTERVEIW WITH DETENTION SERGEANT OBRIEN:

Detention Sergeant OBRIEN advised he was not the first detention staff on scene. Detention Sergeant OBRIEN advised Detention Sergeant WAGONER was the first unit to arrive. Detention Sergeant OBRIEN advised GIBSON was originally in Fpod, cell F300, and was complaining of dizziness and shortness of breath. Detention Sergeant OBRIEN advised he moved GIBSON to the medical unit E190 at approximately 1745 hours on 04/18/2022 for closer observation. Detention Sergeant OBRIEN stated approximately 15 minutes after being moved to the medical unit Detention Sergeant WAGONER conducted a check on GIBSON and found him unresponsive. Detention Sergeant OBRIEN advised CPR was immediately started. Detention Sergeant OBRIEN advised CPR was in progress when he showed up. Detention Sergeant OBRIEN mentioned multiple nurses saw GIBSON throughout his time in CCDF due to the medical complaints he made. Detention Sergeant OBRIEN mentioned Detention Nurse FRASER saw him approximately two times while GIBSON was in Fpod. Detention Sergeant OBRIEN thought GIBSON possibly had a panic attack. Detention Sergeant OBRIEN advised he believed GIBSON was pronounced deceased at approximately 1839 hours. Detention Sergeant OBRIEN advised there were approximately eight other individuals in Fpod with GIBSON and GIBSON was booked into CCDF on 03/24/2022 at approximately 1200 hours. Detention Sergeant OBRIEN suggested I contact Detention Sergeant WAGONER, Detention Nurse FRASER, and Detention Nurse HEATH for more information. See Detention Sergeant OBRIEN'S report, S2201163, for further information.

INVESTIGATION CONTINUED:

I contacted Detention Nurse FRASER and Detention Nurse HEATH next who were still in the medical unit. The following is a synopsis of my interviews with the Detention Nurses.

INTERVIEW WITH DETENTION NURSE FRASER:

Detention Nurse FRASER advised GIBSON had been complaining of medical issues since last Thursday 04/14/2022. Detention Nurse FRASER stated she saw GIBSON around 1700 on 04/18/2022 for complaints of being dizzy. Detention Nurse FRASER advised GIBSON'S vitals were all at the correct levels. Detention Nurse FRASER stated she checked GIBSON'S blood pressure three times and it did not

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW; CS

Incident Number : S2201164

appear to be elevated. Detention Nurse FRASER also checked GIBSON'S Oxygen (O2) levels which appeared to be the correct levels. Detention Nurse FRASER mentioned GIBSON'S pulse was slightly elevated, but she believed it was due to him hyperventilating. Detention Nurse FRASER advised GIBSON to take deep breaths which lowered his pulse to a correct level. Detention Nurse FRASER mentioned GIBSON stated he was not drinking enough water. Detention Nurse FRASER stated GIBSON was taking medication for ████████ ██████████████████████████. Detention Nurse FRASER advised she had no further information to provide. This ended my contact with Detention Nurse FRASER.

It was later found out GIBSON was on ███████████████ for a previous back injury. In addition GIBSON was taking ███████████ his blood pressure.

INTERVIEW WITH DETNETION NURSE HEATH:

Detention Nurse HEATH advised after she was requested to respond to help GIBSON she brought the AED and began CPR. Detention Nurse HEATH mentioned she also started O2. Detention Nurse HEATH advised she performed multiple rounds of CPR on GIBSON and believed he possibly went into cardiac arrest. Detention Nurse HEATH stated she saw GIBSON in Fpod for medical complaints on 04/17/2022 at approximately 1900 hours and he had not requested to be seen again until 04/18/2022 at approximately 1700 hours. Detention Nurse HEATH advised she did not believe GIBSON was seen by any Detention nurses between those two time frames. Detention Nurse HEATH had no further information to provide. This ended my contact with Detention Nurse Heath.

INVESTIGATION CONTINUED:

I was brought back to Intake to interview Detention Sergeant WAGONER next. While being brought to intake, Detective MEYER had arrived and was going to the medical unit to see the deceased. The following is a synopsis of my interview with Detention Sergeant WAGONER.

INTERVIEW WITH DETENTION SERGEANT WAGONER:

Detention Sergeant WAGONER advised he went to complete a check on GIBSON at approximately 1806 hours on 04/18/2022 and noticed GIBSON was laying face down on the bed with an arm hanging over the side. Detention Sergeant WAGONER stated something along the lines of "it did not look like he laid that way on purpose." Detention Sergeant WAGONER stated he did not see GIBSON moving and appeared to not be breathing. Detention Sergeant WAGONER advised at approximately 1808 hours he called out "code" to the nurses and began CPR. Detention Sergeant WAGONER stated the nurses arrived to help him provide aid to GIBSON. Detention Sergeant WAGONER advised he would retrieve the security footage for the incident as well as the security footage in Fpod before GIBSON was moved to medical. Detention Sergeant WAGONER uploaded the security footage to his report, S2201163. Please see Detention Sergeant WAGONER'S report for further information.

INVESTIGATION CONTINUED:

I went back to the medical unit to meet with Detective MEYER. The Medical Examiner showed up shortly after. Detective MEYRE and the Medical Examiner took pictures of the body. I provided the medical examiner with a yellow tag and she took custody of the deceased.

This ended my involvement in the case.

BODY CAMERA:

FLAGSTAFF PD: LOEVY & LOEVY: ATTORNEYS AT LAW: CS

████████

Incident Number : S2201164

BENALLY 000005

The investigation was recorded on my department issued body camera. Please refer to the video for more information and detail.

ENCLOSURES:

MVD information for Gibson BENALLY

DISPOSITION:

Referred to CI.

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW : CS

Incident Number : S2201164

**BENALLY 000006**

| Supplement # :<br>S2201164-0001 | Title :<br>MEYER SUPP A | Author :<br>MEYER, TRISTAN G (1044882) | Entered On :<br>04/28/2022 13:19 |
|---|---|---|---|

CCSO CI DR# S22-01164

OFFICER: DETECTIVE TRISTAN MEYER #43

SUPERVISOR: SERGEANT ETHAN MITKOWSKI #25

INVESTIGATION CONTINUED:

On 04/18/22 at approximately 1856 hours, I was contacted as the on-call detective by Detention Sergeant WAGONER and notified of a death investigation in the medical unit at the Coconino County Detention Facility. WAGONER told me that the deceased subject had recently been moved to the medical unit in a single cell and that the death appeared to be medical event related. I was advised that the deceased person was Gibson BENALLY and that the Medical Examiner's Office had already been notified of the incident.

I was subsequently contacted by Deputy FELDMAN, who advised that she had been notified of the death by dispatch and would be responding to take the initial report.

I arrived at the Coconino County Detention Facility at approximately 1930 hours and contacted Deputy FELDMAN, who advised me of the initial investigative work she had already completed, refer to Deputy FELDMAN's original report for further information. I was then brought to the medical unit by detention staff and made the following scene and body observations.

SCENE/BODY OBSERVATIONS:

I noted the doorway entering the medical unit was sealed with crime scene tape and that approximately half the medical unit hallway was cordoned off with crime scene tape. I observed GIBSON to be lying on his back in the medical unit hallway just outside medical unit room # E190. I noted GIBSON appeared to be a middle aged Native American male wearing a Coconino County Detention Facility issued inmate jumpsuit. I observed evidence of medical intervention in the form of a tube inserted into GIBSON's mouth, AED/lead pads attached to his chest and abdomen and what appeared to be a pic line inserted into his left leg. I noted GIBSON's jumpsuit to be opened at the top to allow access to his chest area, the legs of his jumpsuit appeared to have been cut by responding medical personnel. I looked GIBSON's body over in the location I found him and did not observe any notable injuries or sources of blood emanating from his person. In looking at the bottom of his feet, I did observe a small spot of dried red in color liquid consistent with blood on the bottom of his right toes. In looking at his hands and arms, I did not see any injuries that would be consistent with defensive wounds.

Upon entering dorm E190, I observed there to be a cart containing lifesaving equipment just inside the dorm door. I

FLAGSTAFF PD; LOEVY & LOEVY: ATTORNEYS AT LAW: CS

Incident Number : S2201164

BENALLY 000007

noted none of GIBSON's personal property in the dorm. In looking at GIBSON's bed (where I was advised he had been discovered) I noted a small amount of liquid containing food particles, consistent with vomit. On the right side of the dorm wall, I saw two spots of dried red in color liquid consistent with blood. Detention staff subsequently brought my attention to a detention facility box containing GIBSON's personal property. I was advised that this property had been brought with him when he was transported to the medical unit, but had not been provided to him yet due to the short time he had been in the medical unit.


INVESTIGATION CONTINUED:


Detention staff subsequently advised me that GIBSON had been booked into the detention facility on 03/24/22 and that he had been moved to the medical unit approximately 30 minutes prior to being discovered unresponsive in his cell.


I subsequently looked through GIBSON's personal property to see if there was anything in there that may have contributed to his death. I did not locate anything aside from commissary related items, legal paperwork and detention facility issued property. This property was subsequently provided to detention facility staff, I was later advised that it had been secured in temporary evidence for safekeeping purposes.


During my on-scene investigation, I was contacted by Detention Lieutenant HOVER and provided with GIBSON's detention facility medical records, these records will be enclosed with this supplement.


While on scene, Medical Examiner's Office Forensic Investigator HAMANN arrived on scene to complete her on scene investigation.


During this time, I contacted the other inmates housed in the medical unit, identified as Carletta TAFOLLA, Nicole CONLIN and Narinder SINGH to ask if they had any information to share regarding this investigation. Inmates TAFOLLA and CONLIN were in bed upon contact and indicated they had been sleeping. Inmate SINGH did not have any information to add to the investigation. These contacts were recorded on Deputy FELDMAN's body worn camera.


After HAMANN had completed her initial on scene investigation, GIBSON's body was rolled over, I made the following observations.


BODY OBSERVATIONS CONTINUED:


Upon viewing GIBSON's back and neck/back of the head areas, I did not observe any injuries of note. I did not note any sources of blood emanating from his person.

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW; CS

Incident Number : S2201164

INVESTIGATION CONTINUED:

Custody of GIBSON's body was subsequently turned over to Forensic Investigator HAMANN.

While on scene, Deputy FELDMAN provided me information that the detention facility had been contacted by a concerned party advising that she was GIBSON's daughter and asking about his status following his medical incident. Deputy FELDMAN advised that the name of the potential daughter was unknown. She subsequently provided me with a potential contact number for this person as well as the contact information from a Renelda BENALLY, who GIBSON had been contacting by phone while at the jail.

PHOTOGRAPHS:

During my on-scene investigation, I took photograph #s 1-59 with my department issued digital camera. These photographs have been downloaded to the Criminal Investigations shared drive.

INVESTIGATION CONTINUED:

I subsequently conducted OnCall research for GIBSON and located Flagstaff Police Department report # P17-11714. Upon reviewing this report, I noted that RENELDA had been the reporting party for GIBSON being a missing person, this report identified her as his daughter. I was subsequently advised that RENELDA was again contacting the Detention Facility by phone requesting an update on the status of her father.

At approximately 2116 hours, I spoke with RENELDA by telephone and conducted next of kin notification with her. It should be noted that RENELDA was extremely distraught with the news of her father's death, so I was unable to provide her basic information about the disposition of GIBSON's remains. This contact was recorded, the recording has been downloaded to the Criminal Investigations shared drive.

At approximately 2141 hours, I received a phone call from GIBSON's other daughter, verbally identified as Gabrielle BENALLY, and was able to provide her further information regarding the incident. This contact was recorded, the recording has been downloaded to the Criminal Investigations shared drive.

