**WO**

JL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Renalda Benally,

Plaintiff,

v.

Coconino County, et al.,

Defendants.

No.   CV-24-08049-PCT-MTL (MTM)

**ORDER**

Defendants AB Staffing Solutions LLC ("AB Staffing"), Registered Nurse (RN) Dayna Heath, Nurse Practitioner (NP) Fatimah Lah, and Licensed Practical Nurse (LPN) Tyler Tate ("AB Staffing Defendants") move for summary judgment on the merits of Plaintiff's Fourteenth Amendment medical care claim and state-law claims for medical malpractice, survival, wrongful death, and intentional infliction of emotional distress. (Doc. 148.)   Defendants Registered Nurses (RNs) Janeen Fraser and Leann James separately move for summary judgment on the merits of Plaintiff's Fourteenth Amendment medical care claim and on qualified immunity grounds.   (Doc. 150.)   Plaintiff filed a Response to the Motions.  (Doc. 157.)  Defendants filed Replies.  (Docs. 166, 167.)

The Court will grant the Motions for Summary Judgment.

## I.   Background

Plaintiff Renalda Benally, on her own behalf and on behalf of the estate of Gibson Benally, filed a Complaint asserting claims under § 1983 and related state-law claims regarding the death of her father, Gibson Benally, while he was in the custody of Navajo

and Coconino Counties.  In the operative First Amended Complaint (FAC), Plaintiff sued Navajo and Coconino Counties, numerous individuals who were employed at the County Jails while Benally was in custody, and private entities that contracted with the Jails to supply medical care providers.  (Doc. 65.)  The Court granted in part and denied in part Defendants' Motions to Dismiss and dismissed Navajo County, Navajo County Jail District, Coconino County, Coconino County Jail District, and several individual Defendants without prejudice.  (Doc. 100.)  The Magistrate Judge denied Plaintiff's Motion for Leave to File Second Amended Complaint.  (Doc. 129.)  The parties then stipulated to the dismissal of certain other Defendants.  (Doc. 137.)

The remaining claims are a § 1983 medical care claim against Defendants Heath, Lah, Tate, James, and Fraser (Count Two); a medical malpractice claim against Defendants Heath, Lah, Tate, James, and Fraser (Count Three); a survival claim on behalf of the Estate against all Defendants (Count Four); a wrongful death claim against all Defendants (Count Five); and a claim for intentional infliction of emotional distress against Defendants Heath, Lah, Tate, James, and Fraser (Count Six).  (Doc. 65 at 12-19.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

### III.    Facts[*]

Defendant AB Staffing is a temporary staffing company that recruits qualified medical personnel to government healthcare clients.  (AB Staffing Defendants' Statement of Facts (ABDSOF), Doc. 149 ¶ 1.)  AB Staffing contracted with the Coconino County Jail to provide medical personnel, including Defendants Lah, Tate, and Heath, to work at the Coconino County Jail.  (*Id.* ¶ 2; Doc. 149 at 9-15.)  Defendants Fraser and James were employed at the Coconino County Jail.  (Defs.' Fraser and James Statement of Facts (FJSOF), Doc. 151 ¶ 6; James Decl., Doc. 151-1 at 36 ¶ 5.)

On March 24, 2022, Gibson Benally ("Benally") was admitted to the Coconino County Jail.  (ABDSOF ¶ 3.)  The next day, Defendant James conducted an initial medical screening.  (Doc. 149 at 21.)  Defendant James noted a history of hypertension.  (*Id.*)  Benally's blood pressure that day was documented as 166/117, and his pulse was 77.  (*Id.*)

---

[*] The AB Staffing Defendants and Defendants Fraser and James filed separate Statements of Facts in support of their Motions for Summary Judgment.  (Docs. 149, 151.)  Plaintiff filed separate Responses to each Statement of Facts.  (Docs. 155, 159.)  Plaintiff also separately filed a Statement of Additional Facts in support of her Response to the Motions for Summary Judgment.  (Doc. 158.)

Defendant James entered a note stating: "check BP daily x 3 days; if any BP readings are elevated per our standing directives (> 140/90), generate a task to continue BP checks 2 x per week x 2 weeks and enter a task for medical provider to review BP at the end of that 2 week period." (*Id.* at 25.)

Benally's blood pressure and pulse were checked once each day on March 26, 27, and 28, 2022, while he was seated. (*Id.* at 28.) On March 26, Benally's blood pressure was recorded as 150/98, and his pulse was 79; on March 27, his blood pressure was 129/93, and his pulse was 72; and on March 28, his blood pressure was 135/89, and his pulse was 78. (*Id.*) On March 26, 2022, medical staff received a verbal order to administer Lisinopril 30 mg, which Defendant James administered. (*Id.* at 27.)

At 7:00 p.m. on April 17, 2022, Defendant Heath saw Benally for medical complaints. (ABDSOF ¶ 7.) Just before 12:30 a.m. on April 18, Defendant Heath entered a Medical Note stating, "Called to I/M bunk, reports feeling very weak and dizzy. Blood glucose 166, BP 142/106[,] HR 100. No s/s of distress, no diaphoresis [sweating], no vomiting, or blurred vision. Encouraged I/M to rest on L side and to notify medical staff for any status change. I/M verbalized understanding." (Doc. 149 at 27.)

According to a work schedule, on April 18, 2022, Defendant Heath was scheduled to work a night shift, and Defendant Fraser was scheduled to work from 5:00 a.m. to 5:00 p.m. (Doc. 158-4.) Defendant James was scheduled to work from 7:30 a.m. to 5:30 p.m., and Defendant Tate was also scheduled to work, but her shift is not noted. (*Id.*)

At 4:55 p.m., on April 18, 2022, Benally was seen on surveillance standing up, then "[a] short time later, [lying] back down on his bunk" (ABDSOF ¶ 10; Pl.'s Controverting Statement of Facts (PCSOF), Doc. 155 ¶ 10; Doc. 149 at 44.) The surveillance video shows that one minute later, an inmate went to Benally's bunk then pushed the pod emergency call button and advised that he had an emergency with another inmate. (ABDSOF ¶¶ 11-12; Doc. 149 at 44.) Sergeant O'Brien entered the dorm and asked an inmate what was going on, and the inmate advised that Benally was having the same problems he had last night and that he was blacking out. (Doc. 149 at 44.) Sergeant O'Brien notified nursing

staff and left the dorm. (*Id.*)