On 04/19/22, I reviewed the Inmate Log Report regarding the RFID log for GIBSON, which documented the security checks performed on GIBSON on each day he was at the Detention Facility. I noted this log documented 61 checks on 04/14/22, 48 checks on 04/15/22, 46 checks on 04/16/22, 53 checks on 04/17/22 and approximately 52 checks on 04/18/22. A copy of this Inmate Log Report was downloaded to the Criminal Investigations shared drive.

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW; CS

Incident Number : S2201164

BENALLY 000009

On 04/20/22, I conducted Telmate research regarding calls GIBSON had placed while at the Detention Facility. I noted that the last call he had placed was on 04/07/22. In reviewing this call, GIBSON did not complain of any medical symptoms similar to the symptoms he experienced during this incident. I then searched for any text messages GIBSON may have sent or received while in custody, I did not locate any.

I then searched the suspected phone numbers for GIBSON's family through the Telmate system and located two phone calls placed on 04/18/22 to phone number associated with a person who was unidentified in the Telmate system. These calls were placed from an inmate who verbally identified himself on the calls as "Roman BEGAY". In reviewing the calls, BEGAY appears to be speaking with one of GIBSON's family members. BEGAY notifies the suspected family member of GIBSON's medical event. These two calls have been downloaded to the Criminal Investigations shared drive. I also noted an additional phone call placed on 04/19/22 from inmate Joseph GARCIA's Telmate profile to the suspected family member, in this call, GARCIA indicates that his bunk was near GIBSON's bunk.

I subsequently reviewed GIBSON's detention facility medical records. A copy of these medical records will be enclosed with this supplemental report.

MEDICAL RECORD REVIEW:

I reviewed GIBSON's chart notes and observed an entry dated 04/18/22 at 0025 hours. This entry was entered by Detention Facility Nurse HEATH and documented that nursing staff was called to GIBSON's bunk for reports that he was feeling very weak and dizzy. GIBSON was subsequently evaluated, encouraged to rest and notify medical staff if his status changed.

I observed another chart note entry dated 04/18/22 at 1753 hours entered by Nurse FRASER. This entry documented that nursing staff had been called to F-Pod at 1650 hours regarding GIBSON. GIBSON had advised that he had been feeling poorly since 04/14 and that he was dizzy. He was evaluated and then walked to the dorm table to eat dinner. The chart note documented that the responding nurse was called back to the pod a short time later for GIBSON complaining of being dizzy. The chart notes documented that upon contacting GIBSON, he was hyperventilating, but that his breathing slowed during the contact. The chart notes documented that he was evaluated again during this contact. The chart note documented that minutes later, nursing staff was contacted and advised that GIBSON was complaining of chest pain and was subsequently transported out of the dorm to the medical unit by wheelchair. This chart note documented that upon leaving the pod, GIBSON's breathing slowed and he appeared to relax.

I noted an additional chart note entry dated 04/18/22 at 1914 hours by Nurse FRASER, this entry documents the detention facility medical staff's response to GIBSON's medical emergency.

In GIBSON's medical records, I saw an Inmate Request For Health Services form dated 04/14/22. I noted that this form mentioned medications for his back pain, but did not mention any other medical issues.

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEY'S AT LAW; CS

Incident Number : S2201164

INVESTIGATION CONTINUED:

On 04/21/22 at approximately 1125 hours, I contacted Joseph GARCIA in an intake intoxilyzer room and conducted an interview with him.

INTERVIEW WITH JOSEPH GARCIA:

This interview was recorded, the recording has been downloaded to the Criminal Investigations shared drive.  The following is a synopsis of the interview, the recording should be consulted directly for further information.

I told GARCIA that I wanted to ask him some questions about GIBSON and confirmed that he had been on the bunk next to GIBSON. GARCIA indicated that GIBSON's chest had been hurting him and that nursing staff had come down to evaluate him a couple of times. GARCIA then spoke of a previous incident where GIBSON had fallen when he was coming out of the shower.  He indicated that GIBSON's medical incident had occurred around dinner time and that he had been complaining of blacking out.  GARCIA indicated that he believed that he was having a heart attack or a stroke. He described that nursing staff had responded, evaluated him, advised he was ok and then left.  GARCIA indicated that GIBSON had gotten worse, so the same nurse had responded again, had evaluated him again and said that he was ok.  He told me that GIBSON had gotten even worse and a different nurse had responded with a wheelchair and had removed him from the dorm. I asked GARCIA when GIBSON had previously fallen, he advised that he had fallen the day before he had been removed from the dorm at approximately 1500-1530 hours. I asked what symptoms GIBSON had been complaining of during the incident, he told me that he had been having trouble breathing and that his chest hurt.

INVESTIGATION CONTINUED:

During the course of this investigation, I reviewed detention facility video surveillance footage and body worn camera footage for this incident.  This video footage has been downloaded to the Criminal Investigations shared drive.

VIDEO SURVEILLANCE REVIEW:

Upon reviewing the video of the medical hallway, I noted that GIBSON was brought to medical cell number E190 at approximately 1739 hours. At this time, GIBSON can be heard with labored breathing and making incoherent noises. At approximately 1741 hours, Sergeant OBRIEN closes the cell door and leaves the area. As he is leaving, he can be heard speaking with a detention facility nurse. A short time later, the nurse walks past GIBSON's cell to put the wheelchair he was transferred to the unit in away. At approximately 1751 hours, I male inmate can be heard making a moaning type of noise, it is not certain if this inmate was GIBSON or another male inmate in the medical unit.

At approximately 1806 hours, Sergeant WAGONER arrives in the medical unit to conduct a security check. After visually observing GIBSON for approximately one minute, WAGONER begins attempting to gain his attention by knocking on the cell door.  A few seconds later, WAGONER enters the cell and begins calling GIBSON's name. WAGONER then quickly walks out of the cell and attempts to gain a nurse's

FLAGSTAFF PD: LOEVY & LOEVY: ATTORNEYS AT LAW : CS

Incident Number : S2201164

BENALLY 000011

attention, advising that there was a problem. WAGONER then returns to the cell and shouts GIBSON's name. A few seconds later (at approximately 1808 hours), WAGONER exits the cell and advises "Uh, Code 3" and motions with his hands for nursing staff to respond to the cell. A female voice responds "Code 3?", WAGONER replies "Yeah, I think he's gone." A few seconds later, nursing staff arrives at the cell with lifesaving medical equipment.

At approximately 1809 hours, nursing staff can be heard advising to call 911. The video then shows multiple detention facility staff in GIBSON's cell, an AED can be heard being utilized. At approximately 1812 hours, detention officers remove GIBSON from the cell and place him in the medical unit hallway. Nursing staff then begins performing CPR and rescue breaths on GIBSON. Detention officers and nursing staff alternate performing lifesaving measurers until EMTs from the Flagstaff Fire Department arrive at approximately 1821 hours and subsequently take over care of GIBSON. At approximately 1846 hours, an EMT indicates to stop lifesaving measures (it should be noted that the time of death was called as 1839 hours on the video surveillance).

Upon reviewing the F-300 dorm surveillance video, GIBSON can be seen at his bunk initially. At approximately 1655 hours, he stands up. A short time later, he lies back down on his bunk. At approximately 1656 hours, an inmate sitting at a dayroom table stands up and goes to GIBSON's bunk. At approximately 1657, the inmate pushes the pod emergency call button. At approximately 1658 hours, the inmate advises that he has an emergency with one of the inmates. At approximately 1659 hours, Sergeant OBRIEN enters the dorm and asks inmate Joseph GARCIA what is going on, GARCIA advises that he (GIBSON) is having the same problems he had last night and that he was blacking out. OBRIEN uses the radio to notify nursing staff and exits the housing dorm. At approximately 1703 hours, a nurse arrives with another detention officers and proceeds to GIBSON (who is at his bunk) while OBRIEN distributes dinner trays to the dorm. At approximately 1704 hours, OBRIEN enters the dorm and proceeds to BENALLY's bunk area with the nurse and other detention officer. At approximately 1709 hours, GIBSON is escorted to the dorm table area and is provided a dinner tray. At approximately 1710 hours, the nurse and detention officers leave the dorm.

A short time later, other inmates gather around GIBSON and appear to be trying to assist him. At approximately 1711 hours, an inmate runs to the dorm door, pushes the button and knocks, less than 30 seconds later, a detention officer runs into the dorm and proceeds to GIBSON. At approximately 1713 hours, OBRIEN enters the dorm with the same detention nurse that previously responded. The inmates are asked if GIBSON fell, an inmate then advises that he can not stand up. The detention nurse then re-evaluates GIBSON at the dorm table he is sitting at. During the evaluation, GIBSON places his head on the table multiple times, his breathing can be heard on the dorm audio recording. At approximately 1720 hours, the detention officers assist GIBSON back to his bunk. At approximately 1721 hours, the detention officers and nurse exit the dorm.

At approximately 1725 hours, GIBSON can be heard breathing loudly at his bunk. At approximately 1732 hours, an inmate walks from GIBSON's bunk to the door, pushes the emergency button and advises that GIBSON is saying that his chest pains are getting worse. At approximately 1736 hours, a different detention nurse enters the dorm with a wheelchair and removes him from the dorm.

BODY WORN CAMERA REVIEW:

Upon reviewing the portion of Lieutenant HOVER's body worn camera that was filmed from inside GIBSON's cell, I observed detention officers and nursing staff administering CPR and applying the AED to GIBSON in the cell. Approximately two and a half minutes into the video, HOVER and a detention sergeant remove GIBSON from the cell for more room to perform lifesaving measures.

INVESTIGATION CONTINUED:

Over the course of this investigation, I reviewed the original and supplemental reports for detention staff authored reports (CCSO report # S22-01163) and Deputy FELDMAN's original report for this case.

ENCLOSURES:

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW : CS

Incident Number : S2201164

BENALLY 000012

1. Copy of Gibson BENALLY's detention facility Medical Records (53 pages)

DISPOSITION:

Case open, pending final autopsy report from Medical Examiner's Office.

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW : CS

Incident Number : S2201164

BENALLY 000013

| Supplement # :<br>S2201164-0002 | Title :<br>MEYER SUPP B | Author :<br>MEYER, TRISTAN G (1044882) | Entered On :<br>06/10/2022 11:20 |
|---|---|---|---|

CCSO CI DR# S22-01164

OFFICER: DETECTIVE TRISTAN MEYER #43

SUPERVISOR: SERGEANT ETHAN MITKOWSKI #25

INVESTIGATION CONTINUED:

On 06/09/22, I received a Coconino County Medical Examiner's Office Final Autopsy Protocol report. This report documented BENALLY's cause of death as "Pulmonary thromboembolism" due to "Deep venous thrombosis, left lower leg" with other significant conditions of "Chronic alcohol abuse; hypertension; left leg ulcer with abscess formation". His manner of death was documented as "Natural". Refer to enclosed copy of Coconino County Medical Examiner's Office Final Autopsy Protocol report for further information.

ENCLOSURES:

1. Copy of Coconino County Medical Examiner's Office Final Autopsy Protocol report (17 pages)

DISPOSITION:

Case closed, non-crime.

FLAGSTAFF PD; LOEVY & LOEVY; ATTORNEYS AT LAW; CS

Incident Number : S2201164

BENALLY 000014



Flagstaff Police Department
911 E Sawmill Road
Flagstaff, AZ 86001

Loevy & Loevy Attorneys at Law
311 N Aberdeen, 3rd Floor
Chicago, IL 60607
attn Dana Kondos

Hasler
09/01/2022
US POSTAGE $001.6

BENALLY 000016

EXHIBIT D

1                    REMOTE APPEARANCES

2

3    Appearing on behalf of the Plaintiff Renalda

4    Benally:

5    MIKAYLA S. YOUNG, ESQUIRE

6    Loevy and Loevy

7    311 North Aberdeen Street, Third Floor

8    Chicago, Illinois 60607

9    (312) 243-5900

10   young@loevy.com

11

12   Appearing on behalf of LeAnn James and Janeen

13   Fraser:

14   DAVID L. STOLL, ESQUIRE

15   Beaugureau Hancock Stoll & Schwartz, PC

16   302 East Coronado Road

17   Phoenix, Arizona 85004

18   (602) 956-4438

19   dstoll@bhsslaw.com

20

21

22

23

24

25

 1  night shifts?