At 5:03 p.m., Defendant Fraser arrived at the dorm with another detention officer and examined Benally. (ABDSOF ¶ 15; Doc. 149 at 44.) A Medical Note Fraser entered at 5:53 p.m. on April 18, 2022, states: "Called to F-Pod by [Sergeant] O'Br[ie]n at 1650 since I/M c/o SOB. I/M was found lying on his bed upon my arrival. He reported that he started feeling poorly on Thursday (April 14). He stated that he felt dizzy. . . . BP was 119/77, P 116, O2 sats 98%. I/M was instructed to sit up on the edge of the bed. BP 115/77, P 100. He was then instructed to stand with a BP of 114/70, P 121." (Doc. 149 at 26.) Defendant Fraser noted, "I/M reported only drinking four glasses of water/day. He was reassured that his vital signs were normal. He walked to the table to eat his dinner." (*Id.*) At 5:10 p.m., Defendant Fraser and Sergeant O'Brien left the dorm. (*Id.* at 44.)

At 5:11 p.m., an inmate ran to the door and pushed the emergency button. (ABDSOF ¶ 20; Doc. 149 at 44.) Less than 30 seconds later, a detention officer ran into the dorm to Benally. (Doc. 149 at 44.) Sergeant O'Brien reported to Defendant Fraser that Benally was feeling dizzy. (ABDSOF ¶ 21.) At 5:13 p.m., Defendant Fraser and Sergeant O'Brien entered the dorm. (ABDSOF ¶ 22; Doc. 149 at 44.) Defendant Fraser and Sergeant O'Brien asked other inmates if Benally had fallen, and one inmate told them that Benally could not stand up. (Doc. 149 at 44.) Defendant Fraser reevaluated Benally at the dorm table. (*Id.*) During the evaluation, Benally placed his head on the table multiple times, and his breathing could be heard on the dorm audio recording. (*Id.*) Defendant Fraser's Medical Note states, "As I was walking back to the Medical Department, [Sergeant] O'Br[ie]n was calling for me again. He stated that the I/M was reporting being dizzy. I/M was found sitting at the table. . . . I/M was found to be hyperventilating. His BP was 148/65, P 62, O2 sats 92%. He had to be repeatedly encouraged to slow down his breathing. Once he was more calm, his BP was 107/79, P 51." (*Id.* at 26.)

At 5:20 p.m., detention officers assisted Benally back to his bunk, and Defendant Fraser and the officers left the dorm. (ABDSOF ¶¶ 27-28.) At 5:25 p.m., Benally was heard breathing loudly at his bunk. (Doc. 149 at 44.) At 5:32 p.m., an inmate pushed the

emergency button and advised that Benally was saying that his chest pains were getting worse. (*Id.*) Sergeant O'Brien called the medical department. (ABDSOF ¶ 31.) According to Defendant Fraser's Medical Note, "[w]ithin minutes of leaving the pod," Sergeant O'Brien "called the Medical Department to report that [Benally] was c/o chest pain," and Benally was transported to the Medical Department in a wheelchair. (Doc. 149 at 26.)

At 5:36 p.m., Defendant Heath, whose shift had not started, entered the dorm with a wheelchair and removed Benally from the dorm. (ABDSOF ¶ 32.) Three minutes later, Defendant Heath and Benally arrived at a medical cell. (*Id.* ¶ 34; Doc. 149 at 43.) Benally could be heard on surveillance footage with labored breathing and making incoherent noises. (Doc. 149 at 43.) At 5:41 p.m., Defendant Heath and Sergeant O'Brien left the medical cell. (*Id.*) A short time later, Defendant Heath walked past the medical cell to put away the wheelchair but did not check on Benally. (Pl.'s Statement of Additional Facts (PSOAF), Doc. 158 at 8 ¶ 64; Doc. 149 at 43.) At 5:51 p.m., Benally was "making a moaning type of noise," which could be heard on the surveillance footage of the medical cell. (PSOAF ¶ 65; Doc. 149 at 43.) No one in the medical unit went to check on Benally. (PSOAF ¶ 66.)

At 5:53 p.m., Defendant Fraser entered her medical note regarding Benally's complaints. At 6:06 p.m., Sergeant Wagoner arrived in the medical unit to conduct a security check, observed Benally, exited the cell, and notified nursing staff of a "Code 3." (ABDSOF ¶¶ 40-41; Doc. 149 at 43.) At 6:08 p.m., Defendants Tate, Heath, and Fraser arrived at the cell with lifesaving medical equipment. (ABDSOF ¶ 42.) Defendant James was working in the nursing station. (FJSOF ¶ 24.) One minute later, the nurses advised officers to call 911. (ABDSOF ¶ 43.) Detention officers and the nursing staff performed lifesaving measures until EMTs from the Flagstaff Fire Department arrived at approximately 6:21 p.m. and took over care of Benally. (*Id.* ¶ 44.) Benally was pronounced dead at 6:39 p.m. (*Id.* ¶ 46.)

. . . .

A report from the Flagstaff Fire Department states,

> UPON ARRIVAL ON SCENE, JAIL STAFF ADVISED THAT THEY WERE PERFORMING CPR ON THE PT. THE PT WAS FOUND APNEIC AND PULSELESS LAYING ON THE GROUND IN THE HALLWAY. JAIL STAFF WAS PERFORMING CPR WITH AN AED APPLIED. JAIL STAFF STATES THAT THE PT WAS LAST SEEN NORMAL ABOUT 20 MINUTES BEFORE THEY FOUND HIM UNRESPONISVE AND PULSELESS IN HIS CELL. JAIL STAFF STARTED IMMEDIATE CPR AND APPLIED THE AED. CPR APPEARED TO BE ADEQUATE. STAFF REPORTS THAT THE PT HAD BEEN COMPLAINING OF CHEST PAIN THROUGHOUT THE DAY AND THAT THEY HAD PERFORMED A MEDICAL CHECK ON HIM, SHOWING THAT ALL OF HIS VITALS WERE NORMAL.

(Doc. 158-9 at 2.)