 2       A.   6:00 -- 6:00 P to 6:00 A.

 3       Q.   And so do you know the date when you began

 4  working at Coconino specifically, or?

 5       A.   I believe it was 1/10.

 6       Q.   Okay.

 7       A.   January 10th, I believe.

 8       Q.   Okay.

 9       A.   Or 17th.  It was -- I think it was the

10  10th.

11       Q.   And were you employed by A.B. Staffing,

12  Wexford, or someone else?

13       A.   A.B. Staffing.

14       Q.   A.B. Staffing.  Okay.  And I don't want to

15  know anything you discussed with your attorney, but

16  did you meet with him prior to your deposition?

17       A.   Yes.

18       Q.   Okay.  And did you review any documents or

19  anything or footage before your deposition?

20       A.   No footage.  Documents, yes.

21       Q.   Okay.  Can you tell me what documents you

22  reviewed?

23       A.   I reviewed some of the medical that was

24  from his chart that we had.  And then I also had an

25  incident report prior to, that was given to me by

1   the county, just so -- those were the things I had.

2   Yeah.

3        Q.   Okay.  And do you have any of that in

4   front of you today?

5        A.   I do.

6        Q.   Okay.  All of it?

7        A.   All of it.

8        Q.   Okay.  Can you describe your typical

9   duties and responsibilities as a nurse at Coconino

10  for me?

11       A.   So when -- typically you would do med

12  pass.  You would have any type of dependency, like

13  if you had any type of protocols for like alcohol

14  withdrawal, anything like that.  If an inmate

15  submitted an IRF, which was an inmate request form,

16  you would address it, then you would do another med

17  pass in the morning.  But you were basically there

18  to make sure that if something was to happen, you

19  were available.

20       Q.   And were you assigned to a specific unit

21  or it was just the medical unit?

22       A.   Yeah.  I had the whole -- I had the whole

23  unit.  I had the whole jail at -- at -- at night.

24       Q.   And do you recall who you were reporting

25  to at the time?

1    And I didn't notice him being diaphoretic or

2    anything like that, but that was basically what it

3    was.  He was having some shortness of breath.  But

4    up to that point I had no idea what had happened

5    because I hadn't received a report yet.

6         Q.    Okay.  And so --

7         A.    Like what interventions had been taking

8    place.

9         Q.    Okay.  And do you recall seeing him in any

10   type of distress, shaky, sweaty?

11        A.    No.  He -- he was able to stand.  I didn't

12   notice him being diaphoretic.  He was just saying

13   like he was -- it was like he was -- I don't know.

14   He seemed very -- he just said he -- he said short

15   of breath and he just seemed like he was having some

16   pain at that time.

17        Q.    Some pain.  Okay.  And what was your

18   understanding of the jail's policy on escalating

19   care for serious symptoms?

20        A.    For serious symptoms, so you would bring

21   them to -- to the infirmary or like you would call

22   it, like we would bring them to medical and then

23   depending on what the -- what his symptoms were as

24   far as like -- there was different protocols for

25   like chest pain.

```
 1            There was different protocols for

 2   shortness of breath.  I can't remember all of those

 3   because it's been a -- it's been a while.  But we

 4   did move him to medical and that was the first step.

 5   And again, I wasn't sure what the interventions had

 6   been prior to.

 7        Q.   Okay.  And do you recall what was done

 8   after you brought Mr. Benally down to the medical

 9   unit?

10        A.   So when I had -- when I brought him there,

11   I came back into medical and I let the nurse know I

12   have your patient up here.

13        Q.   Okay.  And did you witness them going back

14   to check on him or anything like that?

15        A.   I don't remember.  I'm not sure.  Sorry.

16        Q.   That's okay.  And do you recall the jail's

17   policy on notifying a physician or calling outside

18   emergency services?

19        A.   I don't remember those like verbatim, so I

20   don't want to kind of guess at it.

21        Q.   That's okay.

22        A.   I don't have any of that stuff in front of

23   me.

24        Q.   That's absolutely fine.  And then do you

25   recall if there was a policy on documenting patient
```

1  complaints and vital signs every time that they

2  complained like the first time that you would go up

3  into the cell?

4      A.   I don't remember that being an actual

5  protocol.

6      Q.   Okay.  And were you informed that Mr.

7  Benally was on prescription medication for

8  hypertension?

9      A.   I -- not at that time, no.  Like I'm sure

10  I probably knew it because I had, you know, been

11  nursing and you can kind of see sometimes like what

12  people take, but -- and I might have even given it,

13  to be honest with you.  I don't have them all in

14  front of me, so I don't know.  But I know like as

15  far as in the -- in the paperwork, it's there.

16      Q.   And so when you brought him to the medical

17  unit, you put him in the cell, you didn't take any

18  of his vital signs or anything, right?  You were --

19      A.   No, because from my understanding when I

20  was there, they had -- I didn't hear like that --

21  she -- like they had mentioned.  I was just there.

22  So again, I didn't know if she had just taken them

23  if they were there.  So that's why I wanted her to

24  know when I brought him back that he was available

25  because my understanding is she had just been there.

1  this.

2      Q.   And is that something that would be

3  contained in his chart?

4      A.   It would be under the MAR.  Mm-hmm.  But

5  unfortunately I don't have that.

6      Q.   Is there anything that you believe could

7  have done -- been done differently to help Mr.

8  Benally?

9      A.   Honestly, no, because he -- the nurses had

10 been in there and like I said, the vital signs were

11 stable, O2 was good.  But us moving him to medical

12 so we could be closer.  And it would be more one-on-

13 one. And that -- no.  I'd say no.

14     Q.   Okay.  And do you recall if anybody was in

15 his cell after you informed them that you had

16 brought him down?

17     A.   Not that I'm aware of.

18     Q.   Okay.  And how long did you stay in that

19 position after this incident?

20     A.   After that -- that was April.  Then in

21 July we had a contract company come in, and I went

22 with them.  So I was there till 2024 -- 2024 or

23 2023.  2023 -- 2024.  I'm sorry.

24     Q.   That's okay.

25     A.   Hold on.  I'm thinking.  I'm so sorry.

EXHIBIT E

# CURRICULUM VITAE

## Bruce D. Charash, M.D.

**Born:** April 8th, 1956
New York City, NY, USA

**Contact Information:**

205 East 63rd Street
#16G
New York, NY 10065

917-439-4398 (cell)
917-725-8800 (fax)

bdc2104@gmail.com

### Education :

Cornell University    A.B. (Chemistry)   **1977**

Cornell University Medical College   M.D.   **1981**

### Hospital Positions:

Internship, Internal Medicine **7/81-6/82**
Mount Sinai Medical Center, Department of Medicine

Residency, Internal Medicine **7/82-6/84**
Mount Sinai Medical Center, Department of Medicine

Fellowship, Division of Cardiology **7/84-6/86**
New York Hospital-Cornell Medical Center

Assistant Attending Physician **7/86-9/91**
New York Hospital-Cornell Medical Center

Assistant Chief of Cardiac Care Unit **7/86-9/91**
New York Hospital-Cornell Medical Center

Chief Cardiac Care Unit, **10/91-1/31/05**
Lenox Hill Hospital

[1]

## Hospital Positions (Continued):

Attending Physician 2**/01/5-6/30/06**
New York-Presbyterian Hospital

Senior Attending Physician, **10/91-6/05**
Lenox Hill Hospital

Attending Physician, **05/07-12/12**
Mount Sinai Hospital

Attending Physician **3/06-present**
Lenox Hill Hospital

## Academic Appointments:

Instructor **7/86-6/87**
Cornell Medical School

Assistant Professor of Medicine **7/87-6/93**
Cornell Medical School

Visiting Associate Professor of Medicine **10/98-1/31/05**
State University of New York Health Center at Brooklyn

Assistant Professor of Clinical Medicine **2/1/05-6/30/06**
Columbia University Medical School

Clinical Associate Professor of Medicine **7/93-12/15**
NYU Medical School

## Committees:

Doc2Dock—Founder and Chairman of the Board since **2005**

[2]

**Licensure and Board Certification:**

New York State License Registration **7/82**; Status: Active

American Board of Internal Medicine **9/84**; Status Active, Lifetime

Cardiovascular Disease Subspecialty **11/87**; Status: Active, Lifetime

**Memberships:**

Fellow of the American College of Cardiology (FACC)

American Heart Association

**Honorary Societies:**

Phi Beta Kappa **1977** Cornell University

Phi Kappa Phi **1977** Cornell University

Alpha Omega Alpha **1981** Cornell University Medical School

**Awards/Honors:**

Daniel and Elaine Sargent Fellow in Cardiology: **1985**

Greater New York Hospital Association: Outstanding Physician of the Year, New York State **2008**

Caring Institute (Washington D.C.):  National Caring Award: **2012**

Top 100 Registry:  Top 100 Cardiologist in the US: **2021**

Top 100 Registry:  Top 100 Doctors in the US: **2022**

[3]

**Publications:**

**Peer-Review Journals:**

Kligfield P, Charash, B, Placek E, Sos TA: Anti-arrhythmic effect of manganese chloride in infracted dogs with observations on the dose response of heart rate and ventricular pressure.  J. Pharm Exper. Therapy 1981;219:289-295

Charash B, Placek E, Sos TA, Kligfield P: Dose-related effects of manganese chloride on the canine electrocardiogram.  Journal of Electrocardiography 1982;15:149-152

Charash B, Scheidt S: The controversy over transdermal nitroglycerin: an update.  Am Heart J  1986;112:207-215

Borer J, Miller D, Schreiber T, Charash B, Gerling B: Radionuclide cineangiography in acute myocardial infarction: role in prognostication.  Seminars in Nuclear Medicine  1987;17:89-94

Sauter D, Goldfrank L, Charash B:  Cardiopulmonary arrest following an infusion of calcium 2-amino ethanol phosphate.  Journal of Emergency Medicine 1990;8:717-720


**Peer Review Abstracts:**

Kligfield P, Charash, B, Placek E, Sos TA:  Hemodynamic and Anti-arrhythmic effects of Manganese Chloride in the ischemic dog.  Clinical Research 1980;28:187A

Kligfield P, Charash B, Placek E, Sos Ta: Dose Related effects of manganese on the canine electrocardiogram.  Clinical Research  1981;29:215A

Kligfield P, Charash B, Placek E, Sos TA: Protective effect of manganese pre-feeding in infarcted dogs.  Clinical Research  1982;30:198A

Charash B, Schreiber T, Miller D, Silvasi D, Kligfield P, Borer J: Inferior myocardial infarction: reperfusion not predicted by ST segment evolution. Clinical Research 1985; 33:739A

Charash B, Silverstein R, Borer J, Nachman R: Enhancement of thrombolysis by pre-mixing recombinant tissue plasminogen activator with platelets.  Clinical Research 1988;36:756A

**Chapters:**

Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1986;287-290

Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1987;285-291

Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1988;286-289

Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1989;289-294

Charash B, Scheidt S:  Nitroglycerin therapy.  Cardiovascular Drug Therapy, Saunders,  New Orleans,  1990;871-881