The medical examiner determined Benally's cause of death was "Pulmonary thromboembolism" due to "Deep venous thrombosis, left lower leg" with other significant conditions of "Chronic alcohol abuse; hypertension; left leg ulcer with abscess formation." (Doc. 149 at 46.) His manner of death was documented as "Natural." (*Id.*)

During a subsequent investigation by the Coconino County Sheriff's Department, Detective Tristan G. Meyer reviewed Inmate Log Reports for Benally, which documented security checks performed each day that he was at the facility. (*Id.* at 41.) Detective Meyer noted the log documented 61 checks on April 14; 48 checks on April 15; 46 checks on April 16; 53 checks on April 17; and "approximately" 52 checks on April 18, 2022. (*Id.*)

Deputy Mindy Feldman interviewed Defendant Fraser. (*Id.* at 36.) According to Deputy Feldman's report, Defendant Fraser "advised [Benally] had been complaining of medical issues since last Thursday 4/14/2022. [Defendant] Fraser stated she saw [Benally] around 1700 on 04/18/2022 for complaints of being dizzy. [Defendant] Fraser advised [Benally's] vitals were all at the correct levels." (*Id.*) Deputy Feldman noted that Defendant Fraser "mentioned [Benally's] pulse was slightly elevated, but she believed it was due to him hyperventilating" and that Defendant Fraser "mentioned [Benally] stated he was not drinking enough water." (*Id.* at 36-37.)

Detective Tristan Meyer interviewed the inmate who had been on the bunk next to Benally, who told Meyer that Benally's "chest had been hurting him and that nursing staff had come down to evaluate him a couple of times." (*Id.* at 43.) The inmate told Detective Meyer that the inmate believed Benally was having a heart attack or a stroke. (*Id.*) The inmate also told Detective Meyer that Benally's "medical incident" had occurred around dinner time and that he had been complaining of blacking out. (*Id.*) Detective Meyer asked the inmate what symptoms Benally had complained about during the incident, and the inmate told Meyer that Benally had been having trouble breathing, and his chest hurt. (*Id.*) The inmate also told Detective Meyer that in the afternoon the day before, Benally had fallen while he was coming out of the shower. (*Id.*)

At some point on April 18, 2022, the same inmate called Plaintiff. (Doc. 158-3 at 2.) According to a transcript of the call, Plaintiff asked, "So he was complaining about just the chest pain?" The inmate responded, "Yeah. For a couple days, three days, that's it . . . . And then yesterday he started falling over." (*Id.*) The inmate said, "oh, then he got worse today. So -- and his chest (inaudible)." (*Id.*) Plaintiff asked, "And they didn't do anything?" The inmate said, "No. They -- didn't want to -- really doing much. They just kept checking his blood pressure and that was it. Then they leave. Then he kept -- it kept happening and they come in and check his blood pressure. And we're like – we're trying to tell them. I don't think it's his blood pressure. You guys need to take him to medical or check him or something." (*Id.*)

## IV.   Plaintiff's Non-Opposition

Plaintiff does not oppose the entry of summary judgment in favor of Defendants AB Staffing, Lah, James, and Tate as to the Fourteenth Amendment claim or as to Defendants Heath, Lah, and Tate as to the state-law claims in Count Three through Six. Accordingly, the Court will grant the Motions for Summary Judgment as to those claims.

## V.   Defendants Fraser and James's Motion

The only remaining claim the Court must address with respect to Defendants Fraser and James's Motion is the § 1983 Fourteenth Amendment medical care claim against

Defendant Fraser. To prevail in a § 1983 claim, a plaintiff must show that (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)). In addition, a plaintiff must demonstrate that he suffered a specific injury because of the conduct of a particular defendant, and he must show an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

### A.    Fourteenth Amendment Medical Care Standard

"Individuals in state custody have a constitutional right to adequate medical treatment." *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021). For pretrial detainees, the right to adequate medical care arises under the Due Process Clause of the Fourteenth Amendment. *Id.* The Ninth Circuit Court of Appeals has held that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). To prevail on a medical care claim under this standard, a pretrial detainee must show

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro*, 833 F.3d at 1071 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). A plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

**B.    Parties' Arguments**

Defendants argue that Plaintiff cannot meet the deliberate indifference standard because there is no evidence that Defendant Fraser was "'actually' aware that Benally was experiencing a life-threatening condition." (Doc. 150 at 7.) Defendants point out that Defendant Fraser "denies knowing, or even suspecting," that Benally was suffering from a life-threatening condition. (*Id.*) Defendants also contend there is no evidence that Defendant Fraser made an "intentional" decision regarding Benally's conditions of confinement or that her conduct was objectively unreasonable under the circumstances. (*Id.* at 8.)

In response, Plaintiff contends she has presented sufficient evidence to defeat summary judgment as to each of the *Gordon* factors. (Doc. 157 at 16.) Plaintiff contends that Defendant Fraser was called upon three times to help Benally on April 18, 2022; met with him on two occasions, once for three minutes and then for eight minutes; checked his vital signs but did not act upon the "concerning changes" in his vital signs; "intentionally chose" to tell him to "calm down and drink water"; and then left his bedside. (*Id.*) Plaintiff asserts that Defendant Fraser later "ignored" Benally's complaints of chest pain when she "should have immediately called 911." (*Id.*) Plaintiff argues that when Benally died, he had multiple emboli in both lungs, meaning that several blood clots had formed, traveled

to his lungs, and completely blocked multiple vessels in both lungs. (*Id.* at 19.) Plaintiff contends this indicates that Benally's clots began on April 14, when he started reporting symptoms. (*Id.*) Plaintiff asserts that once Benally complained of chest pain, Defendant Fraser was "required by the standard of care to call 911," and her decision not to was objectively unreasonable. (*Id.* at 20.) Plaintiff argues there is evidence in the record that Defendant Fraser "must have known" that Benally was "at serious risk of harm" and that Fraser violated Benally's Fourteenth Amendment rights by "failing to provide appropriate and necessary medical care." (*Id.* at 26-27.)