**Books:**

Charash, B:  Heart Myths, Viking  New York: Hardcover 1991

Charash, B:  Heart Myths, Penguin New York: Paperback 1992

EXHIBIT F

**Bruce D. Charash, M.D., F.A.C.C.**
**205 East 63rd Street**
**New York, NY 10065**

August 8, 2025

Maria Makar, Esq.
*Loevy & Loevy*
311 N. Aberdeen
3rd Floor
Chicago, IL 60607

Re: **Gibson Benally, deceased**

Dear Ms. Makar,

I have reviewed the following records concerning Gibson Benally, deceased:

1) Amended Complaint (ECF 65)
2) Coconino County Jail Records (COUNTY 000001–53, COUNTY 0000212)
3) Summit Regional Medical Center (SCH 01–825)
4) Wexford Navajo County Jail Records (Wex 000001–41)
5) Flagstaff Medical Center (FMC 01–2178)
6) Flagstaff Fire Department EMS Report
7) Navajo County Medical Records (COUNTY 0000054–97)
8) Autopsy Report (Benally CCME 00001–17)
9) Certificate of Death (Benally 001980)
10) Death Investigation Report
11) Coconino County Sheriff Office Incident/Investigation Report (COUNTY0000266–319)
12) Coconino County Detention Facility Incident/Investigation Report (BENALLY 000002–000016)
13) Depositions of Dayna Heath, RN, Janeen Rene Fraser, RN, and Sergeant Patrick O'Brien

I am a physician with an unrestricted license to practice medicine in New York since 1982. I graduated from Cornell Medical School in 1981 and trained in the field of Internal Medicine from 1981-1984 at Mount Sinai Hospital, in New York. In 1984 I passed the Boards of Internal Medicine,

becoming a board-certified Internist (lifetime appointment). From 1984-1987 I trained in the subspecialty of Cardiology at the New York Hospital and likewise passed the board of Cardiology in 1987 (lifetime appointment). From 1987-2006 I worked full-time at academic hospitals in NY (Cornell Medical School, Lenox Hill Hospital, and Columbia Medical School) running Cardiac Intensive Care Units at each institution, respectively.

From 2006 to the present, I have been in private practice, remaining on the staff at Lenox Hill Hospital. I have been practicing in the fields of Internal Medicine (since 1984) and Cardiology (since 1987). I am the primary care provider for one half of the patients in my practice.

Over the past 41 years that I have practiced internal medicine, and over the past 38 years that I have practiced cardiology, I am familiar with the diagnosis and the treatment of patients with a wide range of cardiac emergencies. Included in my clinical experience, I have diagnosed and treated hundreds of patients with pulmonary emboli.

Also, over the course of my career, I have had daily experience working with nurses both within the hospital as well as within the offices of other health care providers. I am familiar with what, and when, a health care provider expects a nurse to contact them out of a potential concern for a patient's wellbeing.

It is my opinion, to a reasonable degree of medical certainty, that the care rendered to Gibson Benally at the Coconino County Jail on April 18, 2022, was below that of the standard of care. It is further my opinion that Mr. Gibson died from an otherwise preventable death had the standard of care been followed.

All opinions in this report have been, and will be, rendered to a reasonable degree of medical certainty.

## FACTUAL BACKGROUND

Gibson Benally was a 53-year-old man when, on 3/4/22, he was arrested and brought to the Navajo County Jail in Holdbrook, Arizona.  On 3/24/22 Mr. Benally was transferred to the Coconino County Jail. His blood pressure was measured to be 116/117. He informed the nurses at the jail (Leann James and Sheila Lawver) that he suffered from hypertension (as well as back

pain). His medical history was shared with the other nurses at the Coconino County Jail, including Shelly Cersosimo, Summer Wolfe, and Fatima Lah.

On 4/17/22, at approximately 19:00, Mr. Benally reported having complaints of dizziness and shortness of breath. He was evaluated by Nurse Dayna Heath, who documented at 00:25 on 4/18/22 that Mr. Benally had a blood pressure of 142/106 and a heart rate of 100 beats/min. There was no repeat blood pressure taken on Mr. Benally until after 17:00 (16 hours later that day).

On 4/18/22 at 16:55 Mr. Benally attempted to get up from his bunk but could not do so. Nurse Fraser entered the room at approximately 17:05. Mr. Benally reported that he had been feeling ill since 4/14/22, and that he was now weak and unable to stand. Further he had been feeling short of breath and dizziness. His blood pressure was 119/77, his pulse was 116/min, and his O2 sat was 98%. Nurse Fraser did not record his respiratory rate. Mr. Benally had his blood pressure repeated from the initial reading while he was lying flat in bed, to when he was sitting with his legs dangling from bed, and then to when he was standing. Mr. Benally did not demonstrate orthostatic changes.

Nurse Fraser instructed Mr. Benally to drink more water, and she left him at 17:10. Nurse Fraser was called back at 15:13, because he could not stand up and complained of recurrent dizziness. His blood pressure was measured to be 148/65, his pulse was 62/min, and his O2 saturation had dropped to 92%. Nurse Fraser instructed the patient to voluntarily slow his breathing and to relax. His repeated BP was 107/79 and his pulse had dropped to 51/min. Video surveillance obtained when Nurse Fraser was examining Mr. Benally, that he was hyperventilating so vigorously that the sound was picked up by the audio recording (as documented on the subsequent investigative reports).

At 17:21 Nurse Fraser left the floor. At 17:32 another detainee pressed the emergency call button and reported that Mr. Benally was complaining about worsening chest pain. Sergeant O'Brien called the medical department to report Mr. Benally's complaints of chest pain and was instructed by Nurse Heath to bring him to the medical unit. At 17:36, O'Brien and Heath placed Mr. Benally in a wheelchair and transferred him off his dorm to go to the medical unit.

Nurse Heath and Sergeant O'Brien closed Mr. Benally's cell door on the medical unit (cell number E190) at 17:41. Mr. Benally was not observed to be receiving supplemental oxygen. He was not placed on a cardiac monitor, nor was he placed inside of the examination bed in medical. He was not seen again, until twenty-five (25) minutes later, at 18:06. No medical staff at the Jail provided any monitoring, care, or treatment after Mr. Benally was brought to the medical unit.

Sergeant Waggoner arrived at the medical unit to conduct a safety check. He observed Mr. Benally lying face down on the floor of his cell. Upon entering the cell, he recognized that Mr. Benally was in a state of cardiac arrest, and he called for assistance. At 18:09 the nursing staff can be heard advising to call 911. EMS arrived at 18:21 (12 minutes after they were called).

Mr. Benally could not be resuscitated. His autopsy revealed that he died from pulmonary emboli. On autopsy Mr. Benally was found to emboli extensively thrown to both lung fields. The autopsy report states: "*Within the main the pulmonary trunk and extending to the right pulmonary artery is a red-brown thrombus with a thin gray fibrinous membrane. The thrombus extends to the hilar region of the right pulmonary artery where there is coiling of the thrombus and occlusion of some of the segmental branches. A similar appearing red-brown thrombus with a thin gray fibrinous membrane is in the hilar region of the left pulmonary artery, and this thrombus exhibits marked coiling and occludes the left pulmonary artery and segmental branches.*"

## OPINIONS

There were several deviations from the accepted standard of care in the care and treatment of Mr. Benally. The first deviation is when Mr. Benally complained of dizziness and shortness of breath in the evening hours of 4/17/22. When Nurse Heath found Mr. Benally's blood pressure to be 142/106, the standard of care required that it be repeated within the hour, to ensure that Mr. Benally was not entering a hypertensive crisis. He further needed to have his symptoms explored in some reasonable level of detail, which was not done. Finally, the next morning Mr. Benally needed to have the medical unit instructed to evaluate him earlier in the day, for a more extensive history.

The failure to perform these actions was a deviation in the standard of care.

On 4/18/22 Nurse Fraser deviated from the standard of care on several occasions. When Nurse Fraser came to evaluate Mr. Benally's complaints at approximately 17:05, the standard of care required her to ask a reasonably detailed series of questions to determine what he was complaining about. This is especially significant, as Mr. Benally was complaining about the same issues the night before. Nurse Frasier spent only 5 minutes with Mr. Benally, and that included the time it took to take his blood pressure while lying down, sitting up, and standing up.

Nurse Frasier failed to document Mr. Benally's respiratory rate and likewise failed to document the level of respiratory effort being made by Mr. Benally. However, the audio from the surveillance system reportedly picked up Mr. Benally's intense respiratory difficulties, indicating that he was in respiratory distress. The standard of care required that she call 911 given that Mr. Benally was in danger of respiratory failure and respiratory arrest.

Nurse Fraser was called back to see Mr. Benally at 17:13 because he was deteriorating further.

Nurse Fraser's advice to drink more water and to try and breathe more slowly was not in accordance with the standard of care. Nurse Fraser would not have been able to diagnose Mr. Benally's underlying condition while he sat in his dormitory. She could not exclude if he was suffering from pulmonary edema, in which case increasing his intake of fluids could be catastrophic. Further, when a patient is struggling to breathe, telling them to try and slow down their rate of breathing is not only unacceptable medical advice, but it is also cruel. Mr. Benally was not breathing quickly and more intensely because it was his own choice. He was going into a state of acute respiratory compromise and facing a substantial risk of impending respiratory arrest. If he tried to slow down his breathing, he would have placed him in greater danger of suffering from a respiratory arrest.

It is medically unacceptable to ever simply assume that a patient who is breathing rapidly is doing so for emotional reasons, as opposed to suffering from a medical problem. Nurse Fraser treated Mr. Benally's problems as if they were emotional, which was both dangerous and unacceptable.

Mr. Benally was found to be suffering from multiple pulmonary emboli. This was the underlying medical reason he was suffering from marked

respiratory distress. Therefore, Nurse Fraser's advice that Mr. Benally simply slow down the rate of his breathing reflected a dangerous attitude that Mr. Benally was breathing quickly for emotional reasons.

During her evaluation of Mr. Benally, Nurse Fraser documented Mr. Benally's blood pressure and heart rate. His heart rate was found to range from 100 to 116 to 121. Moments later Mr. Benally's heart rate dropped down to 62/min and then down to 51/min. The medical chart concluded that Mr. Benally's heart rate had dropped because he had calmed down. This is not a reasonable conclusion.

Mr. Benally had run, as a baseline, heart rates averaging 100/min. Dropping down to 62/min and then further down to 51/min did not reflect Mr. Benally's reasonable baseline and certainly was not caused because he was calming down. Instead, it reflected his impending respiratory failure. When a patient is struggling to breathe, and when they continue to deteriorate, the body reacts by slowing down the heart rate (which in turn reduces the amount of oxygen delivery required by the heart). Hence bradycardia, and then asystole, are classic indicators of a respiratory crisis and impending arrest.

With his significantly dropped heart rate (well below his baseline), and his clinical deterioration (worse dizziness, unable to stand, and developing chest pain), the standard of care required calling 911 immediately, and bringing him into an infirmary bed with an AED on standby. He further needed supplemental oxygen while awaiting EMS to arrive.

It was a deviation in the standard of care that Mr. Benally was placed in a cell, without any monitoring and without any treatment, including supplemental oxygen. He was left in that cell for 25 minutes unobserved until he was found dead on the floor of his cell. Had Nurse Fraser called 911 to come to Mr. Benally, they would have reached his side approximately 12 minutes after such a call. Hence, when Mr. Benally complained of worsening chest pain on, or about 17:32, had an ambulance been called shortly thereafter, they would have arrived as early as 17:44 (but potentially minutes later). However, they would have arrived well before he suffered a cardiopulmonary arrest.

After an inmate with known hypertension, complaints of dizziness, weakness, respiratory distress, and then chest pain, the standard of care

required treating that as a potential heart attack, and 911 needed to be called immediately. Instead of receiving the care that he required, Mr. Benally was left alone in a room for 25 minutes, without treatment, and was found dead on the floor. This is a gross deviation in the standard of care.