## C.     Discussion

### 1.     Intentional Decision

The evidence demonstrates that Defendant Fraser evaluated Benally at his bunk at 5:03 p.m.; took his vital signs while he was lying down, sitting on the edge of his bunk, and standing up; left the dorm at 5:10 p.m. and returned three minutes later after Sergeant O'Brien called the medical department; reevaluated Benally at the dorm table; took his vital signs; repeatedly encouraged him to slow down his breathing; took his vital signs again; and then left the dorm at 5:20 p.m. The record supports that Defendant Fraser made intentional decisions regarding Benally's medical care.

### 2.     Substantial Risk of Serious Harm

"In the inadequate-medical-care context, the substantial risk of serious harm prong [is] met if there [is] a serious medical need, such that a failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (internal quotation marks and citation omitted). This includes the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* Conditions causing death are serious medical needs. *Id.* ("Russell's aortic dissection was indeed a 'serious' medical need, as it resulted in his death.").

The medical examiner determined Benally's cause of death was "Pulmonary

thromboembolism" due to "Deep venous thrombosis, left lower leg" with other significant conditions of "Chronic alcohol abuse; hypertension; left leg ulcer with abscess formation." The record supports that Benally's condition put him at substantial risk of serious harm.

### 3.    Objectively Unreasonable Conduct

Plaintiff points to several decisions or failures by Defendant Fraser that Plaintiff argues were objectively unreasonable.  First, when Defendant Fraser evaluated Plaintiff at 5:03 p.m., she failed to ask relevant questions and document Benally's respiratory rate and effort.  (PASOF ¶ 88.)  Second, when Defendant Fraser reevaluated Plaintiff at the dorm table, she failed to recognize concerning changes in Benally's heart rate and instead told him to "calm down" and drink water.  (*Id.* ¶ 89.)  Third, Defendant Fraser ignored Benally's complaints of chest pain.  (*Id.* ¶¶ 91-92.)  Fourth, Defendant Fraser generally failed to recognize the seriousness of Benally's symptoms and failed to summon emergency assistance for him.

A defendant's actions are objectively unreasonable if the defendant "disregarded an excessive risk to the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021) (internal quotation marks and brackets omitted). "To show deliberate indifference, a plaintiff need not 'prove complete failure to treat' because 'access to medical staff is meaningless unless that staff is competent and can render competent care.'" *Russell*, 31 F.4th at 740 (quoting *Ortiz v. Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989)).  And "[a] defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Id.* at 739. Moreover, "although medical negligence is not by itself unconstitutional, the care rendered can be so inadequate to the circumstances known to the medical staff as to amount to deliberate indifference." *Id.* at 740. An "inadvertent failure to provide medical care," however, will not sustain a claim, and an argument that more should have been done to diagnose or treat a condition generally reflects a difference of opinion regarding the proper

course of treatment and not deliberate indifference.  *See Estelle v. Gamble*, 429 U.S. 97, 105, 107 (1976).  Furthermore, misdiagnosis alone is not a basis for a claim of deliberate medical indifference.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012).

With respect to Defendant Fraser's first evaluation of Benally, Benally reported that he started feeling "poorly" four days earlier and that he felt "dizzy."  Benally's vital signs were normal.  There is no evidence that Defendant Fraser knew anything else about Benally's symptoms at that time.  Plaintiff suggests that Defendant Fraser "knew about [] Benally's underlying medical conditions and knew he had been complaining of pain and medical issues since April 14," but that is misleading.  (PSOAF ¶ 16.)  There is no evidence that Benally visited the medical department or otherwise reported any symptoms to medical staff before April 18; rather, it was not until April 18 that Benally told Defendant Fraser that he began feeling "poorly" on April 14.

Plaintiff also repeatedly asserts that Defendant Fraser merely instructed Benally to drink more water, but that also misstates the record.  Defendant Fraser noted that Benally reported drinking only four glasses of water per day.  A reasonable inference for that note is that Fraser thought Benally's symptoms might have been caused by dehydration.  But there is no evidence in the record that Defendant Fraser dismissed Benally's symptoms by telling him to "drink more water."  For this purported instruction, Plaintiff cites paragraph 89 of her Statement of Additional Facts, which in turn cites Dr. Charash's report.  In his report, Dr. Charash states, "Nurse Fraser instructed Mr. Benally to drink more water, and she left him at 17:10."  (Doc. 149 at 66.)  Plaintiff has produced no evidence Defendant Fraser gave that instruction.  Accordingly, his opinion that Defendant Fraser's "advice to drink more water . . . was not in accordance with the standard of care" is not based on the evidence.

The evidence demonstrates that Defendant Fraser reasonably attempted to ascertain the cause of Benally's symptoms.  *See Sandoval*, 985 F.3d at 680.  The evidence does not support that any reasonable nurse in Defendant Fraser's position would have understood, based on Benally's normal vital signs and his general, non-severe symptoms of feeling

"poorly" and "dizzy" that there was a need for emergency medical attention when she first evaluated Benally. *See id.* (concluding that where inmate was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated, every reasonable nurse would have understood that making "essentially no effort to determine" the cause of inmate's symptoms, failing to attempt to treat the symptoms, leaving the inmate for six hours, and failing to pass any information to the nurses who relieved him was a constitutional violation).

Next, when Defendant Fraser reevaluated Benally at the dorm table, his blood pressure was elevated at 148/65, his pulse was 62, and O2 saturation was 92%. After Defendant Fraser encouraged Benally to slow down his breathing, and he was "more calm," his blood pressure 107/79, and his pulse was 51. Defendant Fraser did not note an O2 saturation. Plaintiff contends that between Defendant Fraser's first and second evaluations, Benally's heart rate dropped precipitously from a high reading of 121 to 51, as did his O2 saturation, from 98% to 92%, his dizziness worsened, and he could not stand, all of which should have signaled to Defendant Fraser that Benally's life could be at risk and required her to immediately call 911. (PSOAF ¶ 91.)

In their Reply, Defendants contend that "Plaintiff is arguing that nurses must *immediately* diagnose life-threatening conditions based solely on" a patient experiencing fluctuations in vital signs, reports of being "dizzy" and "not feeling well," and shortness of breath/hyperventilation, which the patient was "able to calm down on his own." (Doc. 167 at 10.) Defendants assert that Plaintiff cannot show "reckless disregard" because it is undisputed that Defendant Fraser "was still in the process of following up on Benally's care" until Defendant Heath took over for her. (*Id.*) Defendants argue that a "a correctional healthcare nurse cannot 'recklessly disregard' a serious medical need when the nurse is still in the process of trying to diagnose a detainee's evolving symptoms." (*Id.*) Defendants further contend there is no evidence that Defendant Fraser "chose a course of treatment 'in conscious disregard' of a life-threatening condition." (*Id.* at 11.)