Mr. Fraser died from pulmonary emboli. He had extensive emboli in both lung fields, with extensive clots into multiple segmental blood vessels. Based on Mr. Benally having reported feeling ill since 4/14 (4 days before his death), within a reasonable degree of medical certainty, Mr. Benally started to throw pulmonary emboli on 4/14/22.

Additionally, Mr. Benally's pulmonary emboli were bilateral and extensive. This only occurs when there are a series of showers of pulmonary emboli. If they all happened at once, Mr. Benally would have experienced instantaneous death. Yet his clinical course was one of symptoms beginning on 4/14/22, worsening in the evening of 4/17/22, and then acutely worsening in the early evening of 4/18/22. This clinical course tracks with Mr. Benally's deterioration as he threw progressively more emboli into his lungs. Each episode of dizziness was, within a reasonable degree of medical certainty, representative of a new clot being thrown into his lungs.

Mr. Benally's falling heart rate, which cannot be explained by the false impression that he was calming down (his heart rate was never that slow while he was incarcerated), was reflective of his impending respiratory collapse. Had EMS arrived on 4/18/22, had a call delivered to them at approximately 17:32, he would have been placed on supplemental oxygen (and earlier intubation if necessary). He would have been given anticoagulation medications (standard of potential heart attacks, and potential pulmonary emboli). He would have had his oxygen saturation measured repeatedly, which would have strengthened the likelihood of his suffering from pulmonary emboli.

Because of the deviations in the standard of care, as discussed in this report, Gibson Benally died from an otherwise preventable cardiorespiratory arrest. Further Mr. Benally experienced conscious pain and suffering. Within a reasonable degree of medical certainty, before he died Mr. Benally experienced worsening shortness of breath, the sensation of suffocation, and the sensation of impending doom.

Had he been treated within the standard of care, he would have survived.
Upon EMS transferring him to a hospital Mr. Benally would have been
subject to treatment with thrombolytic therapy, and potentially an
embolectomy.

All opinions in this report have been rendered within a reasonable degree of
medical certainty.

Very truly yours,

Bruce D. Charash, M.D., F.A.C.C.

EXHIBIT G

## Bruce D. Charash, M.D., F.A.C.C.
## 205 East 63rd Street
## New York, NY 10065

October 23, 2025

Maria Makar, Esq.
*Loevy & Loevy*
311 N. Aberdeen
3rd Floor
Chicago, IL 60607

Re: **Gibson Benally, deceased**

Dear Ms. Makar,

Since my report of 8/8/25, I have reviewed the defense expert reports of Dr. Michael McMunn concerning Gibson Benally. None of the opinions that I rendered in my 8/8/25 report have changed after having reviewed Dr. McMunn's reports. In this report I shall provide some specific rebuttal opinions to statements within Dr. McMunn's report.

All opinions in this report have been, and shall be, rendered to a reasonable degree of medical certainty.

In his report concerning Nurse Fraser and Nurse Heath, Dr. McMunn stated that nurses did not suspect a pulmonary embolism. He further stated, on page 5 of that first report, "*It is not unreasonable nor a violation of the standard of care that Nurse Fraser and Nurse Heath did not recognize Mr. Benally's pulmonary embolism in a correctional setting.*" However, I never stated in my report, nor do I hold the opinion that these nurses needed to consider a pulmonary embolism.

My opinion has always been that these nurses failed to recognize or acknowledge that Mr. Benally was suffering from a potentially life-threatening illness. The standard of care required that Mr. Benally be placed on a cardiac monitor, provided supplemental oxygen, and continuously observed until EMS could reach him. The standard of care required them to

call EMS when Mr. Benally complained of chest pain, and certainly the moment they realized that he needed to go to the medical unit.

Dr. McMunn stated on page 3 of his report that "*Having personally observed fatal pulmonary embolism events, a normal oxygen saturation would tend to lead a nurse, or providers, away from a diagnosis of pulmonary embolism.*" He went on to say "*In addition, anxiety attacks are much more common in the confining nature of jails and prisons. Making it not only reasonable but expected that Nurse Fraser consider anxiety first.*"

It is never reasonable to consider an innocent explanation for a person's symptoms first. It does not matter that anxiety is a common complaint in jails or prisons. It is always critical to first exclude a life-threatening illness before drawing the conclusion that a patient is experiencing a panic attack. With Mr. Benally, the fact that he was finally transferred to the medical unit demonstrates that the nurses did not think this was a simple case of anxiety.

In health care it is never permissible to ignore potentially life-threatening symptoms just because you can think of a non-life-threatening reason for those same symptoms. With this approach many people will die from unnecessary neglect and through the failure to take appropriate diagnostic and therapeutic steps. Indeed, following this logic, if a person is suffering from a heart attack and they feel short of breath, they cannot be ignored just because anxiety is common, and anxiety is a possible reason.

As a medical provider, I first exclude life-threatening illnesses, and I expect the same from providers who are communicating with me and/or securing emergency care.

Additionally, Dr. McMunn discussed his experience with patients suffering from fatal pulmonary embolisms. He stated that a normal oxygen saturation would make a person veer away from a diagnosis of pulmonary embolism. As I stated earlier in this report, I do not find fault in the nurses not thinking about pulmonary embolism. Indeed, they should have first been concerned with an evolving heart attack, given the entirety of his man's deterioration.

As for the oxygen saturation being normal, the oxygen saturation must be measured and compared to the respiratory rate and effort. When a patient is hyperventilating, they will drive their oxygen saturation level up. There are

two critical details to consider with Mr. Benally's oxygen saturation levels. The first is that Mr. Benally was hyperventilating.

The medical notes document that he had been hyperventilating. More significantly, the Incident Report generated after his death discusses the investigator's review of the video surveillance tapes. Within their written report, an investigator stated "*17:30 hours. At this time, Gibson can be heard with labored breathing and making incoherent noises.*" Mr. Gibson was in a state of respiratory distress. The labored breathing he experienced, common to patients with significant pulmonary embolism, is caused by the increase in his respiratory rate and the increase in the intensity of each of his breaths.

In this backdrop, Mr. Benally had an oxygen saturation taken by Nurse Fraser at approximately 17:10 on 4/18/22. It was found to be 98%. After she completed her evaluation of Mr. Benally and left him, Nurse Fraser was called back 3 minutes later at 17:13 (I had made a typographic error, mistakenly writing the time as 15:13 on page 3 of my 8/8/25 report). The repeat oxygen saturation level was 92%.

This reflects a precipitous drop in Mr. Benally's oxygen saturation level from 98% down to 92% in a matter of minutes. This is a highly significant drop in his oxygen saturation over a short period of time. Further, he was hyperventilating. This meant that the 92% oxygen saturation level was already being pushed up by the greater gas exchange in his lungs.

Dr. McMunn further stated in his report that Mr. Benally's blood pressure of 142/106 was "*slightly abnormal.*" This is far from the truth. A diastolic blood pressure of 106 is highly significant. The definition of mild, moderate and severe blood pressure, based on the diastolic blood pressure is as follows:

|                        | diastolic       |
|------------------------|-----------------|
| Mild hypertension:     | 90-99  mm Hg    |
| Moderate hypertension: | 99-109 mm Hg    |
| Severe hypertension:   | >110   mm Hg    |

Mr. Benally's diastolic blood pressure of 106 is more than mild. In contrast, his blood pressure on 3/24/22 was measured to be 135/89. His diastolic pressure on 4/18/22 was 17 mm Hg higher than it was 25 days earlier, when he presented to the jail. This elevated blood pressure is a sign of distress.

Dr. McMunn claims that it is common to see blood pressures similar to the reading of 142/106 in people who are incarcerated. However, Dr. McMunn did not provide a basis for that opinion. There is no medically established difference in the range of blood pressure readings among people who are incarcerated versus those who are not. Living in a chronically stressful environment is not typically associated with a meaningful increase in a given person's day-to-day blood pressure readings. In contrast, people in any environment who are experiencing an acutely stressful event are more likely to experience a rise in their baseline blood pressure.

Certainly, some inmates may be found to have an elevated blood pressure, but the reading of 142/106 cannot be dismissed as "normal" for anyone regardless of whether they are inmates. Mr. Benally had been in the jail for 25 days, and his blood pressure on 4/18/22 was significantly higher than it was upon his arrival (135/89 on 3/24/22), further undermining Dr. McMunn's expressed opinion.

On page 4 of his report, Dr. McMunn stated "*It is not the standard of care in correctional settings to put inmates on cardiac monitors with non-acute symptoms.*" This is a reasonable statement, but it does not apply to Mr. Benally. Mr. Benally demonstrated evidence of suffering from a potentially life-threatening condition through four different observations.

1) **Mr. Benally's heart rate dropped precipitously** between 17:10 and 17:39. During this 29-minute time interval, he had his heart rate measured at 5 different occasions: 116, 100, 106 and then 62 and then 51. Patients in respiratory distress, when they are on the brink of a respiratory arrest, will demonstrate a significant slowing of their heart rate. The heart protects itself by slowing down, which means it requires less oxygen. This dramatic fall in his heart rate, by over 50 beats/min is consistent with his suffering from an acute respiratory illness.

2) **Mr. Benally's oxygen saturation dropped precipitously** from 98% to 92%. This occurred over a matter of minutes, demonstrating the acuity of his condition.

3) **Mr. Benally was heard to have labored breathing.** This is further evidence that he was suffering from more than simple

anxiety. When patients hyperventilate due to anxiety, their respiratory rate is increased, but it is not labored. Mr. Benally was suffering from labored breathing.

4) **Mr. Benally complained of chest pain**. Sergeant O'Brien called the Medical Department and informed Nurse Fraser that Mr. Benally was complaining of chest pain. This further emphasizes his acuity and would certainly raise a concern that he was suffering from a potential heart attack. Even though pulmonary embolism and aortic dissection would be in the differential diagnosis, heart attack would be the first concern once he complained of chest pain.

Looking at these four observations, it was clear that Gibson Benally was not suffering from an anxiety attack. These findings, individually (and taken together in aggregate) required him to be treated with a high index of concern that he was facing a life-threating illness.

When Mr. Benally finally complained about experiencing chest pain, the nurses were required by the standard of care to call 911. Once he was noted to have acute chest pain, and given that he was also having labored breathing, a dropping heart rate, and a dropping oxygen saturation level, the standard of care required that an ambulance been called (for a possible heart attack—the most likely diagnosis at that moment in time).

It further required that Mr. Benally be placed on a cardiac monitor (or as a minimum, placed near the AED), as well as be given supplemental oxygen and under constant observation. The failure to have done this was a deviation in the standard of care.

Had Mr. Benally been placed on oxygen, his cardiac arrest would have been significantly delayed. The most likely mechanism of his arrest was bradycardia leading to asystole. This is the mechanism of death for patients suffering from progressive respiratory failure. Mr. Benally had already demonstrated a highly concerning drop in his heart rate (from over 100/min down to 51/min), consistent with his impending respiratory failure. At this same time, he was heard to be experiencing labored breathing, and the new onset of chest pain.

Had Mr. Benally been treated with supplemental oxygen, and had 911 been called, and had Mr. Benally been under constant observation until the ambulance arrived, he would not have died on 4/18/22.

Dr. McMunn's effort to minimize the significance of Mr. Benally's findings is not consistent with the reasonable practice of medicine. In his report he ignored Mr. Benally's complaint of chest pain, ignored the dropping heart rate and dropping oxygen saturation, and he ignored Mr. Benally's labored breathing.

All opinions in this report have been rendered within a reasonable degree of medical certainty.

Very truly yours,

Bruce D. Charash, M.D., F.A.C.C.