The "conscious disregard" standard that Defendants cite no longer applied to pretrial

detainees in April 2022, when Benally died. *See Gordon v. County of Orange*, 6 F.4th 961 (9th Cir. 2021) ("At the time of the incident here [2013], it was well settled that prison officials violate the Constitution when they choose a course of treatment that is 'medically unacceptable under all of the circumstances,'" and in cases involving "choices between alternative courses of treatment," a plaintiff must show that officials chose a course of treatment "in conscious disregard of an excessive risk to plaintiff's health"). The relevant standard is objective; a defendant's lack of awareness that a patient was at substantial risk of suffering serious harm is irrelevant. *See Russell*, 31 F.4th at 739 ("A defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference."); *Sandoval*, 985 F.3d at 669 (concluding that district court erred by applying the subjective deliberate indifference standard to the plaintiff's Fourteenth Amendment claim).

Nevertheless, viewed under the objective standard, the evidence does not support that Defendant Fraser recklessly disregarded a substantial risk of serious harm to Benally. Benally's symptoms—decreased heart rate and oxygen saturation, worsening dizziness, and inability to stand—were not symptoms that any reasonable nurse in Defendant Fraser's position would have recognized that his condition required emergency treatment.

With respect to Benally's complaints of chest pain, Plaintiff asserts that when Sergeant O'Brien called the medical unit to the pod at 5:32 p.m., he "told [Defendants] Fraser and Heath about [] Benally's report of worsening chest pain (meaning it was not a new symptom and was getting worse." (PSOAF ¶ 46.) This misstates the record. As Defendants argue in their Reply, there is no evidence that anyone told Defendant Fraser that Benally has chest pain until sometime after Defendant Heath assumed responsibility for Benally's care at approximately 5:36 p.m. (Doc. 167 at 3.) There is no evidence in the record that Defendant Fraser knew Benally had complained of chest pain when she treated him at 5:03 p.m. or at 5:13 p.m. At her deposition, Defendant Fraser testified, "We received a call from Sergeant O'Brien. I don't remember the exact time. It was later in the shift,

maybe around 5:00 that he was requesting an assessment on Mr. Benally. So I went to the pod and provided that assessment." (Fraser Dep., Doc. 158-1 at 3.) Defendant Fraser testified that Benally was complaining about being dizzy, so she assessed his blood pressure. (*Id.*) She testified that Benally was lying on his bunk when she arrived in pod, so she assessed his blood pressure while he was lying down, then had him sit on the edge of his bunk and assessed it again, then assessed it while he was standing up "in an attempt to see if he was experiencing hypo static -- or . . . orthostatic hypotension, which can cause dizziness." (*Id.*) Defendant Fraser testified that she also assessed Benally's oxygen level, and his readings were "normal," but he "appeared to be anxious." (*Id.*)

In her Declaration, Defendant Fraser avers that Benally "never once complained to [her] about chest pain during either of [her] encounters with him." (Fraser Decl., Doc. 151-1 at 24 ¶ 22.) Defendant Fraser declares that she did not "interact" with Benally after 5:21 p.m., but while she was reporting on him, "someone" called the nursing station. (*Id.* ¶¶ 19-20.) The evidence Plaintiff cites supports Defendants' position that Defendant Fraser had no knowledge of Benally's complaints of chest pain until Sergeant O'Brien called the medical department after Defendant Fraser saw Benally for the second time.

Furthermore, Sergeant O'Brien testified at his deposition that he could not recall which nurse he spoke to when he called the medical department at 5:00 p.m. (O'Brien Dep., Doc. 158-7 at 2.) Sergeant O'Brien testified that while he was assisting with passing out dinner trays, he responded to a possible medical emergency and found out that Benally "was having shortness of breath." (*Id.*) Sergeant O'Brien testified that he called for nursing staff, and about five minutes later, Defendant Fraser responded with Officer Michaud. (*Id.*) Sergeant O'Brien testified that Defendant Fraser completed her assessment and left, and a few minutes later, O'Brien "was notified" that Benally was "still under distress." (*Id.*) Sergeant O'Brien testified that he "called Fraser back." (*Id.*) He testified that approximately 15 minutes after Defendant Fraser left after conducting her second assessment, he was "notified [Benally] was having another – or experiencing – still experiencing distress." (*Id.*) Sergeant O'Brien testified that he called again for nursing

staff to respond.  (*Id.*)  He testified that Defendant Heath responded with a wheelchair, and they moved Benally to medical.  (*Id.*)

Finally, Plaintiff cites a portion of a Detective Meyer's report, which describes the surveillance footage of Benally's cell.  The report states, "At approximately 1732 hours, an inmate walks from [Benally's] bunk to the door, pushes the emergency button and advises that [Benally] is saying that his chest pains are getting worse." (Doc. 151-at 63.) The report is not evidence that Defendant Fraser knew Benally complained of worsening chest pain. In short, the available evidence does not support an inference that Defendant Fraser received the report from Sergeant O'Brien that Benally reported chest pain.

The evidence does not support a conclusion that Defendant Fraser's failure to call 911 at any point was objectively unreasonable.  Considering the facts known to Defendant Fraser at the time, the symptoms Benally reported were neither specific nor severe enough that any reasonable nurse in her position would have recognized that his condition required emergency treatment.  *See Gardner v. Las Vegas Metro. Police Dep't*, 831 F. App'x 365, 366 (9th Cir. 2020) (mem.) (no genuine issue of material fact as to whether a serious medical need was "so apparent as to render the consequences of the defendants' conduct 'obvious'" where the decedent "may have shown symptoms of illness before his hospitalization," but the record did not show that those symptoms were evidence of the cancer from which he suffered).  Plaintiff's argument that Defendant Fraser should have immediately called 911 presupposes that Fraser knew Benally had reported worsening chest pain, which is unsupported by the record, and that Fraser knew or should have known that Benally was suffering from a condition that required emergency treatment.  On this record, there is no genuine dispute of material fact regarding whether Defendant Fraser's conduct was objectively unreasonable.