EXHIBIT H

**Benally v. Coconino County, et al**                    **Bruce Charash MD**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Renalda Benally, as           )
Administrator of the Estate   )
of Gibson Benally, and on     )
her own behalf,               )
                              )
          Plaintiff,          )
                              ) No. 3:24-v-08049-MTL-MTM
      vs.                     )
                              )
Coconino County; et al.,      )
                              )
          Defendants.         )
_____)


DEPOSITION OF BRUCE CHARASH, M.D.

(Videoconference)


New York, New York
November 17, 2025
12:01 p.m. (EST)



TAKEN BY:  Wanda J. Curry, RMR
           CR No. 50366 (AZ)

**Benally v. Coconino County, et al**                          **Bruce Charash MD**

---

**Page 12**

1 a judge will exclude me by -- in law and one or two
2 times by substance.
3      Q.  Okay.  What percentage, roughly, of cases do
4 you handle for plaintiff's law firms?
5      A.  The best way I could break it down is that
6 approximately 85 percent of my reviews come from
7 plaintiff firms and about 15 percent of my testimony is
8 for plaintiff firms.
9      Q.  So would it be fair to say that 100 percent
10 of the cases you handle are for plaintiff's firms?
11     A.  Actually 15 percent of what I review are for
12 defense firms.  85 percent of what I review are for
13 plaintiff firms.
14     Q.  Okay.  I think you said 15 percent of the
15 reviews being plaintiff, so I misunderstood.
16     A.  Oh, I'm so sorry if I said that wrong.
17 Yeah, it's 85 percent of my review is
18 plaintiff and 15 percent of my review is defense.
19 Whereas for testimony, under five percent of both
20 depositions and trials are in defense-related cases.
21     Q.  Yeah, I'm sorry, you cut out again.  You said
22 85 percent?
23     A.  Okay.  Let me do it in reverse.
24          15 percent of my --
25     Q.  Okay.

---

**Page 13**

1      A.  -- reviews are for defense firms.  1-5, I
2 said.
3          But under that, five percent or less of my
4 testimony in both deposition and trial are for
5 defense.  So 15 percent of what I review is for
6 defense, but only five percent of the testimony is for
7 defense.
8      Q.  Okay.  So if I understand correctly,
9 95 percent of the time you testify in a court
10 proceeding, it is on behalf of a plaintiff?
11     A.  Yes.
12     Q.  Okay.  Have you ever worked as a nurse?
13     A.  No.
14     Q.  Okay.  I wanted to ask you a few questions
15 about pulmonary embolisms and get your experience with
16 that.
17          From what I understand, you've handled quite
18 a few cases involving pulmonary embolisms; is that
19 correct?
20     A.  Yes.
21     Q.  Would you agree with me that those are
22 difficult to diagnose?
23     A.  No.  I think that it depends on what level
24 you're asking for diagnosis.  I think that it's easy to
25 put in the differential and the testing is easy to do,

---

**Page 14**

1 but I still don't -- as I mentioned in my rebuttal
2 report, I'm not holding anyone to a standard to think
3 about a PE.
4          And I think that with reasonable certainty,
5 this man would have, if he'd went to a hospital, they
6 would have easily diagnosed him with a pulmonary
7 embolism.  You know, a hospital could do an echo,
8 they'd see right heart failure.  That would probably be
9 the first thing they'd do.  You can get a CAT scan.
10         It's easy to diagnose it, but there's no -- I
11 have no expectation that anybody in the prison should
12 even think of PE.  If anything, they probably should
13 haven been thinking of a heart attack.
14         But they should have recognized an emergency.
15 So whether a PE is easy to diagnose or hard to diagnose
16 in given situations, I'm not holding anyone there, a
17 nurse in a prison, to put PE anywhere on their
18 list.  It's just this man needs an emerg- -- an
19 ambulance right now.  That's the only thing.  I don't
20 care if they thought about PE.
21         It's like a straw man, you know, they -- the
22 report of your expert or whoever hired Dr. McMunn --
23 Dr. McMunn is -- created a false -- defended in a false
24 attack.  I never said the nurses should have diagnosed
25 a PE, not even close, and yet he told you about how

---

**Page 15**

1 hard it is to diagnose it.
2          It's not hard if a person's crashing in the
3 ER.  It's very easy to diagnose.
4      Q.  Okay.  So if I understand correctly, a PE is
5 easier to diagnose in certain situations, harder to
6 diagnose in other situations; correct?
7          MS. MAKAR:  Objection, form.
8          THE WITNESS:  No, that mischaracterizes what
9 I said.  I think that clinically, it should be in the
10 differential diagnosis by practitioners.
11         If you're talking about the standard for a
12 nurse, I don't think nurses would be expected to know
13 if a differential -- there -- there are three sources
14 of chest pain that can kill you very shortly if you
15 don't diagnose it immediately, three immediately
16 life-threatening sources of chest pain for people who
17 come to the emergency room or who are brought to an
18 emergency room.
19         And that is heart attack, and there are about
20 a million of them a year; the second is pulmonary
21 embolism, there are about 800,000 a year; and the third
22 is acute aortic dissection, and there are about 25,000
23 a year.  All three of them are life-threatening
24 diagnoses that need immediate intervention to save a
25 person's life.  So if you don't, if you're a health

---

6 (Pages 12 to 15)

Benally v. Coconino County, et al                                    Bruce Charash MD

---

**Page 52**

1  just had a name.  See, I'm having a hard day today.
2       MS. MAKAR:  Boyer.
3       THE WITNESS:  Boyer, thank you.
4       I did a case called Boyer.  It was a jail
5  case, a woman who died in jail.  And I was deposed in
6  that case, but -- I wrote reports, but there was no
7  trial.
8       Then I did a case with them a month ago,
9  around October 17th, with a deposition, and that was
10 the case called Rogers, and that was another
11 incarcerated person.
12      And now this case, Benally, is my third case
13 for the Loevy firm and I'm being deposed today.  So
14 three cases, and today's the third out of three
15 depositions.
16      Q.  BY MR. HALL:  Okay.  So you've given
17 depositions in all three of the cases that you've
18 handled with the Loevy firm?
19      A.  You could say it's three out of three.
20      Q.  Okay.  As I mentioned earlier, I also
21 represent Defendant James and I don't see any opinions
22 against her in your initial report.
23      Am I safe to assume that you didn't find
24 fault with any of her actions?
25      A.  Can you just remind me who she is, in case

---

**Page 53**

1  I'm just forgetting?  Who -- what was James' --
2  Ms. James' role?
3       Q.  Ms. James?
4       A.  Yes.
5       Q.  She was another nurse inside the correctional
6  health care.
7       A.  Okay.  That's what I thought, but I don't
8  remember seeing her.  I don't know to what degree she
9  interfaced that day.  I just can't remember what her
10 interface was.
11      I'm critical of the health care system.
12 Individually, yes, I have specific criticisms of
13 Nurse Fraser and Nurse Heath, but I don't remember --
14 but I didn't mention her in my report so I don't
15 remember what her role was.
16      Q.  Okay.  So is it -- it would be safe to say
17 you don't have any criticism of Defendant James?
18      A.  Unless she had a role in delaying getting an
19 ambulance, no.
20      Q.  Okay.  And as you sit here right now, you
21 don't even know what her involvement was?
22      A.  Yeah, I remember she was a nurse, but I don't
23 remember her -- what she was doing that day, if
24 she's -- you know, did she see him in the cell?  I
25 don't remember what her role was.

---

**Page 54**

1       If she had contact with him, though, that
2  day, then I would have, to the degree of her
3  involvement, a criticism of her care.
4       Q.  Do you know anything about what
5  Defendant James did in this case?
6       A.  No, I don't remember.
7       Q.  Okay.  And if it's not in your initial
8  report, I can assume that you didn't have any
9  criticisms of Defendant James?
10      MS. MAKAR:  Objection, mischaracterization,
11 asked and answered.
12      THE WITNESS:  Yeah, I can't remember, so...
13      Right now, I'm only saying to whatever degree
14 if she was physically involved in seeing this patient,
15 this man, in his cell when he came up, then I would be
16 critical of her not calling an ambulance.  But only to
17 the degree of her physical involvement.
18      Q.  BY MR. HALL:  And this is a similar question,
19 but it sounds to me like you don't know what her
20 physical involvement was?
21      A.  Correct.  At this point, I just don't
22 remember.
23      Q.  Okay.  And if anything had stood out to you
24 about Defendant James, you would have addressed that in
25 your report; correct?

---

**Page 55**

1       A.  Unless I didn't see her name appear in the
2  chart and -- or just didn't pick up on that.
3       I don't recall her role.  I -- you know,
4  obviously I'm quoting pages in objective records
5  mentioning Nurses Fraser and Heath, but I don't see her
6  name in the report.  So I don't recall.
7       Q.  Okay.  And you don't recall being asked to
8  render opinions about Defendant James?
9       A.  I was asked to render opinions about the
10 events of that day and where there was a standard of
11 care deviation and whether it contributed towards his
12 death.
13      The issues haven't changed, it's just where
14 individuals should be inserted in the series of events.
15 And it was very clear where Nurse Fraser and
16 Nurse Heath were in term of their involvement at given
17 stages.
18      So if Nurse James was involved, for example,
19 seeing him in the cell when he arrives up there, when
20 he first got -- he -- I know he went up to the cell and
21 was left there by, you know -- was it Sergeant O'Brien
22 that I think leaves him there?
23      But if she came and saw him in the cell, then
24 I would have a criticism of her, again.
25      MR. HALL:  Okay.  I don't have any other

---

**Benally v. Coconino County, et al**                          **Bruce Charash MD**

<table>
<tr><td>

**Page 56**

1  questions.
2      I'm sure that Tom probably has a few, so I'll
3  pass the baton to him.
4      THE WITNESS:  Thank you.  Of course.
5      MR. SLUTES:  Thank you.
6
7          EXAMINATION
8  BY MR. SLUTES:
9      Q.  Good afternoon, Dr. Charash.  Can you hear
10 me?
11     A.  Yes, I can, sir.
12        Although you're very hard to see.
13     Q.  I represent --
14     A.  I can't see your face.
15        I mean, that may not be the most important
16 thing, but it's hard for me to see.
17     Q.  Well, I can't --
18     A.  If you could adjust the camera --
19     Q.  Well, I'm trying, but it's dark.
20     A.  Yeah.
21     Q.  Okay.  Anyway, I represent Nurse Heath, who
22 you've mentioned a little bit today.
23     A.  Yes.
24     Q.  And a couple of nurses -- well, one of them
25 wasn't even there and the other one helped with the

</td><td>

**Page 58**

1      Q.  Okay.  Do you understand that Nurse Heath had
2  essentially two interactions with Mr. Benally, one was
3  on the early morning hours of the 18th or perhaps it
4  was the late night of the 17th when she took his
5  blood pressure?
6      A.  Correct.
7      Q.  Do you --
8      A.  And I --
9      Q.  -- recall that?
10     A.  Yeah, and I raised a criticism about that.
11        But in terms of causation, I really have no
12 major causation so I'm not going to bring that up in
13 court.  It's pointless.
14     Q.  Okay.  And that's where -- and that's all I
15 was getting to is that you -- you said that a
16 blood pressure of 142 over 106 might be evidence of a
17 hypertensive crisis, but happily that didn't happen so
18 that crisis never came about; correct, sir?
19     A.  Correct.
20     Q.  All right.  So I guess the primary thing
21 you're critical about is the following day, around
22 5:00 o'clock, 5:30, 6:00 o'clock in the evening, when
23 Mr. Benally was taken to the medical unit; am I correct
24 about that, sir?
25     A.  The events occurred at that period of time,

</td></tr>
<tr><td>

**Page 57**

1  code.
2      I gather you have no complaint about the way
3  the code was run, do you, Doctor?
4      A.  That's correct, I have no criticism of that
5  point.
6      Q.  All right.  So did you read Nurse Heath's
7  deposition?
8      Dayne Heath.
9      A.  Yeah, I know -- I know who you're talking
10 about.  I mean, I'd have to look at my report again.
11     I'm sorry, I just -- yeah, I did read her
12 deposition.  I thought I read it.
13     Q.  Did you make any notes concerning it, sir?
14     A.  No.
15     Q.  Did you underline anything that you think --
16 did you find anything significant in that?
17     A.  I reviewed it in July to early August, when I
18 wrote my report, or maybe even earlier, and I don't
19 recall what she testified to.
20     But I -- certainly my criticisms are
21 unchanged.
22     Q.  So without knowing what she did, you're
23 criti-- I think you're criticizing it?
24     A.  Well, the objective information in the chart
25 is more than enough.