The Court will grant Defendants' Motion for Summary Judgment as to the § 1983 claim against Defendant Fraser.

### D.      Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary

Judgment as to Defendants Fraser and James.

**VI.    Defendants AB Staffing and Heath**

The remaining claims against the AB Staffing Defendants are the Fourteenth Amendment claim against Defendant Heath, the medical malpractice claim against Heath, the wrongful death claim against AB Staffing and Heath, the survival claim against AB Staffing and Heath, and the intentional infliction of emotional distress claim against Heath.

**A.    Section 1983 Medical Care Claim**

**1.    Parties' Arguments**

Defendants argue that although Plaintiff is critical of Defendant Heath for her care and treatment of Benally on the night of April 17, 2022 and the night of April 18, 2022, "this criticism amounts to nothing more than a difference of medical opinion." (Doc. 148 at 9.)  Defendants also contend that when Defendant Heath arrived at the jail for her shift on April 18, 2022, and escorted Benally to the medical cell, he had already been evaluated "multiple times," and his vitals were "assessed to be normal." (*Id.*)  Defendants point out that Benally was able to have a conversation with Defendant Heath on the way to the observation cell and could stand up from the wheelchair upon arrival. (*Id.*)  Defendants argue that Defendant Heath, under the circumstances, believed that Benally was experiencing an anxiety attack; observed that Plaintiff was not diaphoretic, was able to talk, and was able to stand up in the medical cell; and knew that Benally had recently had his vitals checked and re-checked and the vitals were within normal limits. (*Id.* at 11.)

In her Response, Plaintiff asserts that once Benally complained about chest pain, Defendant Heath was required by the standard of care to call 911, and her decision not to was objectively unreasonable. (Doc. 157 at 20.)  Plaintiff also contends that failing to intervene to stop Defendant Fraser's constitutional violation is sufficient to Defendant Heath's liability. (*Id.* at 20-21.)

**2.    Discussion**

**a.    Intentional Decision**

The evidence demonstrates that Defendant Heath evaluated Benally in the evening

of April 17, 2022; took his vital signs; and encouraged him to rest and to notify medical staff for any status change.  The record supports the fact that Defendant Heath made intentional decisions regarding Benally's medical care.

### b.    Substantial Risk of Serious Harm

As discussed, the record supports that Benally had serious medical needs that put him at substantial risk of serious harm.

### c.    Objectively Unreasonable Conduct

The next question is whether Defendant Heath's decisions were "objectively unreasonable."  Plaintiff identifies the following conduct by Defendant Heath that Plaintiff asserts was objectively unreasonable: First, Defendant Heath evaluated Benally on April 17, and although he complained of shortness of breath, dizziness, and fainting after he showered, and his heart rate and blood pressure were elevated, Defendant Heath "did nothing."  (PSOAF ¶¶ 17-20.)  Second, after Defendant Heath transported Benally to the medical cell, Heath left Benally in the cell and never checked on him.

Plaintiff generally conflates Defendants Heath and Fraser's decisions regarding Benally, but the evidence demonstrates that Defendant Heath first saw Benally shortly in the evening of April 17, when he reported feeling very weak and dizzy.  Benally's blood pressure was 142/106, but he exhibited no signs of distress and no sweating, vomiting, or blurred vision.  The evidence does not support that any reasonable nurse in Defendant Fraser's position would have understood, based on Benally's normal vital signs; his general, non-severe symptoms of feeling very weak and dizzy; and the absence of signs of distress and more serious symptoms; that there was a need for emergency medical attention when she evaluated Benally.

At her deposition, Defendant Heath testified that when she arrived for her night shift on April 18, 2022, the nurses were "busy charting," so Heath went over to her computer. (Heath Dep., Doc. 158-2 at 2.)  Defendant Heath testified, "[T]hen, we got a call from Sergeant O'Brien saying that the patient was having like shortness of breath and so I -- the girl -- they were charting.  So I'm like, 'I'll go get him.'" (*Id.* at 3.)  Defendant Heath

testified that she went down with a wheelchair. (*Id.*) She testified, "I just -- I'm like, 'Hey, let's go up to the medical because it's closer and we can have closer observation.'" (*Id.*) Defendant Heath testified she and Sergeant O'Brien took Benally to a medical cell, and that Benally was talking to them. (*Id.*) She testified that she did not "notice [Benally] being diaphoretic or anything like that, but that was basically what it was. He was having some shortness of breath. But up to that point I had no idea what had happened because I hadn't received a report yet. . . . Like what interventions had been taking place." (*Id.*) Defendant Heath testified that Benally was "able to stand" and said he was "short of breath and he just seemed like he was having some pain at that time." (*Id.*) Defendant Heath testified that her understanding of the jail's policy regarding escalating care for serious symptoms was, "you would bring them to -- the infirmary or like you would call it, like we would bring them to medical and then depending on what the -- what his symptoms were as far as like -- there was different protocols for like chest pain. There was different protocols for shortness of breath." (*Id.*) Defendant Heath testified that when she brought Benally to the medical unit, she "came back into medical and [she] let the nurse know [she] ha[d] [the] patient up here." (*Id.*)

The evidence in the record does not support an inference that Defendant Heath knew Benally reported having chest pain or worsening chest pain; rather, the evidence demonstrates only that at 5:32 p.m., an inmate advised that Benally was saying that his chest pains were getting worse, and Sergeant O'Brien informed somebody in the medical department that Benally was having chest pain. There is no evidence that Defendant Heath received the report that Benally complained of chest pain, or that Sergeant O'Brien informed Heath that Benally had complained of chest pain.

Defendant Heath did not interact with Benally again until 5:36 p.m., when she took Benally in a wheelchair to the medical unit. Benally could be heard on surveillance footage with labored breathing and making incoherent noises; it is unclear from the record where Defendant Heath was in relation to Benally's cell, but there is no evidence that she saw Benally on surveillance or was otherwise aware of his labored breathing or incoherent

noises.  At 5:41 p.m., Defendant Heath and Sergeant O'Brien left the medical cell.