</td><td>

**Page 59**

1  yes.
2      Q.  Okay.  And do you know exactly what role
3  Nurse Heath had in those events?
4      A.  Well, Nurse Heath, I believe, is the person
5  who responded to the final call when Nurse Fraser
6  returned to the medical area.  And according to her
7  testimony, from what I remember, Nurse Heath, I think,
8  was her supervisor and she took over in terms of
9  handling that third emergency phone call.
10     Q.  Well, Nurse Heath wasn't her supervisor.
11     A.  Okay.
12     Q.  I can't remember if it was Fraser or James,
13 but it was one of the two.
14     A.  Okay.
15     Q.  You don't have that straightened out in your
16 head too clearly?
17     A.  No.
18     Q.  Okay.
19     A.  I thought it was her, but I may be wrong.
20     Q.  That's okay.
21     Did you read Nurse Heath's testimony about
22 her observations of Mr. Benally as she wheeled him from
23 his cell to the medical unit?
24     A.  I don't recall what she said, but again, that
25 has to be -- she doesn't have a contemporaneous note so

</td></tr>
</table>

**17 (Pages 56 to 59)**

**Benally v. Coconino County, et al**                    **Bruce Charash MD**

---

Page 64

```
 1      Q.  Okay.  And they see you in the office you're
 2  sitting in right now?
 3      A.  Yes.  I have an examining room in another
 4  part of this apartment.  It's kind of -- I have a
 5  waiting room and an examining table.
 6          But I have done more telemedicine in the last
 7  two years than I had done ever.
 8          Well, with COVID, it started.  That's where
 9  all telemedicine really began for many of us.  And
10  when, you know, I had a major back problem and I had a
11  little bit of a lung problem, I worked from my office
12  via telemedicine.
13      Q.  Okay.  And you're a single sole practitioner?
14      A.  Yes.
15      Q.  Let's say in the last 10 years, have you had
16  occasions to teach nurses in an accredited nursing
17  school or college?
18      A.  No.  We're not affiliated with one at my
19  hospital.  I teach nurses at Lenox Hill Hospital.
20          And what I want to make clear, by the way, is
21  that the first 20 years of my career, I was hired by
22  hospitals full-time, Lenox Hill for 14 of those 20, and
23  I was chief of the intensive care unit for heart
24  disease and I trained nurses on a regular basis in
25  formal lectures and meetings with nurses.
```

Page 65

```
 1          Now I'm in private practice.  So when a
 2  patient of mine gets admitted, I not only teach the
 3  doctors in training but also the nurses about the
 4  medicine and about, you know, nursing responsibilities.
 5  But I don't -- I don't have an official nursing school
 6  credential.
 7      Q.  And the teaching of nurses is on a
 8  case-by-case basis, kind of almost like a residency or
 9  something; is that right?
10      A.  Well, it is now, although for the years --
11  the 20 years I was hired by hospitals, I gave formal
12  lectures to nurses.
13      Q.  Right.
14          So -- but you have not been, I guess, just in
15  the last -- well, at any time during your career, you
16  have not given, let's say, full time or most of your
17  time to teaching in an accredited nursing school; am I
18  correct?
19      A.  Yeah, we never had an affiliation with any
20  nursing school.  So I've never had a faculty
21  appointment at a nursing school.
22      MR. SLUTES:  All right.  Thank you, Doctor.
23  I have no other questions.
24      THE WITNESS:  Okay.
25      MS. MAKAR:  I don't have any questions.
```

Page 66

```
 1  Thank you.
 2      THE WITNESS:  I just want to point out that
 3  I'll be sending an invoice.  It's a minimum of two
 4  hours, as you may know from the fee schedules so there
 5  will be a two-hour invoice.
 6
 7          EXAMINATION (Further)
 8  BY MR. HALL:
 9      Q.  Doctor, I did have one follow-up on one of
10  the questions that Tom asked.
11      A.  Of course.
12      Q.  Within the last year, what percent of your
13  time is spent testifying as an expert versus actual
14  clinical practice?
15      A.  I -- and I don't want to sound nitpicky.
16          Are you talking about testifying, not
17  reviewing?
18      Q.  Any type of expert witness work.
19      A.  Yeah, it's about 15 percent of my time and
20  20 percent of my income.
21      Q.  So 15 percent of your time is spent on expert
22  witness matters?
23      A.  Yes.
24      Q.  And then --
25      A.  Although many of those hours are at night, on
```

Page 67

```
 1  my own time.
 2          But of my workweek --
 3      Q.  Yeah.
 4      A.  -- about 15 percent of the time is
 5  medical-legal.
 6      MR. HALL:  Okay.  Sounds good.
 7  That's all I had.  Thanks.
 8  Thank you, sir.
 9      (Off-the-record discussion.)
10      COURT REPORTER:  Did you need a copy of this?
11      MR. HALL:  I do.
12      COURT REPORTER:  Okay.
13      MR. HALL:  Definitely.
14      COURT REPORTER:  Ms. Makar?
15      MS. MAKAR:  Yes, thank you.
16      COURT REPORTER:  And Mr. Slutes?
17      MR. SLUTES:  Yeah, I'd like a copy.
18      COURT REPORTER:  Okay.  Any preference, PDF,
19  electronic, all good?
20      MR. HALL:  Electronic for me.
21      COURT REPORTER:  Okay.
22      MS. MAKAR:  We don't need a condensed version
23  or an index.
24      COURT REPORTER:  Okay.
25      MR. SLUTES:  And just a condensed for me,
```

**19 (Pages 64 to 67)**

EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Renalda Benally

v.

Coconino County, et al

Case No. 3:24-cv-08049-MTL-DMF

Preliminary Report of Dr. Michael McMunn, APRN, FNP-BC, CCHP-MH, CCHP-A.

1. I, Michael McMunn, DNP, APRN, FNP-BC, CCHP-MH, CCHP-A, am a licensed registered nurse and licensed family nurse practitioner in the State of Georgia. I am certified as an Advanced Certified Correctional Health Professional and a Certified Correctional Health Professional in Mental Health. The CCHP-A is the highest level of certification offered by the National Commission on Correctional Healthcare (NCCHC). I was in the first group of professionals to be certified as CCHP-MH (Mental Health) in 2013. I currently provide nursing and nurse practitioner services in 4 county jails and 1 correctional institute and have done so for the past 23 years. I am currently contracted by Southern Health Partners as a medical and nursing care provider, in correctional facilities. I actively practice primary care and mental health correctional medicine in jail settings. I devote over half of my professional time in the provision of correctional medicine and have done so over 20 years.

2. I am familiar with the standards of training and knowledge of individuals functioning in correctional healthcare regarding medical and mental health issues.

3. I have reviewed the following discovery:
   a.  Complaint
   b.  Ex. 1 – Incident Report
   c.  Ex. 2 – Incident Report
   d.  Ex. 3 – Coconino Medical Records
   e.  Ex. 4 – Summitt Medical Records
   f.  Ex. 5 – Property Snapshot Report
   g.  Ex. 6 MEF Printout
   h.  Ex. 7 Coconino Final Autopsy
   i.  Ex. 8 Medical Examiner's Final Summary
   j.  Ex. 9 Axis Forensic Toxicology
   k.  Ex. 10 - T Gen Lab Report
   l.  Ex. 11 ADHS Report
   m.  ADHS Lab Report
   n.  Heath Deposition
   o.  Charash Report
   p.  O'Brien Deposition

4. Opinion Statement

Relating to the healthcare provided to Mr. Benally while he was detained within the Coconino County Jail (CCJ), I provide the following opinions to a reasonable degree of medical probability. Based on my experience and review of these records, the care provided did meet the standard of care for nursing and mid-level practice. To a reasonable degree of medical probability, I believe that the nurses and healthcare providers referenced herein were not grossly negligent and did not deviate from the applicable standard of care. This opinion relates to AB Staffing employees; NP Fatima Lah, Nurse Dayne Heath and Nurse Tyler Tate.

5. Opinion regarding policy, protocols and health system design

A review of discovery reveals the policy, protocols and health system design as it relates

2

to AB Staffing, was within the standard of care.  There is no evidence of any of these three parties functioning beyond the scope of their practice and violating the standard of care.

6. NCCHC Applicable Standards Met:

a.      J-A-01 Access to Care – Transfer to Infirmary.  EMS activated.

b.      J-A-03  Medical Autonomy – Decisions made by qualified staff.

c.      J-C-01  Credentials – Staff functioning per legal capacity.

7. Nursing Specific Opinions- Nurse Tyler Tate and Nurse Dayna Heath

a. Responded appropriately to the objective symptoms observed.

b. Personally transported Mr. Benally to the medical unit.

c. All actions were appropriate for suspected clinical conditions.

d. Security staff on site, "I thought they were doing what they needed to do (O'Brien Deposition 15:8).  I agree with this statement and perspective.

All activities compliant with the standard of care.

8. Mid-Level Provider Specific Opinions- NP Fatima Lah -

a. Properly supervised the clinical practice of nurses.

b. Ordered the restart of Gabapentin for Mr. Benally to ease pain.

c. Orders were appropriate for known clinical conditions.

All activities compliant with standard of care.

3

1    9. My additional opinions include:

2

3    A. Based on these events and per the National Commission on Correctional Healthcare, the

4    care provided to Mr. Benally by the nursing and mid-level staff of AB Staffing did not

5    violate NCCHC standards and the standard of care.

6

7

8    10. Rebuttal of Dr. Bruce Charash

9    a. 142/106 is a common blood pressure in correctional settings.  Particularly if anxiety or

10    a panic attack is suspected.  It does not require urgent or emergent action.  It does require

11
      follow-up at chronic care if routine checks show blood pressure remaining slightly high. (p.3)
12
      b. It is not the standard of care in correctional settings to put inmates on cardiac monitors
13
14    with non-acute symptoms.  Many facilities are not equipped with monitors either. (p.4)

15    c. It is not reasonable nor a violation in the standard of care that the AB Staffing employees

16    did not recognize Mr. Benally's diagnosis in a correctional setting.  Even within acute care

17
      facilities, pulmonary embolism is not typically the first diagnosis considered. (p.7)
18
      d. Unfortunately, many of these flawed opinions may be the result of Dr. Charash lacking
19
20    experience providing direct care in correctional healthcare settings.