The evidence establishes that when Defendant Heath left Benally in the medical unit, her only personal observations of Benally's condition were that he was "short of breath" and "seemed like he was having some pain at that time."  Again, Plaintiff's argument that Defendant Heath should have immediately called 911 is premised on an assumption that Fraser knew Benally had reported worsening chest pain, which is unsupported by the record, and that Heath knew or should have known that Benally was suffering from a condition that required emergency treatment.  The evidence does not support that any reasonable nurse in Defendant Heath's position would have recognized that Benally's condition required emergency treatment.  There is no genuine dispute of material fact upon which a reasonable jury could find that Defendant Heath's conduct was objectively unreasonable.  Accordingly, Plaintiff's Fourteenth Amendment claim against Defendant Fraser fails.

The Court will grant Defendants' Motion for Summary Judgment as to the § 1983 claim against Defendant Fraser.

### B. Medical Malpractice

Under Arizona law, to prove medical malpractice, a plaintiff must prove injury that resulted from the failure of a health care provider to follow the accepted standard of care because "[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances" and "such failure was a proximate cause of the injury." Ariz. Rev. Stat. § 12-563; *see also Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009) (en banc) ("In medical malpractice actions, as in all negligence actions, the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages.") (citation omitted).  The "yardstick by which a physician's compliance with [his] duty is measured is commonly referred to as the 'standard of care.'" *Smethers v. Campion*, 108 P.3d 946, 949 (Ariz. Ct. App. 2005).

"[A]s medicine in general and, more specifically, advanced medical techniques

involve extensive professional training, in most instances the applicable standard of care, and the probable consequences of failing to meet that standard, are beyond ordinary lay knowledge." *Sampson v. Surgery Center of Peoria, LLC*, 491 P.3d 1115, 1118 (Ariz. 2021). Accordingly, "[t]he standard of care must be established by expert medical testimony '[u]nless malpractice is grossly apparent.'" *Id.* at 1119 (quoting *Rasor v. Nw. Hosp., LLC*, 403 P.3d 572, 575 (Ariz. 2017); *see also Seisinger*, 203 P.3d at 492 (absent expert testimony, plaintiff could not meet the burden of production "except when it was a matter of common knowledge . . . that the injury would not ordinarily have occurred if due care had been exercised").

"A plaintiff must generally prove the elements of his medical malpractice claim by a preponderance of the evidence." *Henke v. Hospital Dev. of W. Phoenix, Inc.*, 578 P.3d 47, 52 (Ariz. 2025) (citation omitted). "The preponderance of the evidence standard requires that the fact-finder determine whether a fact sought to be proved is more probable than not." *Kent K. v. Bobby M.*, 110 P.3d 1013, 1018 (Ariz. 2005). Thus, "a plaintiff in a medical malpractice action must generally prove that the failure to follow the accepted standard of care more probably than not caused the injury." *Henke*, 578 P.3d at 52.

Section 12-2604(A) prescribes expert witness qualifications for testimony in a medical malpractice action. A person giving expert testimony on the appropriate standard of practice or care must be licensed as a health professional and, during the year immediately preceding the occurrence giving rise to the lawsuit, must have devoted a majority of the person's professional time to "[t]he active clinical practice of the same health profession as the defendant." Ariz. Rev. Stat. § 12-2604(A)(2). The statute also provides that if the defendant is a general practitioner, the expert witness must have devoted a majority of the witness's professional time in the year preceding the occurrence giving rise to the lawsuit to active clinical practice as a general practitioner. *Id*. § 12-2604(A)(3). When the testimony is offered against a health care professional employed by the defendant health care institution, subsection A applies "as if the health professional were the party or defendant against whom or on whose behalf the testimony is offered." *Id*. § 12-2604(B).

Under § 12-2604(A), the qualifications of a standard of care witness are dependent on what "health profession" the defendant practices and whether the defendant is a "specialist" or "general practitioner." *Windhurst v. Arizona Dep't of Corr.*, 536 P.3d 764, 770 (Ariz. 2023). Defendant Heath is a registered nurse. Nursing qualifies as a "health profession" for purposes of § 12-2604(A)(2). *Cornerstone Hosp. of Se. Ariz., L.L.C. v. Marner ex rel. County of Pima*, 290 P.3d 460, 472 (Ariz. Ct. App. 2012). "The goal of § 12–2604 is to 'ensur[e] that experts have qualifications and experience comparable to the [medical professional] whose conduct is at issue.'" *Id.* (quoting *Baker v. Univ. Physicians Healthcare*, 296 P.3d 42, 50 (Ariz. 2013)). Accordingly, any expert testifying against a nurse must be a nurse, or someone who spends the "majority" of his time instructing nurses. *See St. George v. Plimpton*, 384 P.3d 1243, 1245, 1247 (Ariz. Ct. App. 2016).

Defendants argue that Plaintiff did not disclose a qualified expert with respect to the standard of care applicable to Defendant Heath because Heath is a nurse, and Plaintiff's expert, Dr. Charash, is a physician with a board certification in internal medicine and cardiology. (Doc. 148 at 14.) Plaintiff contends Dr. Charash is a qualified expert under the expert witness statute because he is a "general practitioner," and the statute does not require that a defendant and an expert witness have the same medical license. (Doc. 157 at 32.)

In his report, Dr. Charash states that he has been in private practice since 2006. (Doc. 149 at 65.) Dr. Charash states that he has practiced internal medicine for 41 years and cardiology for 38 years, and he is the primary care provider for half of the patients in his practice. (*Id.*) Dr. Charash states that over the course of his career, he has had "daily experience working with nurses both within the hospital as well as within the offices of other health care providers," and he is "familiar with what, and when, a health care provider expects a nurse to contact them out of a potential concern for a patient's wellbeing." (*Id.*)

Dr. Charash is not a nurse and did not spend the majority of his time during the year before the events giving rise to this lawsuit instructing nurses. Dr. Charash is therefore not qualified to testify regarding the standard of care that applies to Defendant Heath. *See*

- 23 -

*Cornerstone*, 290 P.3d at 472; *Trujillo v. United States*, CV-16-08205-PCT-DLR, 2018 WL 1729345, at *3 (D. Ariz. Apr. 10, 2018) (noting that a physician's assistant belongs to a different health profession than a physician and concluding that a physician is not qualified to testify as to the appropriate standard of care for a PA). Consequently, Plaintiff has not disclosed a qualified expert witness with respect to the applicable standard of care.