21

22    11. Trial testimony

23

24

25    I have testified once as an expert at panel hearing and once at trial:

26    *Laudermilk vs. CCS – Maine Superior Court - DOCKET NO. CV-17-25 (Panel hearing)*

27
      *Lewis v. Cain, et al.- Class Action Complaint - United States District Court - Middle District*
28

4

1    *of Louisiana – Case No: 3:15-cv-00318-BAJ-RLB (Trial)*

2

3    12. Deposition Testimony – I have testified via deposition 37 times as an expert witness,
4    21 times in the past 4 years:

5    *Willingham vs. Shelby County, et al. – United States District Court – Western District of*
     *Tennessee - Case No. 2:20-cv-2135 SHL-atc*
6

7     *Lewis v. Cain, et al.- Class Action Complaint - United States District Court - Middle District*
     *of Louisiana – Case No: 3:15-cv-00318-BAJ-RLB*

8
     *Gwen Moore, etc. v. Franklin County, Ohio, et al. - United States District Court Southern*
9    *District of Ohio, Eastern Division – Case No. 3:20-cv-305*

10
     *Rodrigues v. Wellpath LLC, et. al., in the Maricopa County Superior Court, CV 2020-006273*
11

12   *Milkiewicz v. Genesee County, et al., United States District Court – 2:20-cv-10017-GCS-APP,*
     *Eastern District of Michigan, Southern Division*
13

14   *DeLeon v. Corizon, et al. In the Superior Court of the State of Arizona – CV-2017-056467 In*
     *and for the County of Maricopa*

15   *Stewart vs. Boyd County Detention Center, et.al United States District Court – Eastern District*
16   *of Kentucky, Ashland Division Case No. 0:20-CV-00008-HRW*

17   *Harris v. PFHS, et al. - CV-2020-900170 - Circuit Court of Walker County – State of Alabama*

18   *Patrick Neal vs. Wexford Health Sources, Inc., et al. - United States District Court - Northern*
19   *District of Alabama -Northeastern Division - Case No.: 5:21-cv-00713-HNJ*

20   *Stanley Green v. Young Mi Dreaden, et al. - United States District Court – Case No. 5:20-cv-*
     *00195-MTT - Middle District of Georgia, Macon Division*
21

22   *McClain v. Ferguson, et al. – United States District Court – Southern District of Indiana –*
     *New Albany Division – Case No. – 4:21-cv-00165-SEB-DML*
23

24   *Kee v. Crossing Healthcare, et al. – United States District Court – Central District of Illinois*
     *– Urbana Division – Case No. – 2:20-cv-02203-SLD-JEH*

25   *Burgess v. USA, et al. – United States District Court – Middle District of North Carolina –*
26   *Case No. 1:21cv805 (MDNC)*

27   *Smothers v. Childers - United States District Court – Northern District of Alabama – Jasper*
     *Division - Civil Action No. 6:21-CV-01057-RDP*
28

5

*Sanford v. Dawson County – United States District Court – Northern District – Gainesville Division - Case No. 2:22-cv-00078-RW*

*Asuncion v. Wellpath – State Court of Cobb County – Case No. - 22-A-1841*
*White v. TurnKey - United States District Court – Northern District of Oklahoma - Case No. 22-CV-139-CVE-SH*

*Horton v. Centurion – United States District Court – Western District of Tennessee – Eastern Division – Case No: 1:23-cv-STA-jay*

*Schomer v. Medallus - United States District Court for the District of Nevada Case No. 2:23-cv-00390-ART-CSD*

*Ervin v. Turn Key – United States District Court for the Eastern District of Arkansas Central Division – Case No: 4:23-cv-185-KGB-PSH*

13. I have not published any research articles in the past 10 years. I have done no formal presentations.

I certify that these statements are true and correct to the best of my knowledge, to a reasonable degree of medical and nursing certainty. I reserve the right to modify my opinion as additional documents and evidence become available. Signed under the pains and penalties of perjury on this 10th day of September 2025.

Dr. Michael McMunn, DNP, APRN, FNP-BC, CCHP-MH, CCHP-A

**EXHIBITS**

Exhibit 1 – CV

Exhibit 2 -  Fee Schedule – Terms & Conditions

6

# Dr. Michael McMunn DNP CCHP-MH, CCHP- A
## Expert Witness – Correctional Healthcare NP



### Contact

5962 Zebulon Rd. #200
Macon GA 31210
770-712-2210
correctionalexpert@gmail.com

### Summary

Expert regarding Standard of Care determination in correctional healthcare settings for NP, PA, RN, LPN, CNA, MA and EMT function. Advanced Certification in Correctional Healthcare (CCHP-A). per the National Commission on Correctional Healthcare (NCCHC).

Experience in 50+ Georgia correctional facilities with 25 - 2500 inmates.  Knowledge base includes policy development and the current legal/business/political trends in correctional healthcare. Experience with Diagnostic Facilities, State Prisons, CI's, PDC's, Transitional Centers, YDC's, RYDC's and County Jails.

*Currently providing services in 4 county jails and 1 Correctional Institute (state inmates).*

### Education

**University of North Georgia**
*DNP Nursing – Graduation 2021*
Doctoral Project – Suicide Prevention
Training for Correctional Officers
Additional Coursework – Risk
Management and Reimbursement
Additional Research – Correctional
Officer Training Theories,
Epidemiology of Jail Suicides,
NCCHC Standards

**Medical College of Georgia**
*MN Nursing – Graduation 2000*

**Brenau University**
*BSN Nursing – Graduation 1997*

**Athens Technical College**
*ADN Nursing – Graduation 1996*

**Emmanuel College**
*AA Religion – Graduation 1987*

### NCCHC Certifications

*CCHP-A – Advanced - 2020*
*CCHP-MH – Mental Health - 2013*
*CCHP - 2007*
**Moderator**
**2019 NCCHC National Conference**
*Prison Standards Review*
**2020 NCCHC National Conference**
*Cancelled due to COVID-19*
**2021 NCCHC National Conference**
*Five sessions*
**2022 NCCHC National Conference**
*Six sessions*
**2023 NCCHC National Conference**
*Suicide Prevention Review*

**2024 NCCHC National Conference**
*Three Sessions*

### Experience - Licenses, Qualifications, Memberships and Certifications

| | |
|---|---|
| Correctional Healthcare Expert Witness | 2015 to Present |
| Nurse Practitioner (APRN) - Southern Health Partners | 2002 to Present |
| Nurse Practitioner (APRN) - Vista Healthcare Partners | 2002 to 2020 |
| Nurse Practitioner (APRN) - CareATC – Monroe | 2014 to 2019 |
| Project Manager - The Little Clinic | 2008 to 2011 |
| Clinic and Project Development - MinuteClinic | 2005 to 2008 |
| College Professor - Medical College of Georgia | 2002 to 2005 |
| Clinic Director – The Bridge Institute - YDC (Georgia DJJ | 2001 to 2002 |
| Agency and Contract Critical Care Work – Multiple Sites | 2000 to 2001 |
| Piedmont Athens Hospital – Pulmonary, Medical, ACLS | 1996 to 2000 |

ANCC board certified as Family Nurse Practitioner since 2000
Licensed in Georgia as a RN and APRN (FNP), Licensed in Alabama as an RN
Current DEA authorization, practice has never been restricted.
Content Reviewer – Journal of Correctional Health
Member – Georgia Nursing Congress, Correctional Healthcare – 2 Terms
2021 Approved Georgia POST Trainer – Suicide Prevention Training in County Jails

### Previous Expert Witness Testimony Jurisdictions

Alabama   Arizona   Arkansas   California   Colorado   Florida   Georgia   Illinois   Indiana   Kansas   Kentucky   Louisiana   Massachusetts   Maryland   Maine   Michigan   Missouri   Montana   New Jersey   New Mexico   New York   Nevada   North Carolina   North Dakota   Ohio   Oklahoma   Oregon   Pennsylvania   South Carolina   Tennessee   Texas   Vermont   Virginia   Washington   West Virginia



## Expert Witness – Fee Schedule

# Dr. MICHAEL MCMUNN, APRN, DNP-BC, CCHP-MH, CCHP-A

| For all activity from 8/1/25 – 12/31/25 | Activity | Rate |
|---|---|---|

| Activity | Rate |
|---|---|
| **eview Expert Services**<br>e activity, 30+ full days before any verbal or written report or document is due. | $400/Hour |
| **Rates for Case Review Expert Services** | |
| of any Discovery, 15-30 full days before any verbal or written report is due. | $600/Hour |
| of any Discovery, 1-14 full days before any verbal or written report is due. | $800/Hour |
| **Testifying for Deposition – No deposition date is confirmed until payment is received.**<br><br>All Fees must be paid in advance by requesting attorney, a minimum of 30+ days prior. Including any time requested over 4.0 hours.<br><br>If cancelled or rescheduled, 30 or more days prior, full refund of all funds paid (Appearance fee-travel time).<br>If cancelled or rescheduled, 15-29 days prior, 50% refund of all funds paid. (Appearance fee-travel time).<br>If cancelled or rescheduled, less than 15 days prior, no refund of funds paid (Appearance fee-travel time) and no rescheduling without new fee.<br><br>All estimated travel expenses must be paid by requesting attorney, 30+ days prior.<br>Half day rate is arrival time to departure time at location, 4 hours. Unless prepaid, the witness will cease testimony after 4.0 hours and a new deposition fee will be required. Continued questioning after 4 hours will not be billed. | $2,000 Flat Rate 0.0-4.0 hours Appearance Fee<br><br>$500.00/Hour PREPAID for each hour desired beyond 4.0 hours, up to 7.0 |
| **Testifying for Panel Hearings, Trials, Arbitrations, and Mediations**<br><br>Fee must be paid in advance by requesting attorney, a minimum of 30+ days prior, or appearance not guaranteed.<br><br>If cancelled or rescheduled, 30 days prior, full refund of all funds paid (Appearance fee-travel time).<br>If cancelled or rescheduled, 15-29 days prior, 50% refund of all funds paid. (Appearance fee-travel time).<br>If cancelled or rescheduled, less than 15 days prior, no refund of funds paid (appearance fee-travel time) and no rescheduling without new fee.<br><br>All estimated fees and travel expenses must be paid by requesting attorney, 30+ days prior.<br>Rate is arrival to departure time at location., 0.0-8.0 hours. Time per day greater than 8 hours is billed @ $500 hr | $5,000 per Day Flat Rate Appearance Fee 0.0-8.0 hours<br><br>$500/Hour thereafter |
| **Travel Time for Testifying**<br>Maximum 8 hours per day. Overnight travel will be billed at 8 hours per day. Time calculated door to door. | $250.00/Hour At Cost |
| **Billable Expenses**<br>Billable expenses for supplies, postage, services, etc. are billed at cost.<br>Meals while traveling - $100 per any portion of a day, flat rate. Prepaid. | $100 Daily for Meals |
| **er – Rate is based on time remaining when funds/documents arrive until verbal or written is due.** | |
| **60+ days until verbal or written report or document.**<br>is required before any services will be performed. This credit includes the first 10 hours of activity and is non-refundable. | $4,000 - includes first 10 hours of review. $400 per hour for all review time over 10 hours. |
| **31-59 days until verbal or written report or document.**<br>is required before any services will be performed. This credit includes the first 10 hours of activity and is non-refundable. | $6,000 - includes first 10 hours of review. $400 per hour for all review time over 10 hours. |
| **15-30 days until verbal or written report or document.**<br>is required before any services will be performed. This credit includes the first 10 hours of activity and is non-refundable. | $8,000 - includes first 10 hours of review. $600 per hour for all review time over 10 hours. |
| **1-14 days until verbal or written report or document.**<br>,000 is required before any services will be performed. This credit includes the first 10 hours of activity and is non-refundable. | $10,000 - includes first 10 hours of review. $800 per hour for all review time over 10 hours. |
| s will generally be submitted at the end of each month. Invoices must be paid within 15 days, to arrive within 30 days. Invoices ays past due may be assessed a 5% monthly fee charged on 1st of each month until paid in full. Invoices unpaid after 60+ days result in suspension of all case activity. Zero balance required for all verbal reports, documents, deposition appearances and opearances. If short deadline, inquire about estimate to complete. Submission of retainer constitutes absolute agreement with nedule terms and rates. Do not submit retainer unless terms are 100% agreeable. Dates for deposition are only reserved with ent, no exception. Do not use USPS for time critical payments. Avoid unscheduled phone calls, email and text are preferred.<br>**Link for rapid payment of retainers or invoices -** https://www.paypal.com/paypalme/correctionalexpert | **REQUIRED TERMS** |