Unless negligence is grossly apparent, expert testimony is required as to the applicable standard of care. The parties agree that expert testimony is required here. "When a defendant moves for summary judgment based on a plaintiff's failure to produce an expert meeting the § 12-2604 qualifications, the plaintiff may file a Rule 56(d) affidavit and corresponding motion for relief." *Rasor*, 403 P.3d at 577. "[I]n the absence of proceeding under Rule 56(d), a plaintiff's failure to provide a qualified standard-of-care expert would justify summary judgment for the defense." *Id.* at 578.

Here, Defendants moved for summary judgment based on Plaintiff's failure to produce a qualified expert witness. Plaintiff did not file a Rule 56(d) affidavit and corresponding motion for relief. Plaintiff therefore cannot substitute another expert witness. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's medical malpractice claim.

### C.    Wrongful Death

In Arizona, "[w]hen death of a person is caused by wrongful act, neglect or default, . . . the person who . . . would have been liable if death had not ensued shall be liable to an action for damages." Ariz. Rev. Stat. § 12-611. A prerequisite for recovery under § 12-611 is the ability of the decedent to have maintained an action if death had not ensued. *Summerfield v. Superior Ct. in and for Maricopa County*, 698 P.2d 712, 720 (Ariz. 1985). A wrongful death claim is not a continuation of the decedent's claim; instead, it compensates statutory beneficiaries for their injuries. *Barragan v. Super. Ct. of Pima County*, 470 P.2d 722, 724 (Ariz. 1970).

"Generally, a plaintiff may bring a wrongful death claim as an 'independent claim for damages sustained by the decedent's survivors.'" *McKee v. State*, 388 P.3d 14, 17-18

(Ariz. Ct. App. 2016) (quoting *Diaz v. Magma Copper Co.*, 950 P.2d 1165 (Ariz. Ct. App. 1997)). "However, the right to bring a wrongful death action exists only if the decedent would have been able to maintain an action for damages if death had not ensued." *Id.* at 18. The wrongful statute does not provide an independent theory of liability; a wrongful death claim therefore must rest on an underlying tort theory.

The Court has already determined that Plaintiff's medical malpractice claim fails because she failed to submit qualified expert witness testimony. Accordingly, Plaintiff's wrongful death claim also fails. The Court will therefore grant Defendants' Motion for Summary Judgment as to Plaintiff's wrongful death claim in Count Five.

### D.   Survival

Plaintiff brings Count Four on behalf of the Estate of Benally, as personal representative of the Estate. (FAC ¶ 101.) Plaintiff alleges that because of Defendants' wrongful actions, Benally suffered severe injuries, including physical pain, emotional distress, and ultimately death. (*Id.* ¶ 100.)

Arizona's survival statute provides that "[e]very cause of action," with certain exceptions that do not apply here, "shall survive the death of the person entitled thereto or liable therefor . . . provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed." Ariz. Rev. Stat. § 14-3110. A survival statute claim provides for recovery of damages sustained by the decedent from the time of injury until his death and passes from the decedent to the personal representative, becoming an asset of the estate. *See Barragan*, 470 P.2d at 724.

Because Plaintiff cannot prove her medical malpractice claim, the Estate has no claim under the survival statute. The Court will therefore grant Defendants' Motion for Summary Judgment as to the survival claim in Count Four.

### E.   Intentional Infliction of Emotional Distress

In Count Six, Plaintiff asserts a claim for intentional infliction of emotional distress on her own behalf and on behalf of the Estate. An intentional infliction of emotional distress claim requires proof of (1) extreme and outrageous conduct, (2) intend to cause

emotional harm or reckless disregard of a near certainty of causing such harm, and (3) severe emotional distress. *Citizen Publ'g Co. v. Miller,* 115 P.3d 107, 110 (Ariz. 2005) (citations omitted). An act will qualify as intentional only if "the actor desired to cause the consequences-and not merely the act itself-or if he was certain or substantially certain that the consequences would result from the act." *Mein ex rel. Mein v. Cook*, 193 P.3d 790, 794 (Ariz. Ct. App. 2008).

An action is "extreme and outrageous" if it "falls at the very extreme edge of the spectrum of possible conduct" and goes "beyond all possible bounds of decency, [so as] to be regarded as atrocious[ ] and utterly intolerable in a civilized community." *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980) (citations omitted); *see also* Restatement (Second) of Torts § 46(1) cmt. d (1965) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"). "Conduct may be otherwise tortious, and even illegal, and not be outrageous." *Pankratz v. Willis*, P.2d 1182, 1192 (Ariz. Ct. App. 1987). The Court determines whether acts are sufficiently extreme and outrageous for relief. *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554 (Ariz. Ct. App. 1995). The issue goes to the jury only when reasonable minds could differ in determining whether the conduct was sufficiently extreme or outrageous. *Id.*

"Cases where there has been a sufficient finding of outrageousness contain stark and repulsive facts that strike at very personal matters, such as willful ignorance of rampant sexual harassment, a doctor who hid the reason for an infant's death from its mother, or conspiracy to hide a child from a father." *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1012 (D. Ariz. 2013) (internal citations omitted). On this record, no reasonable jury could find that Defendant Heath's conduct was "extreme" and "outrageous." *See*, *e.g.*, *Watts*, 619 P.2d at 1035 (holding nursing home's neglect and failure to timely inform wife of husband's terminal illness was "unjustifiable," but did not rise to level of "extreme and outrageous" conduct).

Plaintiff does not assert that Defendant Heath intentionally killed Benally. Thus, to

prevail on her claim, Plaintiff must show that Defendant Heath was aware of and recklessly disregarded a near certainty that Benally would die, with accompanying severe emotional distress. The evidence does not support such a conclusion. On this record, there is no genuine issue for trial as to Plaintiff's intentional infliction of emotional distress claim.

The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Six.

**F.     Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Defendants AB Staffing, Heath, Lah, and Tate.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 148, 150).

(2)     The Motions for Summary Judgment (Docs. 148, 150) are **granted**, and this action is terminated **with prejudice**. The Clerk of Court must enter judgment accordingly.

Dated this 17th day of July, 2026.

Michael T. Liburdi
United States District Judge